Amy J. Oliver (8785)
olivera@sec.gov
David D. Whipple (17347)
wadleyd@sec.gov
Laurie E. Abbott (14577)
abbottla@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel.  801-524-5796

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>   PLAINTIFF,<br>v.<br><br>DANIEL F. PUTNAM, an individual; JEAN PAUL RAMIREZ RICO, an individual; ANGEL A. RODRIGUEZ, an individual; MMT DISTRIBUTION, LLC, a limited liability company; R & D Global, LLC, a limited liability company,<br><br>   DEFENDANTS; and<br><br>RICHARD T. PUTNAM, an individual,<br><br>   RELIEF DEFENDANT. | Case No.:<br><br>**COMPLAINT**<br><br>Judge:<br><br>Case: 2:20−cv−00301<br>Assigned To : Barlow, David<br>Assign. Date : 5/7/2020<br>Description: Securities & Exchange Commission v. Putnam et al |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY OF THE ACTION

1. From at least July 2017 through at least November 2019, Daniel F. Putnam ("Putnam"), Jean Paul Ramirez Rico ("Ramirez"), Angel A. Rodriguez ("Rodriguez"), MMT Distribution, LLC, and R & D Global, LLC (collectively, "Defendants") have participated in the fraudulent offering of digital asset-related securities.

2. Through their fraudulent conduct, Defendants have raised at least $12 million from over two thousand investors across the United States and from various countries throughout the world.

3. Daniel Putnam recruited investors by making material misrepresentations regarding the nature of the investment opportunities and how investment funds would be used.

4. Relief Defendant Richard T. Putnam, a member of R & D Global, LLC, received a portion of theses investor funds.

5. By engaging in this conduct, as further described herein, Defendants violated and, unless restrained and enjoined by this Court, may continue to violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78o(a)(1)], and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

6. Furthermore, by engaging in this conduct, as further described herein, Defendants Putnam, Ramirez, and MMT Distribution, LLC violated, and unless restrained and enjoined by this Court, may continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)].

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and (g)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d) and (e)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as this Court may deem just and appropriate.

8. Defendants were involved in the offer and sale of so-called "cryptocurrency mining packages" and "cryptocurrency trading packages," which are each a "security" as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

9. Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

10. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

11. Venue in this District is proper because Defendants are found, inhabit, and/or transacted business in the District of Utah and because one or more acts or transactions constituting the violations occurred in the District of Utah.

## DEFENDANTS

12. **Daniel F. Putnam**, age 46, resides in Layton, Utah. Putnam has operated in the multilevel marketing industry for several years. Putnam is a member of MMT Distribution, LLC and R & D Global, LLC.

13.     **Jean Paul Ramirez Rico**, age 37, resides in Medellín, Columbia, and is a Columbian citizen. Ramirez purports to have experience and licenses in the securities industry and partnered with Putnam to conduct digital asset trading activities.

14.     **Angel A. Rodriguez**, age 43, resides in Provo, Utah. Rodriguez introduced Ramirez to Putnam and serves as an interpreter and intermediary between Putnam and Ramirez.

15.     **MMT Distributions, LLC (d/b/a Modern Money Team, Eyeline Trading, and WealthBoss)**, is a Utah limited liability company headquartered in Orem, Utah, and controlled by Putnam.

16.     **R & D Global, LLC (d/b/a Modern Money Team, Bitzolkin, Bzlogin)**, is a Utah limited liability company headquartered in Layton, Utah and controlled by Putnam and Putnam's father, Richard T. Putnam. R & D Global received funds from investors in Modern Money Team.

## RELIEF DEFENDANT

17.     **Richard T. Putnam**, age 76, resides in St. George, Utah. Richard Putnam is Daniel Putnam's father and is a member of R & D Global, LLC.

## FACTS

### The Digital Asset[1] Multilevel Marketing Companies

18.     Beginning in at least July 2017 and continuing until at least November 2019, Putnam has operated three multilevel marketing businesses ("MLMs")—Modern Money Team,

---

[1] The term "digital asset" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology. Digital assets may also be referred to in the market by labels such as "virtual assets," "digital tokens," "digital coins," "digital currencies," and "cryptocurrencies." Many digital assets are traded on platforms that often are called "digital asset trading platforms," "cryptoasset trading platforms," "cryptocurrency exchanges" or the like.

Eyeline Trading, and WealthBoss (the "Putnam MLMs")—that have offered investors opportunities to profit from two digital asset-related investment opportunities.

### *The Mining Operation Investment*

19. First, Putnam started Modern Money Team and began offering investments in the "crowd-funding [of] a powerful cryptocurrency mining operation."

20. Putnam, through Modern Money Team, touted that investors could "purchase mining machines, run them in [Modern Money Team's facilities], and earn money on the profits each month."

21. According to the Modern Money Team website, investors could purchase "a share in the hashing power of the mining operation" for "as little as $50" on a two-year contract or could purchase a "complete rig with a lifetime contract" for $2,000.

22. Investors were told they could expect to earn profits from the successful mining of digital assets by the mining operation.

23. Investors who sought to purchase actual mining machines were told that their machines would be stored and operated remotely at sites selected by Putnam and that Putnam or those he hired would control all of the mining activities. Therefore, other than making the initial purchase, investors had no responsibility for managing the mining activities that were to generate profits for the investors.

24. Putnam allowed mining operation investors to pay him in fiat currency or with digital assets. Some investors therefore wired or deposited funds into the accounts of R & D Global, MMT Distribution, LLC, into Putnam's personal bank accounts, or paid Putnam directly with cash.

25. In one instance, a single investor delivered to Putnam $100,000 in cash to invest in the mining operations.

26. Putnam raised approximately $3.25 million through the sale of mining machines and participation in the mining operation to nearly two hundred investors.

27. Among the mining operation investors is D.B., who invested over $600,000, purportedly in exchange for nearly 500 mining machines and the profits that would be generated by the mining operations, which were to be stored remotely and operated by or under the control of Putnam.

28. D.B.'s machines appeared to be operating for several months, during which time D.B. received weekly payouts that were displayed on his Modern Money Team back office site, a website interface where investors could monitor their purported profits.

29. D.B. generally reinvested his profits to purchase more machines.

30. In or around November 2018, D.B. stopped receiving payouts, and Putnam told him that, due to the drop in price of digital assets, mining was no longer profitable.

31. D.B. began requesting that he take physical possession of the mining machines he believed he had purchased, but, over the course of several months, Putnam gave excuses for why D.B.'s machines could not be delivered to him.

32. Eventually, in February 2020, Putnam told D.B. that he could pick up his machines in Salt Lake City, Utah.

33. Upon information and belief, D.B. has still not obtained physical possession of any mining machines from Defendants.

*The Digital Asset Trading Investment*

34. After the mining operation investment program was no longer profitable, Putnam, through Modern Money Team, began offering investors the option of purchasing so-called "cryptocurrency trading packages."

35. The trading packages were the result of a business relationship that Putnam developed with Ramirez, who Putnam came to know through Rodriguez, a long-time colleague in the MLM industry.

36. Ramirez pitched himself to Putnam and Rodriguez as a digital asset trader with licensing he obtained while working for Goldman Sachs and TD Ameritrade.

37. Putnam and Ramirez agreed to a business arrangement pursuant to which Putnam and Rodriguez would recruit investors through the Putnam MLMs, would send investor funds to Ramirez, and Ramirez would use those funds purportedly to engage in digital asset arbitrage and trading activities.

38. Beginning with Modern Money Team, and then later with Eyeline Trading and WealthBoss,[2] Putnam began offering trading packages to investors.

39. To promote the investment opportunity, Putnam and Rodriguez developed websites for the MLMs

40. The trading packages offered by each of the Putnam MLMs have taken on slightly different forms, but they ultimately involve the same basic investment opportunity.

41. Specifically, investors could purchase packages ranging in price from $20 to $500 per package and in duration from one to two years. Half of the invested funds would be used to

---

[2] Putnam began operating Eyeline Trading and offering trading packages through that MLM in or around July 2018. In or around October 2018, the British Columbia Securities Commission placed Eyeline Trading on its "Investment Caution" list. Around that time, Eyeline Trading ceased operating. By January 2019, Eyeline Trading had been rebranded as WealthBoss and began offering the same trading packages, renamed "WealthBlocks."

7

engage in trading activities, and the other half would be paid out as commissions to the MLM structure.

42. Putnam represented that the trading packages derive profits from digital asset trading and arbitrage activities being conducted by "professional traders that are constantly monitoring the news in anticipation of price fluctuations that could create profitable trading opportunities."

43. Putnam further told investors that their funds would be held in Bitfinex[3] trading accounts controlled by Ramirez, who was responsible for conducting the trading.

44. One investor presentation stated that investors can "[e]arn regardless of what's happening in the market."

45. With regard to the packages promoted through the Eyeline Trading MLM, Putnam represented that the packages were "individual accounts" that are "not pooled" and that investors can "start . . . or stop at anytime" or "withdraw [their] principal at anytime."

46. Investors in Eyeline Trading and Modern Money Team were promised daily profits of up to 0.66% on the half of the funds that were to be invested in the trading packages; the WealthBoss website touted that investors can earn up to 170% returns in a year.

47. To purchase the trading packages, some early investors wired funds or deposited cash into Putnam's personal bank account and bank accounts for MMT Distribution, LLC. Putnam was then to convert the fiat currency into digital assets, which were then transferred to Ramirez who would use the funds in his trading activities.

48. Eventually, Putnam began requiring investors to purchase the trading packages with digital assets. To facilitate the transfer of digital assets from investors, Putnam set up an

---

[3] Bitfinex is a digital asset trading platform registered in the British Virgin Islands and headquartered in Taiwan.

account with Coinpayments, a payment processor that enables account holders to send and receive digital assets.

49. Records produced from Coinpayments demonstrate that the Putnam MLMs raised at least $1,548,356.81 in digital assets between July 15, 2017 and March 9, 2020.

50. Investors in each of the Putnam MLMs were provided with access to a back office online account where they could monitor the investments purportedly being made on their behalf, make withdrawals, or reinvest their reported profits into new trading packages. Investors' back offices consistently reported monthly returns of 10%.

51. Until November 2019, investors' back offices showed weekly gains, and investors were able to make periodic withdrawals from their accounts.

52. In November 2019, however, the Putnam MLMs stopped making the purported profit payments to investors and trading activities appeared to cease.

53. Putnam told investors that Bitfinex had put a freeze on Ramirez's trading accounts, thus ceasing Ramirez's trading activities and shutting him off from access to the funds held in those accounts.

54. Since that time, investors have received no return on their investments and have been unable to make any withdrawals of principal or purported profit.

**The J.A. Group of Investors**

55. In addition to the investors who purchased trading packages through the Putnam MLMs, another subset of investors purchased trading packages from Putnam and R & D Global outside the MLM structure, through separate d/b/a's Bitzolkin and/or Bzlogin.

56. The principal such investor, J.A., was introduced to Putnam at the end of 2018 by a mutual business associate.

57. Putnam pitched J.A. on an investment in Putnam's trading packages, offering J.A. the opportunity to purchase packages for $1,000 each.

58. Putnam represented to J.A. that investors in the trading packages could turn the trading off at any time, that their funds would be held in individual accounts, and that the trading packages were SEC compliant.

59. Putnam further represented to J.A. that he, Putnam, and R & D Global would manage the investments, which would be held in an account at Bitfinex controlled by R & D Global and Ramirez.

60. Putnam also told J.A. that he could expect returns of up to 0.33% per day.

61. Based on these representations, J.A. made several investments with Putnam, R & D Global, and Ramirez: between late 2018 through November 2019, he invested a total of almost 169 Bitcoin, or over $1 million based on the value of bitcoin at the time of the investments.

62. J.A. also recruited several friends and family members to purchase trading packages, who collectively invested 993.29 bitcoins or $7.2 million.

63. Like the Putnam MLM investors, J.A. and his group of investors saw consistent returns of 10% per month in their back offices.

64. Putnam managed the weekly withdrawal requests from the J.A. group of investors. These withdrawals were consistently delayed and Putnam frequently made excuses for why withdrawals could not be made on time.

65. On one occasion when withdrawal payments to the J.A. contacts were due, Putnam told J.A. that the payments would be late because Putnam had been late in requesting the withdrawals from Ramirez.

66. In order to get the investors their payments on time, J.A. agreed to provide Putnam with a loan to cover the withdrawals until the funds came from Ramirez. J.A. therefore loaned Putnam 8 bitcoins, or approximately $80,000, which Putnam used to payout the withdrawals.

67. To date, Putnam has not repaid J.A. on the loan.

68. As with the Putnam MLM investors, J.A. and his group of investors were no longer able to access their investment funds beginning November 2019.

69. Also like the Putnam MLM investors, Putnam told J.A. that Bitfinex had frozen Ramirez's trading accounts and therefore the investor funds in those accounts were no longer engaged in trading activities or accessible for withdrawals.

70. Following the alleged Bitfinex freeze, J.A. began demanding more information from Putnam, and Putnam disclosed that, contrary to his initial representations, J.A.'s investment funds had not been maintained in a separate account. Instead, Putnam told J.A. that J.A.'s funds had been pooled with those of the Putnam MLM investors, in a single trading account at Bitfinex.

**Misappropriation of Investor Funds**

71. Putnam frequently misused investor funds.

72. With respect to investor funds deposited into the Modern Money Team Coinpayments accounts—which were supposed to be transferred to Ramirez's Bitfinex trading accounts—records demonstrate that $133,752.71 worth of bitcoin was transferred to a Trezor digital asset wallet controlled by Putnam.

73.     According to Putnam's own account of his agreement with investors, Putnam was not entitled to any portion of investors' principal investment, but instead was to be compensated only though profits derived from the trading activities.

74.     Bank records also demonstrate misuse of investor funds.

75.     In one instance, two investors deposited funds totaling $112,500 into the MMT Distribution, LLC bank account between August 7 and August 8, 2018. Bank records do not reflect that those funds were exchanged for digital assets. Instead, on August 15, 2018, Putnam wired $105,273 from the account to purchase a condominium in his name in Cedar City, Utah.

76.     Similarly, on January 26, 2018, Putnam's personal account had a balance of $8,914. Between January 29 and February 8, his account received four investor deposits totaling $28,500 and one transfer of $34,000 from another entity he controls VIP Deals, LLC, for total deposits of $62,500. During the same time period, Putnam transferred $13,000 back to VIP Deals, LLC, purchased a $33,827 spa and made numerous personal purchases. The ending balance on February 8, was $10,688.

**Misrepresentations to Investors**

***Investor funds would be traded in accounts at Bitfinex.***

77.     Putnam told the trading-package investors that their funds would be used to engage in digital asset trading and arbitrage activities through accounts held by Ramirez at Bitfinex.

78.     In or around January 22, 2020, Putnam told Modern Money Team investors that the Modern Money Team Bitfinex account held approximately 260 bitcoins.

79. Additionally, back office records for the J.A. group of investors showed that, as of November 2019, those accounts held a combined total of 2061.2951 bitcoin, which Putnam represented were being traded in accounts controlled by Ramirez at Bitfinex.

80. In reality, Bitfinex records show that Ramirez had just one trading account, which never held more than 50 bitcoin at any given time, and that was closed in or around May 2019.

### *Investor funds would not be pooled.*

81. On the Eyeline Trading website and in disclosures Putnam made to Jason J.A., Putnam told investors that their funds would be held in individual trading accounts and that their funds would not be pooled.

82. In reality, investor funds, including those brought in by the J.A. network of investors, were comingled in single accounts at Coinpayments and Bitfinex.

### *Trading packages are SEC complaint.*

83. Putnam represented to J.A. that the trading packages were SEC compliant. Contrary to this representation, Putnam filed no registration statements with the Commission with respect to the trading packages, nor had he taken any other steps to assure compliance with Commission statutes or rules. Rather, the trading packages were not compliant because they were offered and sold in unregistered offerings and were not subject to an exemption from the registration requirements of the federal securities laws. They also, as discussed herein, were sold in violation of certain antifraud provisions of the federal securities laws.

### *Investors could turn their trading on and off.*

84. Putnam told investors that they would be able to turn their trading off at any time. Contrary to this representation, investors had no such "on/off" capability and instead, relied solely on the efforts of Putnam and Ramirez to realize profits on their investments.

***Mining operation investor funds would be spent on the purchase and operation of mining machines.***

85. Putnam represented that he would use mining operation investor funds to purchase mining machines.

86. In at least some instances, however, Putnam did not use funds as represented. Instead, Putnam used investor funds to purchase a condominium and to pay for other personal expenses.

87. The misrepresentations and omissions described above would be material to a reasonable investor, and a reasonable investor would not have invested in the mining operation or digital asset trading program had s/he known of them.

***Putnam and Rodriguez acted with Scienter***

88. WhatsApp communications between Putnam and Rodriguez show that both Putnam and Ramirez knew or were reckless in not knowing that Ramirez's trading activities were specious.

89. In or around February 13, 2019, Putnam stated to Rodriguez, "We are going to bring Jean Paul [Ramirez] so much money this year . . . We are either going to retire this year or go to jail . . . And Im [sic] still not sure any of it is real."

90. In subsequent WhatsApp communications, Putnam (1) discussed with Rodriguez buying "a beach house in another country in case we have [to] flee," (2) stated, after being frustrated with Ramirez's failure to make payouts, that it "[j]ust seems like Jean Paul might be running a ponzi," and (3) expressed that he was "pretty much 100% [Jean Paul] is a scammer."

91. Additional WhatsApp communications demonstrate Putnam's and Ramirez's actual knowledge that Ramirez was making Ponzi-like payments.

92. In or around July 22, 2019, Rodriguez stated, "I talked to [Ramirez] and he told me he was going to have [the payments] today but he needs to be careful because he is going to be paying from principal" and thus would not "have anything to trade later."

## FIRST CLAIM FOR RELIEF

**Violations of Section 17(a)(1), (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)]**
**(*Against each of the Defendants*)**

93. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-92, inclusive, as if they were fully set forth herein.

94. By engaging in the conduct described above, Defendants, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails have (1) employed devices, schemes, or artifices to defraud; and (2) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

95. With respect to violations of Section 17(a)(1) of the Securities Act, Defendants engaged in the above-referenced conduct knowingly or with severe recklessness.

96. With respect to violations of Section 17(a)(3) of the Securities Act, Defendants were at least negligent when they engaged in the above-referenced conduct.

97. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Section 17(a)(1), (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)].

## SECOND CLAIM FOR RELIEF
**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. 77q(a)(2)]**
**(*Against Defendants Putnam, MMT Distribution, LLC, and R & D Global, LLC*)**

98. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-92, inclusive, as if they were fully set forth herein.

99.     By engaging in the conduct described above, Defendants Putnam, MMT Distribution, LLC, and R & D Global, LLC directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails has obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

100.    Defendant Putnam was at least negligent in making the above-referenced untrue and misleading statements.

101.    By reason of the foregoing, Defendants Putnam, MMT Distribution, LLC, and R & D Global, LLC violated and, unless enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### THIRD CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a), (c) [17 C.F.R. § 240.10b-5(a), (c)]**
(*Against Each of the Defendants*)

102.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-92, inclusive, as if they were fully set forth herein.

103.    By engaging in the conduct described above, each of the Defendants, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

104. Defendants engaged in the above-referenced conduct knowingly or with severe recklessness.

105. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a), (c) [17 C.F.R. § 240.10b-5(a), (c)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]**
(*Against Defendant Putnam*)

106. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-92, inclusive, as if they were fully set forth herein.

107. By engaging in the conduct described above, Defendant Putnam, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails has made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108. Defendant Putnam made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

109. By reason of the foregoing, Defendant Putnam violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

### FIFTH CLAIM FOR RELIEF
**Violation of Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]**
(*Against Defendants Putnam, Ramirez, and MMT Distribution, LLC*)

110. The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 92 above.

111. Defendants Putnam, Ramirez, and MMT Distribution, LLC, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, or carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

112. No registration statement has been filed with the Commission or has been in effect with respect to these securities.

113. By reason of the foregoing, Defendants Putnam, Ramirez, and MMT Distribution, LLC directly or indirectly violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a)(1) of the Exchange Act [15 U.S.C. §§ 78j(b), 78o(a)(1)], and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5];

**II.**

Permanently restraining and enjoining Defendants Putnam, Ramirez, and MMT Distribution, LLC from, directly or indirectly, engaging in conduct in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)];

**III.**

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that temporarily, preliminarily, and permanently enjoin Defendants and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from transferring, changing, wasting, dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets, claims, or other property or assets owned or controlled by, or in the possession or custody of, Defendants.

**IV.**

Ordering Defendants and Relief Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**V.**

Ordering Defendants to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**VI.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

## VII.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: May 7, 2020.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

_____
Amy J. Oliver
David D. Whipple
Laurie E. Abbott
Attorneys for Plaintiff