# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

# CORRECTED EXPERT REPORT OF JOHN M. GRIFFIN

**MARCH 2, 2023**

*U.S. Securities and Exchange Commission v. Putnam et al.*
Index No. 2:20−cv−00301

## TABLE OF CONTENTS


**1. INTRODUCTION .......... 2**

*1.1. Assignment .......... 2*

*1.2. Qualifications .......... 2*

*1.3. Documents Relied Upon .......... 4*

**2. SUMMARY OF OPINIONS .......... 4**

**3. BRIEF BACKGROUND ON SEC ALLEGATIONS .......... 5**

**4. TOTAL RAISED FROM INVESTORS .......... 6**

*4.1. Methodology .......... 6*

*4.2. Findings .......... 13*

**5. TOTAL JOINT PROCEEDS TO DEFENDANTS .......... 16**

*5.1. Methodology .......... 16*

*5.2. Findings .......... 18*

**6. TOTAL PROCEEDS TO INDIVIDUAL DEFENDANTS .......... 20**

*6.1. Methodology .......... 20*

*6.2. Findings .......... 22*

**I. APPENDIX A – CURRICULUM VITAE OF JOHN M. GRIFFIN .......... 27**

**II. APPENDIX B – RECENT TESTIMONY AND COURT-FILED EXPERT REPORTS .......... 38**

**III. APPENDIX C – DOCUMENTS RELIED UPON .......... 39**

**IV. APPENDIX D – BLOCKCHAIN TRACING METHODOLOGY .......... 41**

**V. APPENDIX E – REVIEW OF DOCUMENTS PROVIDED BY DEFENDANTS' EXPERT AFTER CLOSE OF DISCOVERY .......... 50**

# 1. INTRODUCTION

## 1.1. Assignment

1. I have been engaged by the Securities and Exchange Commission ("SEC") to provide expert testimony in the matter of *U.S. Securities and Exchange Commission v. Putnam et al.,* pending in the U.S. District Court for the District of Utah. The SEC alleges that Daniel F. Putnam ("Putnam"), Jean Paul Ramirez Rico ("Ramirez"), Angel A. Rodriguez ("Rodriguez"), MMT Distribution, LLC, and R & D Global, LLC (collectively, "Defendants") "participated in the fraudulent offering of digital asset-related securities" (herein, the "Securities Offerings"). I have been retained to independently analyze i) the amount of funds raised by Defendants in the Securities Offerings and ii) the amount of proceeds from the Securities Offerings that have collectively accrued to Defendants as well as accrued individually to Putnam, Ramirez, and Rodriguez.

2. My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter, and the analyses described in this Report. My analyses in this Report rely partly on data, documents, and statements produced to the SEC by Defendants.

## 1.2. Qualifications

3. I am a Professor of Finance and the James A. Elkins Centennial Chair in Finance at the University of Texas, McCombs School of Business. I have also served on the faculty at Arizona State University, Yale University, Hong Kong University of Science and Technology, and Harvard Business School. I received a B.A. in Economics from Baylor University in 1992, a M.S. in Finance from Texas A&M University in 1993, and my Ph.D. in Finance from Ohio State University in 1997. I have been teaching investments to undergraduate and Ph.D. students over

the last twenty-five years. I have also taught international finance to undergraduate and MBA students at Arizona State University, Yale University, and the University of Texas. I am a past President and Vice-President of the Western Finance Association and Society of Financial Studies SFS Cavalcade, and former director of the Western Finance Association and Financial Management Association.

4. My research focuses on forensic finance, with a specific interest in cryptocurrencies and digital assets, market manipulation, structured finance, credit ratings, initial public offerings (IPOs), and international finance. I have published over 30 papers, mostly in the top three finance journals (the Journal of Finance, Review of Financial Studies, and Journal of Financial Economics) and have been cited over 11,000 times according to Google Scholar. In the digital assets space, my academic research on Tether and the Bitcoin price bubble, titled "Is Bitcoin Really Un-Tethered?", was published in The Journal of Finance and has been extensively featured in over 750 media outlets around the world including Bloomberg, The New York Times, The Wall Street Journal, and The Financial Times.

5. I am the President and owner of Integra FEC, LLC ("Integra FEC"), which provides expert consulting related to forensic finance and other financial and economic matters. Through my work at Integra FEC, I have advised and consulted for the U.S. Department of Justice, the Securities and Exchange Commission, the Commodity Futures Trading Commission, state-level enforcement and regulatory entities, and various private parties.

6. My curriculum vitae, attached as Appendix A to this report, provides more details about my educational and professional background and experience, as well as a list of my publications. A list of cases for which I have provided testimony or submitted court-filed expert reports in the past four years is attached as Appendix B. I have been compensated at a rate of $700

per hour for my personal time and I have been assisted by employees of Integra FEC. My compensation is not contingent upon the findings of this report or outcome in this or any other matter. The use of "I" in this report includes all analyses of data performed by the staff of Integra FEC under my direction and oversight. My opinions are based on my own understanding of the analysis and results presented in this Report.

### 1.3. Documents Relied Upon

7. Documents, data, and other information that have been relied upon as the basis for my opinions are cited in this Report and listed in Appendix C. These include, but are not limited to, investor records, Defendants' internal communications and emails, and account data produced by crypto exchanges. Other sources relied upon include publicly available blockchain data.

8. This Report's calculations rely on the provided documents, which at some points may be incomplete. The major assumptions for these calculations are provided in the Report. It is possible that I may review additional new information that may become later available, as well as the reports and depositions of other experts. I reserve the right to supplement my report and analyses based on any additional evidence, including any evidence brought to my attention by the defense, other experts, or obtained through discovery.

## 2. SUMMARY OF OPINIONS

9. Based on i) a review of the documents provided to me, ii) analysis of blockchain data, and iii) my academic research and knowledge of this field, I conclude the following:

- The total value raised by the Securities Offerings is approximately $13.16 million.
- The total value of proceeds accruing to all Defendants is approximately $8.57 million.

- The breakout in terms of proceeds accruing to individual Defendants Putnam and Ramirez depend on which Defendant controlled a particular blockchain address[1] that was part of the Securities Offerings. If Ramirez controlled this address, proceeds from the Securities Offerings to Putnam are approximately $2.43 million and proceeds to Ramirez are approximately $5.97 million. If Putnam controlled this address, proceeds to Putnam are approximately $3.90 million and proceeds to Ramirez are approximately $4.50 million. Proceeds accruing to Defendant Rodriguez are approximately $170,000 regardless of whether Ramirez or Putnam controlled the particular address.

## 3. BRIEF BACKGROUND ON SEC ALLEGATIONS

10. The SEC's Complaint alleges, among other things, that the Securities Offerings consisted of Defendants' "offer and sale of so-called 'cryptocurrency mining packages' and 'cryptocurrency trading packages."[2] In particular, the SEC's Complaint alleges that Defendants offered "cryptocurrency mining packages" and that Putnam informed investors that they could "purchase mining machines, run them in [Modern Money Team's facilities], and earn money on the profits each month."[3] In addition, the SEC's Complaint alleges that Defendants offered investors the option of purchasing "cryptocurrency trading packages" and that Putnam told investors that they would "derive profits from digital asset trading and arbitrage activities being conducted by 'professional traders that are constantly monitoring the news in anticipation of price fluctuations that could create profitable trading opportunities.'"[4] The SEC alleges that Defendants primarily offered investors the opportunity to participate in three multilevel marketing businesses

---

[1] Referred to in this Report as the Eyeline API (3Lbgt) Collection Point, as discussed in more detail in Section 4.1.1.
[2] SEC v. Putnam et al., Case: 2:20–cv–00301, Complaint, Paragraph 8.
[3] *id.*, Paragraphs 19-20.
[4] *id.*, Paragraphs 34 and 42.

– Modern Money Team ("MMT"), Eyeline Trading ("Eyeline") and WealthBoss; Defendants also offered investment opportunities through an entity called R & D Global ("R & D") and two other DBA's named Bitzolkin and Bzlogin.[5]

## 4. TOTAL RAISED FROM INVESTORS

### 4.1. Methodology

11. To identify the total amount raised by the Securities Offerings, this Report identified the various blockchain addresses and crypto platform accounts used by Defendants to collect funds (collectively referred to as "Collection Points"). Next, the total amount of funds sent to the Collection Points was calculated using blockchain analysis and account information supplied to the SEC by crypto platforms. Funds sent to a given Collection Point from another Collection Point or sent from the same Collection Point to itself are identified as "Recycled Funds" and not counted towards the total raised, since these are internal transfers and not funds from investors. Funds deposited to Collection Points from mining pools or from Ramirez-controlled sources[6] are also not counted towards the total raised. The remaining balance of funds deposited to the Collection Points is counted as the total amount raised by the Securities Offerings. This amount is comprised of i) investor deposits that are identified by investor records produced to the SEC and matched with blockchain or crypto platform account records (referred to as "Identified Investor Deposits") and i) other deposits made to Collection Points (referred to as "Other Deposits"). Figure 1 provides a summary of the total raised calculation.

---

[5] *id.*, Paragraphs 15-16.
[6] These referenced Ramirez-controlled sources do not include the Collection Points controlled by Ramirez, since Collection Point funds are already removed as Recycled Funds in the previous step.

**Figure 1. Methodology for Calculating Total Amount Raised.**
Total raised by the Securities Offerings is calculated as total deposits to Collection Points minus Recycled Funds, funds from mining, and funds from Ramirez. Total raised by the Securities Offerings is comprised of Identified Investor Deposits and Other Deposits.




### *4.1.1. Identifying Collection Points*

12. The Collection Points used by Defendants to collect funds as part of the Securities Offerings are identified if they meet any of the following three criteria: i) they collected deposits from investors, ii) they made payouts to investors based on documents produced to the SEC, or iii) they were crypto platform accounts containing the names of one of the companies associated with the Securities Offerings, i.e., Modern Money Team, Eyeline Trading, WealthBoss, R & D Global, Bitzolkin or Bzlogin.[7] The list of the Collection Points is shown in Table 1.

[7] Some crypto platform accounts and blockchain addresses associated with Defendant Ramirez also made payouts to investors. However, these are not included as Collection Points because it appears that Ramirez operated another business venture called GMM from which he also collected funds (SEC-RodriguezA-E-0000332). Hence such accounts and addresses are not included as Collection Points for the Securities Offerings analyzed in this Report.

**Table 1. Collection Points Identified.**
Collection Points are identified based on whether they collected investor deposits, made investor payouts, or are accounts held in the name of a Security Offerings company. The identified Collection Points are listed in this table alongside their criteria for inclusion as Collection Points.

| Collection Point | Type | Collected Investor Deposits | Made Investor Payouts | Securities Offering Company Account |
|---|---|---|---|---|
| CoinPayments (MMT) | Crypto platform account | ✓ | ✓ | ✓ |
| CoinPayments (Eyeline) | Crypto platform account | | | ✓ |
| CoinPayments (R & D) | Crypto platform account | | | ✓ |
| Coinbase (Putnam) | Crypto platform account | | ✓ | |
| Coinbase (Rodriguez) | Crypto platform account | | ✓ | |
| Trezor (Putnam) | Crypto wallet/address | | ✓ | |
| Trezor (31r7m) | Crypto wallet/address | ✓ | ✓ | |
| Trezor (3NPiR) | Crypto wallet/address | ✓ | ✓ | |
| Trezor (38o8u) | Crypto wallet/address | ✓ | ✓ | |
| Eyeline API (3Lbgt) | Blockchain address | ✓ | ✓ | |
| Eyeline API (3FmcU) | Blockchain address | ✓ | ✓ | |
| Eyeline API (3BCEz) | Blockchain address | ✓ | | |
| Eyeline API (3BsKC) | Blockchain address | ✓ | ✓ | |

13. As seen in Table 1, this analysis identifies three types of Collection Points. The first are accounts belonging to Defendants or Defendants' companies at crypto platforms CoinPayments and Coinbase.[8] Account records produced to the SEC indicate that these crypto platform Collection Points were controlled by Putnam and Rodriguez.[9] The next type of Collection Points are Trezor wallet blockchain addresses. Trezor provides a crypto wallet service which enables its customers to generate, store, and use blockchain addresses to transact in crypto assets. Documents produced to the SEC indicate that the Trezor Collection Points were either controlled

[8] CoinPayments is a crypto payment processor that provides crypto payment services to merchants and individuals (https://www.coinpayments.net/) and Coinbase is a U.S.-based crypto exchange offering services to its customers including trading crypto assets and depositing and withdrawing crypto assets to and from various blockchains (https://www.coinbase.com/).
[9] The following documents correspond to the crypto platform accounts identified as Collection Points: CoinPayments (MMT) - SEC-EW-EPROD-000000119; CoinPayments (Eyeline) – SEC-EW-EPROD-000010298; CoinPayments (R & D) – SEC-EW-EPROD-000011575; Coinbase (Dan Putnam) – SEC-EW-EPROD-000010120; Coinbase (Rodriguez) – SEC-EW-EPROD-000010120.

by Putnam or associates taking direction from Putnam.[10, 11] The last type of collection point is what is referred to as "Eyeline API" addresses.[12] These are a collection of four addresses on the Bitcoin blockchain that were used by Defendants to receive investor funds. Based on my review of the provided documentation, these addresses appear to have only been used to collect and store funds in connection with the Securities Offerings.[13] Some documents produced to the SEC indicate that Ramirez controlled all four of these addresses.[14] However, there is also at least one document that suggests that Putnam had control of at least one of the Eyeline API addresses, 3Lbgt.[15] Given the uncertainty as to whether Ramirez or Putnam controlled this address, this analysis details gains to Ramirez and Putnam under both possibilities.

14. Eleven Collection Points were identified to have either received investor deposits or made investor payouts. Collection Points are identified to have received investor deposits if deposits into the Collection Points match the transaction records of investor deposits provided to the SEC.[16] Similarly, Collection Points are identified to have made investor payouts if they made

---

[10] Putnam's Trezor wallet is identified in document SEC-EW-EPROD-000035300, which is a document where he emails himself the wallet address and identifies it as a "Trezor wallet." Putnam also requests that funds be sent to that same address in text messages with Angel Rodriguez (SEC-RodriguezA-E-0000332).

[11] The other Trezor wallets are identified in email communications (SEC-EW-EPROD-000000001, SEC-EW-EPROD-000004298, and SEC-EW-EPROD-000004300). One of these emails states that "new orders from exterior wallets will be funded to one of Bitzolkins' trezor wallets," indicating that these wallets received investor deposits. These Trezor wallet addresses were created by "Harry" (presumed to be Harry Singh) and "Vinay" (SEC-EW-EPROD-000000001) and it can be seen from another document that Harry Singh took direction from Putnam related to MMT operations (SEC-EW-EPROD-000035301).

[12] Email from Zack Myers to SEC, April 23, 2020 (SEC-EW-EPROD-000000001).

[13] *ibid*.

[14] Text messages between Daniel Putnam and Angel Rodriguez (SEC-RodriguezA-E-0000432) and email from Zack Myers to SEC, April 23, 2020 (SEC-EW-EPROD-000000001). For example, the email from Zack Myers suggests that Ramirez had control of the Eyeline API wallets.

[15] Text messages between Daniel Putnam and Angel Rodriguez (SEC-RodriguezA-E-0000432). In one text communication indicating Putnam's control of this address on November 7, 2018, Putnam asks Rodriguez to give him an address so that Putnam can send funds to Ramirez. Rodriguez subsequently gives him the address 162ZYV2MWyKSdneib2dgWuaGJefGj5U7kB, and on November 8, 2018, 20.5 BTC is sent from Eyeline API (3Lbgt) to 162ZYV2MWyKSdneib2dgWuaGJefGj5U7kB (Bitcoin transaction hash: b3448ae9d7b45920e123996b8452199e3a034c669f7827a6114d51f3ae93880b). This indicates that Putnam had control of Eyeline API (3Lbgt) and not Ramirez.

[16] Documents reflecting investor deposits: SEC-EW-EPROD_20210811 and SEC-EW-EPROD-000004273.

payments to addresses identified in the investor records produced in connection with this litigation.[17]

#### *4.1.2. Calculating Total Funds Received by Collection Points*

15. To calculate the total funds received by each of the Collection Points, two different techniques are used depending on whether the Collection Points are crypto platform accounts or blockchain addresses.

16. The total funds received by Collection Points that are crypto platform accounts are calculated as the US Dollar value of all fiat currencies and crypto assets at the time they are deposited into the accounts, as recorded by crypto platform account data produced to the SEC. If the crypto platform data does not include the US Dollar value of crypto assets deposited, the value is calculated as the close of day price for the given crypto asset on the day it is deposited to the crypto platform.[18]

17. The total funds received by Collection Points that are blockchain addresses are calculated as the value of all crypto assets at the close of day price on the day they are received by the address. Transactions details including the date, time, amount and type of crypto asset deposited into these blockchain addresses are obtained from publicly available Bitcoin and Ethereum blockchain data. The blockchain data records all the deposits and withdrawals associated with every address, and thus it is possible to obtain all the incoming deposit transactions associated with the blockchain address Collection Points.

[17] Documents reflecting investor withdrawals: SEC-EW-EPROD-000009925 and SEC-EW-EPROD-000004276. Document reflecting investor addresses: SEC-EW-EPROD-000026700.
[18] For the purpose of this analysis, the close of day prices are obtained from CoinMarketCap.com.

#### *4.1.3. Identifying Recycled Funds*

18. Funds received at a given Collection Point that originated from another Collection Point, or from the same Collection Point, were identified as "Recycled Funds" and removed from the total raised amount to avoid double-counting. Funds were identified as Recycled Funds when they were traced forward from a Collection Point withdrawal and either i) later deposited into another Collection Point blockchain address or ii) later deposited into the same Collection Point.[19] The traced amounts later received at the second Collection Point were classified as Recycled Funds sent from the first Collection Point to the second Collection Point.[20] Similarly, any funds leaving a Collection Point and traced as returning to the same Collection Point are also classified as Recycled Funds.[21]

19. The value of Recycled Funds is calculated as the traced amount of the crypto asset multiplied by the close of day U.S. dollar price on the day of the subsequent deposit into the second Collection Point (or the same Collection Point if funds are recycled between the same Collection Point). Thus, the value of Recycled Funds is removed from deposits at the second Collection Point (or the subsequent deposit to the same Collection Point). The values of all traced amounts originating and ending at Collection Points are then summed to determine the total value of Recycled Funds.

#### *4.1.4. Identifying Funds from Mining and from Ramirez*

20. The Collection Points also received funds from known crypto mining sources not associated with any investors in the Securities Offerings (herein, the "Mining Funds"). These Mining Funds were subtracted from the deposits to Collection Points. To calculate the amount of

[19] Refer to Appendix D which describes the blockchain tracing and attribution methodology used in this Report.
[20] *ibid*.
[21] *ibid*.

crypto assets received from mining sources, blockchain analysis was conducted for each Collection Point. Each Collection Point is either a blockchain address, e.g., Eyeline API addresses, or if it is a crypto platform account, e.g., Putnam's Coinbase account, has one or more uniquely associated blockchain deposit addresses. For Bitcoin blockchain addresses, all the funds entering those addresses were backward traced and identified for this analysis as Mining Funds if they originated from a Bitcoin mining pool or a newly mined Bitcoin.[22] The same process was used for Ethereum blockchain addresses.[23, 24]

21. Funds deposited to the Collection Points from addresses and crypto platform accounts controlled by Ramirez were also not included in the total raised calculation.[25] Documents produced in connection with this litigation indicate that Ramirez held accounts at the following crypto platforms: Bitfinex,[26] BitMex,[27] LocalBitcoin,[28] and Xapo.[29] These documents also indicate that Ramirez controlled a Bitcoin address and an Ethereum address using Freewallet, an application that enables users to store and transact in crypto assets.[30] In addition, communications produced in connection with this litigation identify other blockchain addresses that appear to be

---

[22] *ibid*.
[23] *ibid*.
[24] This backward tracing analysis was not conducted for Litecoin and Bitcoin Cash deposits into the Collection Points since they only total approximately $42,000, and it is more difficult to trace on these blockchains.
[25] These Ramirez controlled addresses and accounts are in addition to the Eyeline API wallet addresses, of which at least three are assumed to be controlled by Ramirez. These Eyeline API addresses are already classified as Collection Points and thus funds originating from these Collection Point addresses have already been removed from the total raised calculation since they are Recycled Funds.
[26] Production from Bitfinex: SEC-EW-EPROD-000000066, SEC-EW-EPROD-000000067, and SEC-EW-EPROD-000000078.
[27] Production from BitMEX: SEC-EW-EPROD-000036757, SEC-EW-EPROD-000036766, SEC-EW-EPROD-000036774, SEC-EW-EPROD-000036783.
[28] Production from LocalBitcoins: SEC-EW-EPROD-000054868, SEC-EW-EPROD-000054860. Records from LocalBitcoins (SEC-EW-EPROD-000054868) indicate that Ramirez internally transferred funds between his LocalBitcoins account and other accounts at LocalBitcoins that were opened with different names while also receiving funds from the Securities Offerings; these other accounts are thus assumed to be accounts associated with Ramirez.
[29] Production from Xapo: SEC-EW-2023-000000301.
[30] Production from Freewallet: SEC-EW-EPROD-000053041.

controlled by Ramirez.[31] These communication records include both individual blockchain addresses and transaction hashes which can be used to identify blockchain addresses associated with Ramirez.

#### *4.1.5. Identifying Known Investor Deposits*

22. Documents produced in connection with this litigation contain lists of transactions purporting to constitute investor deposits.[32] This Report's analysis attempted to match the deposits catalogued in these documents to deposits into the Collection Points. To the extent the analysis confirmed a match between the purported investor transactions and identified deposits into a Collection Point, such matched transactions were classified as Identified Investor Deposits. In addition, this Report's analysis attempted to match deposits into Collection Points with other deposits cataloged in documents provided to the SEC by investors.[33] To the extent the analysis identified a match between the purported investor transactions identified in investor documents and deposits into a Collection Point, such matched transactions were also classified as Identified Investor Deposits. Deposits into the Collection Points that are not classified as Identified Investor Deposits, deposits from Recycled Funds, deposits from mining or deposits from Ramirez are classified together as "Other Deposits" for the purposes of this Report.

### 4.2. Findings

23. The total value raised by the Securities Offerings is presented in Figure 2 and Table 2. In total, approximately $23.59 million was collected at the identified Collection Points. Of this amount, approximately $9.18 million was classified as Recycled Funds. Approximately $350,000

[31] Text messages between Daniel Putnam and Angel Rodriguez (SEC-RodriguezA-E-0000432 and SEC-RodriguezA-E-0000432).
[32] Documents reflecting investor deposits: SEC-EW-EPROD_20210811 and SEC-EW-EPROD-000004273.
[33] Additional purported investor transactions were found in SEC-EW-EPROD-000004299 and SEC-EW-EPROD-000004298.

in deposits to the Collection Points are identified as Mining Funds. Subtracting Recycled Funds, Mining Funds and funds from Ramirez yields a total of approximately $13.16 million raised by the Collection Points.

24. The total amount raised of approximately $13.16 million is comprised of two categories: i) payments from investors identified in the provided documents and ii) other blockchain deposits. A total of approximately $6.16 million comes Identified Investor Deposits and approximately $7.00 million in Other Deposits.[34]

25. This Report includes Other Deposits as investor deposits into the Securities Offerings for two reasons. First, over half of the Other Deposits went to the same accounts and addresses that received Identified Investor Deposits, namely the CoinPayments (MMT) and Eyeline API Collection Points. Second, among the remaining Collection Points almost all[35] made payouts to investors. It is reasonable to believe that these payouts were funded by investor deposits and not some other source since, to my knowledge, there is no indication from the reviewed documents produced in Discovery that the Collection Points engaged in another business venture unrelated to the Securities Offerings.

[34] All identified deposits are matched between investors identified in documents produced to the SEC and transactions as recorded in blockchain or crypto account data. The Other Deposits to Collection Points are deposits that do not include deposits from mining, Ramirez, Putnam, Recycled Funds, or identified investors. These are either deposits from unidentified sources or deposits from associates of Defendants for which it cannot be ruled out as indirectly coming from other investors.

[35] With the exception of CoinPayments (Eyeline) and CoinPayment (R&D Global) which account for approximately 2% of the total raised.

**Figure 2. Total Raised from Investors**

The total amount raised from investors is calculated as the funds deposited to collection points minus Recycled Funds, Mining Funds and funds from Ramirez. The total amount raised from investors is divided between Identified Investor Deposits and Other Deposits. These calculations are shown in this figure.




**Table 2. Total Raised from Investors.**

This table shows the calculation of total raised from investors for each Collection Point. This table also shows how much of the total raised amount for each account is attributable to identified investors and to Other Deposits. Values shown are in US Dollars.

| Collection Points | Deposits | Recycled | Mining | Funds from Ramirez | Total Raised | Identified Investors | Other Deposits |
|---|---|---|---|---|---|---|---|
| **Coinbase (Rodriguez)** | 285,572 | 46,772 | 169 | 8,857 | 229,775 | - | 229,775 |
| **CoinPayments (MMT)** | 3,429,967 | 169,767 | 335,499 | 94,931 | 2,829,769 | - | 2,829,769 |
| **CoinPayments (Eyeline)** | 265,188 | - | - | - | 265,188 | - | 265,188 |
| **CoinPayments (R&D Global)** | 2,106 | 1,987 | - | - | 119 | - | 119 |
| **Trezor (31r7m)** | 513,259 | - | 34 | - | 513,225 | 377,266 | 135,959 |
| **Trezor (3NpiR)** | 1,512,797 | - | 1,119 | 40,740 | 1,470,938 | 593,695 | 877,243 |
| **Trezor (38o8u)** | 472,965 | 278,743 | - | - | 194,222 | 108,647 | 85,575 |
| **Trezor (Putnam)** | 197,432 | 9 | - | - | 197,423 | - | 197,423 |
| **Coinbase (Putnam)** | 1,760,986 | 752,632 | 9,394 | 749,046 | 249,914 | - | 249,914 |
| **Eyeline API (3Lbgt)** | 8,065,136 | 5,950,806 | 4,883 | 6,673 | 2,102,774 | 247,234 | 1,855,540 |
| **Eyeline API (3FmcU)** | 3,739,014 | 1,661,179 | 1,066 | - | 2,076,769 | 1,805,690 | 271,079 |
| **Eyeline API (3BCEz)** | 159,934 | 6,096 | - | - | 153,838 | 153,676 | 162 |
| **Eyeline API (3BsKC)** | 3,189,242 | 309,978 | 1,583 | - | 2,877,681 | 2,879,223 | (1,542) |
| **Grand Total** | **23,593,598** | **9,177,971** | **353,747** | **900,246** | **13,161,634** | **6,165,430** | **6,996,204** |

# 5. TOTAL JOINT PROCEEDS TO DEFENDANTS

## 5.1. Methodology

26. To calculate the total proceeds that collectively accrued to Defendants, the analysis first starts with the total raised amount of $13.16 million calculated in Section 4. To this total raised amount, Mining Funds and the net value of asset appreciation are added in order to determine the total funds Defendants accrued prior to making investor payouts. Next, payments made to identified investors from the Collections Points are subtracted and the resulting balance is the value of total proceeds accruing to Defendants, as illustrated in Figure 3.

**Figure 3. Methodology for Calculating Total Proceeds to Defendants.**
Total proceeds to Defendants are calculated as total raised, plus mining funds, plus or minus asset appreciation, minus payments to identified investors.




### *5.1.1. Forward Tracing Funds from Collection Points*

27. This Report used blockchain analysis to trace the destination of funds leaving each identified Collection Point. Blockchain analysis enables a determination of the extent to which Defendants spent the funds collected from the Securities Offerings to pay back investors, pay other Defendants, or for other purposes. Funds that left Collection Points on the Bitcoin and Ethereum blockchains were traced using the blockchain methodology described in Appendix D to determine the destination of funds. In addition, there were a small number of crypto assets that were withdrawn on the Litecoin and Bitcoin Cash blockchains. Only direct withdrawals on these

blockchain were analyzed, and the Litecoin and Bitcoin Cash that was sent to unidentified addresses is treated as investor payments for the purpose of this analysis.[36]

### *5.1.2. Mining Funds and Appreciation of Assets*

28. To determine the proceeds accruing to Defendants, the same value of funds sent to the Collection Points from crypto mining sources, as shown in Table 2, is added back to the total collected at each Collection Point because these are proceeds Defendants accrued from the Securities Offerings.

29. The net appreciation of assets is also included as proceeds accruing to Defendants. This is calculated as the difference in the value of crypto tokens between the date they were deposited to the Collection Points and the date they reached an identified destination. Asset price appreciation is included to account for the effect of fluctuating crypto asset values on Defendants' proceeds.[37]

### *5.1.3. Identifying Payments Made to Investors*

30. Payments to investors are identified using documents produced to the SEC.[38] These documents contain lists of blockchain addresses that appear to have been used by investor accounts to receive payments from the Securities Offerings. Funds withdrawn from the Collection Points

---

[36] A total of $9,162 Bitcoin Cash (BCH) was withdrawn from Collection Points, and $7,807 was traced to known investor addresses. The remaining $1,355 that did not go to known addresses in direct withdrawal transactions is assumed to be paid out to investors. A total of $92,322 Litecoin (LTC) was withdrawn from Collection Points, with $75,888 traced to investors and $500 to the CoinPayments (R & D Global) Collection Point. The remaining $15,934 that did not go to known addresses in direct withdrawal transactions is assumed to be paid out to investors. Additional tracing beyond direct withdrawals on the Bitcoin Cash and Litecoin blockchains was not conducted because it is more difficult to trace on these blockchains. If these funds were not paid to investors then the proceeds to Defendants could be slightly higher.

[37] In a hypothetical example, suppose an investor sends 1 Bitcoin valued at $30,000 to a Collection Point. If the price of Bitcoin increases from $30,000 to $60,000, and the investor is paid back 0.5 Bitcoin, valued at $30,000, while Defendants keep 0.5 Bitcoin to themselves, this would mean that Defendants' proceeds increased by the 0.5 Bitcoin that they did not pay back to investors, or $30,000.

[38] Documents reflecting investor withdrawals: SEC-EW-EPROD-000009925 and SEC-EW-EPROD-000004276. Document reflecting investor addresses: SEC-EW-EPROD-000026700.

that were sent to these investor-associated blockchain addresses, as determined using the blockchain tracing methodology described in Appendix D, are deemed to have been used for investor payouts. One exception is if the blockchain address is associated with an individual Defendant, in which case the payment would not be classified as an investor payout but rather classified as a proceed to such Defendants.[39]

**5.2. Findings**

31. The total value of proceeds accruing to Defendants are presented in Figure 4 and Table 3. As shown in Section 4.2, a total of approximately $13.16 million was raised from the Securities Offerings at the Collection Points. Adding to this total raised amount, Defendants received approximately $350,000 from crypto mining sources and accrued approximately $450,000 in crypto asset appreciation, which sums to a total value of approximately $13.96 million in proceeds accruing to Defendants prior to investor payments. Subtracting investor payments of approximately $5.39 million from this amount results in a total amount of approximately $8.57 million in proceeds accruing to Defendants.

[39] In a document reflecting MMT investors (SEC-EW-EPROD-000026700), multiple user accounts are associated with Putnam. Withdrawals to accounts identified as belonging to Putnam in the provided documentation are categorized as payments to Putnam instead of as payments to investors.

**Figure 4. Total Proceeds to Defendants.**
The total amount collected is calculated as the total raised from investors, plus mining funds, plus net asset appreciation. The total proceeds to Defendants are calculated as the total collected minus payments to identified investors. These calculations are shown in this figure.




**Table 3. Total Proceeds to Defendants.**
This table shows the calculation of proceeds to Defendants for each Collection Point. As explained in Footnote 7, Ramirez controlled other addresses and accounts that are not classified as Collection Points. These Ramirez-controlled addresses and accounts made payments to identified investors and are listed in the bottom row as "Other Ramirez Accounts." Values shown are in US Dollars.

| Collection Points | Total Raised | Mining | Asset Appreciation | Total Accrued | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|
| **Coinbase (Rodriguez)** | 229,775 | 169 | (73,252) | 156,692 | 12,546 | 144,145 |
| **CoinPayments (MMT)** | 2,829,769 | 335,499 | 59,169 | 3,224,437 | 1,556,486 | 1,667,951 |
| **CoinPayments (Eyeline)** | 265,188 | - | (73,457) | 191,731 | - | 191,731 |
| **CoinPayments (R&D Global)** | 119 | - | (653) | (535) | 29 | (564) |
| **Trezor (31r7m)** | 513,225 | 34 | (1,248) | 512,010 | 505,459 | 6,552 |
| **Trezor (3NPiR)** | 1,470,938 | 1,119 | (74,550) | 1,397,507 | 1,138,457 | 259,050 |
| **Trezor (38o8u)** | 194,222 | - | (3,350) | 190,871 | 451,125 | (260,254) |
| **Trezor (Putnam)** | 197,423 | - | 59,088 | 256,511 | 30,235 | 226,275 |
| **Coinbase (Putnam)** | 249,914 | 9,394 | 229,948 | 489,256 | 962,666 | (473,410) |
| **Eyeline API (3Lbgt)** | 2,102,774 | 4,883 | (15,901) | 2,091,755 | 9,964 | 2,081,791 |
| **Eyeline API (3FmcU)** | 2,076,769 | 1,066 | 94,119 | 2,171,953 | 2 | 2,171,951 |
| **Eyeline API (3BCEz)** | 153,838 | - | 23 | 153,861 | - | 153,861 |
| **Eyeline API (3BsKC)** | 2,877,681 | 1,583 | 248,470 | 3,127,734 | 616,641 | 2,511,093 |
| **Other Ramirez Accounts** | - | - | - | - | 112,073 | (112,073) |
| **Grand Total** | **13,161,634** | **353,747** | **448,404** | **13,963,785** | **5,395,685** | **8,568,100** |

32. One way to understand these values is in terms of losses to investors. Of the $13.16 million raised by Defendants, approximately $5.39 million is identified to have been returned to investors meaning that investors in aggregate lost approximately $7.77 million through the Defendants' Securities Offerings. However, the actual amount lost by investors is higher than $7.77 million because certain investors received more than they invested.[40] Since some individual investors received more than their original investment, this means that the extra return they received came at the expense of other investors in the Securities Offerings.

33. In addition, the $7.77 million in aggregate loss to investors does not account for the opportunity cost of their capital. This concept, often known as the time value of money, generally shows that a dollar in the past is worth much less than a dollar today, because a dollar in the past could be invested and earn interest or capital appreciation over time. Indeed, the investors in these Securities Offerings were looking for capital appreciation, and had they instead invested the money in the U.S. S&P 500 index, they would have made a significant return.[41]

## 6. TOTAL PROCEEDS TO INDIVIDUAL DEFENDANTS

### 6.1. Methodology

34. To calculate the proceeds accruing to individual Defendants Putnam, Rodriguez and Ramirez, this Report's analysis considered cross-payments (funds sent and received between these Defendants) to determine the net amount each of these Defendants received, individually, in

[40] For example, based on i) a document reflecting deposits (SEC-EW-EPROD-000004273) and a document reflecting withdrawals (SEC-EW-EPROD-000004276) and ii) the Bitcoin blockchain, user mnelson deposited 0.18 Bitcoin (worth approximately $1,528) and received back 3.9 Bitcoin (worth approximately $25,358).

[41] To understand the opportunity cost of capital, consider the following illustrative example from the S&P 500 index. Deposits by identified investors were received between July 17, 2017 and February 6, 2020. The value of the S&P 500 index in the middle of this period is $2,658.69, and the value of the index as of February 15, 2023 is $4,147.60 (values sourced from Yahoo Finance). The index is 56% higher in February 2023 indicating that the $7.77 million would be worth approximately $12.12 million today.

proceeds from the Securities Offerings. Therefore, in addition to the accounting for mining, appreciation of assets and payments to identified investors, net funds from cross-payments are added for individual Defendants, as reflected in Figure 5 below.

**Figure 5. Methodology for Calculating Proceeds to Individual Defendants.**
Total proceeds to individual Defendants are calculated as total raised at Collection Points controlled by individual Defendants, plus or minus net funds from other Defendants, plus mining funds, plus or minus asset appreciation, minus payments to identified investors. Net funds from other Defendants are calculated as the amount received by an individual Defendant's account from other Defendants, minus the amount sent to other Defendants from that Defendant's account.




### *6.1.1. Identifying Payments Made Between Defendants*

35. This Report's analysis considered different types of cross-payments made between Defendants in determining the proceeds accrued to individual Defendants. The first are cross-payments made between Collection Points controlled by the individual Defendants. These were previously calculated as part of the Recycled Funds calculations described in Section 4.1.3. This analysis determined whether an individual Defendant's Collection Point received more funds from other Defendants' Collection Points than it had sent to other Defendants' Collection Points. In such a case, this would increase the proceeds from the Securities Offerings accruing to that individual Defendant. For example, the Coinbase account controlled by Rodriguez received $46,646 from Collection Points controlled by Putnam and Ramirez and sent $10,275 to Collection

Points controlled by Putnam (and none to Collection Points controlled by Ramirez). Therefore, the Coinbase Collection Point that he controlled received a net of $36,371 from Collection Points controlled by other individual Defendants which was added to his proceeds.[42]

36. In addition, this Report's analysis considered payments from Collection Points to accounts belonging to other Defendants that are not Collection Points. For example, Ramirez and Putnam both controlled blockchain addresses that were not considered as Collection Points, and Ramirez additionally controlled crypto platform accounts that were not considered as Collection Points.[43] Any withdrawals from individual Defendants' Collection Points that were traced to these accounts and addresses associated with another Defendant were subtracted from the originating Defendant's proceeds and added to the proceeds for the Defendant who received these funds.

37. Finally, this Report's analysis considered payments received by the Collection Points from accounts and addresses associated with a different individual Defendant that are not classified as Collection Points. Any such payments were subtracted from the sending Defendant's proceeds and added to the proceeds for the Defendant controlling the receiving Collection Point.

### 6.2. Findings

38. To calculate the proceeds accruing to individual Defendants there are two scenarios to consider. This is because documents produced to the SEC suggest that the Eyeline API (3Lbgt) Collection Point could have been controlled by either Putnam or Ramirez.[44] The first scenario

[42] In addition, Rodriguez received $8,857 from Ramirez accounts and addresses that are not Collection Points and sent $22,470 to an address belonging to Ramirez, resulting in a net of $13,614 sent to Ramirez. Subtracting this net amount from the $36,371 that Rodriguez received from Collection Points controlled by Ramirez and Putnam yields a total of $22,757 that he received from the other individual Defendants, as shown in Table 4.

[43] Other Ramirez accounts and addresses are listed in Section 4.1.1. Putnam's other address are: 0x003376246c76d2594ce28f09cb9bf2b85a338c04, 0x3499098851799e7a155870429ae174c10a0a52e3, 3H1bk7yayvVz7uzYj8i1RQ167Nia4MLoie, 3G7m1iakx6LcTTsydVZZGQnnuszAUEsHt5, and 3EboKyrhDSiE6oc53NQqufeX6cdUMax23G. These addresses are identified based on a document reflecting MMT investors (SEC-EW-EPROD-000026700) and a document reflecting MMT withdrawals (SEC-EW-EPROD-000009925).

[44] Refer to Footnotes 14 and 15.

assigns proceeds from Eyeline API (3Lbgt) to Ramirez and the second scenario assigns these proceeds to Putnam. The calculations for these two scenarios are shown in Table 4. In Scenario 1 where Ramirez controlled the Eyeline API (3Lbgt) Collection Point, proceeds to Putnam are approximately $2.43 million and proceeds to Ramirez are approximately $5.97 million. In Scenario 2 where Putnam controlled the Eyeline API (3Lbgt) Collection Point, proceeds to Putnam increase to $3.90 million and proceeds to Ramirez decrease to $4.50 million. If Putnam and Ramirez shared the proceeds from the Eyeline API (3Lbgt) Collection Point, then their totals would be between the two ranges above for Scenarios 1 and 2. Proceeds to Rodriguez are approximately $170,000 under both scenarios.

39. Finally, I understand that, in connection with settlement discussions, Defendants retained an expert ("Defendants' Expert") who submitted a spreadsheet that aims to provide a justification for payments received by and sent from the following Collection Points: CoinPayments (MMT), CoinPayments (Eyeline), CoinPayments (R & D Global), Coinbase (Putnam) and Trezor (Putnam). In connection with this spreadsheet, Defendants' Expert shared a set of documents not otherwise produced in this case, which purport to support the findings set forth in the spreadsheet. However, there are questions about the completeness and reliability of these documents. For example, many documents contained neither a blockchain address, transaction ID or associated party with a transaction.[45] Other documents contained a blockchain

[45] See, for example, file REV00045979.eml.pdf which only has the following information:

From: Angel Rodriguez
To: Dan Putnam
Sent: May 31, 2019 2:21:18 PM MDT
[No subject line]
[Message body]: He is getting now

address or transaction ID but no associated party with the address or transaction.[46] Appendix E provides an analysis of these documents and their potential impact on the findings presented in this Report.

[46] See, for example, file DP_091558.pdf which only has the following information:
From: Warner Kwame <13037187358>
To: Dan Putnam <8018884792>
Sent: February 26, 2019 1:53:55 PM MST
[Message body]: 1Mtgb6zYhNABz4TA26hE8ySSj9MWqzvd7H

**Table 4. Total Proceeds to Individual Defendants.**
This table shows the calculation of proceeds to individual Defendants, grouped by Collection Points. Both Putnam and Ramirez controlled other addresses and accounts that were not classified as Collection Points, and net payments between those addresses and accounts to other individual Defendants are included as "Other (Putnam)" and "Other (Ramirez)" respectively.[47] Payments from Ramirez-controlled addresses and accounts to identified investors are also included.[48] Panel A shows the proceeds to each individual Defendant if the Eyeline API (3Lbgt) Collection Point was controlled by Ramirez, and Panel B shows the proceeds if Eyeline API (3Lbgt) was controlled by Putnam. Values shown are in US Dollars.

**Panel A. Scenario 1, if Ramirez Controlled Eyeline API (3Lbgt).**

| Defendant | Collection Point | Total Raised | Net - Other Defendants | Mining Funds | Asset Appreciation | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|---|
| Putnam | CoinPayments (MMT) | 2,829,769 | (480,733) | 335,499 | 59,169 | 1,556,486 | 1,187,218 |
| | CoinPayments (Eyeline) | 265,188 | (105,304) | - | (73,457) | - | 86,427 |
| | CoinPayments (R&D Global) | 119 | 1,987 | - | (653) | 29 | 1,423 |
| | Trezor (31r7m) | 513,225 | - | 34 | (1,248) | 505,459 | 6,552 |
| | Trezor (3NPiR) | 1,470,938 | (238,003) | 1,119 | (74,550) | 1,138,457 | 21,047 |
| | Trezor (38o8u) | 194,222 | 278,743 | - | (3,350) | 451,125 | 18,490 |
| | Trezor (Putnam) | 197,423 | (773) | - | 59,088 | 30,235 | 225,502 |
| | Coinbase (Putnam) | 249,914 | 1,348,095 | 9,394 | 229,948 | 962,666 | 874,685 |
| | Other (Putnam) | - | 12,145 | - | - | - | 12,145 |
| **Subtotal** | | **5,720,797** | **816,158** | **346,046** | **194,946** | **4,644,458** | **2,433,490** |
| Ramirez | Eyeline API (3Lbgt) | 2,102,774 | (610,989) | 4,883 | (15,901) | 9,964 | 1,470,803 |
| | Eyeline API (3FmcU) | 2,076,769 | (447,666) | 1,066 | 94,119 | 2 | 1,724,285 |
| | Eyeline API (3BCEz) | 153,838 | (10,117) | - | 23 | - | 143,743 |
| | Eyeline API (3BsKC) | 2,877,681 | (1,421,666) | 1,583 | 248,470 | 616,641 | 1,089,426 |
| | Other (Ramirez) | - | 1,651,524 | - | - | 112,073 | 1,539,451 |
| **Subtotal** | | **7,211,061** | **(838,915)** | **7,532** | **326,710** | **738,681** | **5,967,708** |
| Rodriguez | Coinbase (Rodriguez) | 229,775 | 22,757 | 169 | (73,252) | 12,546 | 166,902 |
| **Subtotal** | | **229,775** | **22,757** | **169** | **(73,252)** | **12,546** | **166,902** |

**Panel B. Scenario 2: If Putnam Controlled Eyeline API (3Lbgt).**

| Defendant | Collection Point | Total Raised | Net - Other Defendants | Mining Funds | Asset Appreciation | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|---|
| Putnam | CoinPayments (MMT) | 2,829,769 | (480,733) | 335,499 | 59,169 | 1,556,486 | 1,187,218 |
| | CoinPayments (Eyeline) | 265,188 | (105,304) | - | (73,457) | - | 86,427 |
| | CoinPayments (R&D Global) | 119 | 1,987 | - | (653) | 29 | 1,423 |
| | Trezor (31r7m) | 513,225 | - | 34 | (1,248) | 505,459 | 6,552 |
| | Trezor (3NPiR) | 1,470,938 | (238,003) | 1,119 | (74,550) | 1,138,457 | 21,047 |
| | Trezor (38o8u) | 194,222 | 278,743 | - | (3,350) | 451,125 | 18,490 |
| | Trezor (Putnam) | 197,423 | (773) | - | 59,088 | 30,235 | 225,502 |
| | Coinbase (Putnam) | 249,914 | 1,348,095 | 9,394 | 229,948 | 962,666 | 874,685 |
| | Other (Putnam) | - | 12,145 | - | - | - | 12,145 |
| | Eyeline API (3Lbgt) | 2,102,774 | (610,989) | 4,883 | (15,901) | 9,964 | 1,470,803 |
| **Subtotal** | | **7,823,571** | **205,169** | **350,929** | **179,045** | **4,654,422** | **3,904,292** |
| Ramirez | Eyeline API (3FmcU) | 2,076,769 | (447,666) | 1,066 | 94,119 | 2 | 1,724,285 |
| | Eyeline API (3BCEz) | 153,838 | (10,117) | - | 23 | - | 143,743 |
| | Eyeline API (3BsKC) | 2,877,681 | (1,421,666) | 1,583 | 248,470 | 616,641 | 1,089,426 |
| | Other (Ramirez) | - | 1,651,524 | - | - | 112,073 | 1,539,451 |
| **Subtotal** | | **5,108,288** | **(227,926)** | **2,650** | **342,611** | **728,716** | **4,496,905** |
| Rodriguez | Coinbase (Rodriguez) | 229,775 | 22,757 | 169 | (73,252) | 12,546 | 166,902 |
| **Subtotal** | | **229,775** | **22,757** | **169** | **(73,252)** | **12,546** | **166,902** |

[47] See Footnote 43.
[48] See Footnote 7 for an explanation of these other Ramirez accounts.

I declare under penalty of perjury under the laws of the United States of America that the statements and opinions contained in this Report are, to the best of my knowledge and understanding, true and correct.

Executed on February 28, 2023

John M. Griffin

## I. APPENDIX A – CURRICULUM VITAE OF JOHN M. GRIFFIN

# JOHN M. GRIFFIN

UNIVERSITY OF TEXAS AT AUSTIN
MCCOMBS SCHOOL OF BUSINESS
JOHN.GRIFFIN@UTEXAS.EDU ● WWW.JGRIFFIN.INFO

### ACADEMIC APPOINTMENTS

| | |
|---|---|
| Sept 2015 – Present | James A. Elkins **Centennial Chair in Finance** |
| Jan 2019-June 2019 | **Visiting Professor at** HKUST (Hong Kong University of Science and Technology) |
| Sept 2012 – Aug 2015 | Arthur Andersen & Co. Alumni Centennial **Professorship in Finance** |
| Spring 2013 | **Visiting Professor** at Harvard Business School |
| Sept 2009 – Aug 2012 | **Full Professor**<br>University of Texas at Austin, McCombs School of Business<br>**Bank of America Centennial Fellow** |
| July 2008 – Feb 2009 | **Visiting Professor at** HKUST (Hong Kong University of Science and Technology) |
| Jan 2004 – Aug 2009 | **Associate Professor of Finance** (with Tenure)<br>University of Texas at Austin, McCombs School of Business |
| Jan 2005 – May 2005 | **Whitebox Visiting Fellow in Behavioral Finance**<br>Yale School of Management |
| Jan 2003 – Dec 2003 | **Frederick Frank Visiting Assistant/Associate Professor of Finance at** Yale School of Management |
| May 2003 – Jul 2003 | **Associate Professor of Finance** (with Tenure, on leave)<br>Arizona State University, W.P. Carey School of Business |
| Aug 1997 – May 2003 | **Assistant Professor of Finance**<br>Arizona State University, W.P. Carey School of Business |

### RESEARCH INTERESTS

Forensic Finance, Cryptocurrencies, Loan Misreporting, Market Manipulation, Conflicts of Interest, CDOs, MBS, Credit Ratings, International Finance, Insider Trading, Institutional and Individual Investors, Real Estate, Rational and Behavioral Pricing, Hedge Funds

PUBLISHED OR FORTHCOMING ARTICLES

"Do Municipal Bond Dealers Give their Customers Best Execution or Opportunistic Pricing?" with Nicholas Hirschey and Samuel Kruger. Forthcoming in *Journal of Finance.*

"Did FinTech Lenders Facilitate PPP Fraud?" with Samuel Kruger and Prateek Mahajan. Forthcoming in *Journal of Finance.*

"Are CLO Collateral and Tranche Ratings Disconnected?" with Jordan Nickerson, 2022, *Review of Financial Studies*, Vol. 35(11).

"Is COVID Revealing a CMBS Virus?" with Alex Priest. Forthcoming in *Journal of Finance.*

"Is the Chinese Anti-Corruption Campaign Effective?" with Clark Liu and Tao Shu, 2021, *Management Science*, Volume 68(10), pg. 7248-7273.

"Ten Years of Evidence: Was Fraud a Force in the Financial Crisis?" 2021, *Journal of Economic Literature,* Volume 59, issue 4: 1293-1321.

"What Drove the 2003-2006 House Price Boom and Subsequent Collapse? Disentangling Competing Explanations" with Samuel A. Kruger and Gonzalo Maturana, 2021, *Journal of Financial Economics,* 141(3), 1007-1035.

"Is Bitcoin Really Un-Tethered?" with Amin Shams, August 2020, *The Journal of Finance*, Vol. 75, No. 4: 1913-1964.

"Personal Infidelity and Professional Conduct in 4 Settings" with Samuel A. Kruger and Gonzalo Maturana, 2019, *Proceedings of the National Academy of Sciences (PNAS)* 116(33), 16268-16273.

"Do Labor Markets Discipline? Evidence from RMBS Bankers" with Samuel A. Kruger and Gonzalo Maturana, 2019, *Journal of Financial Economics* 133(3), 726-750.

"Manipulation in the VIX?" with Amin Shams, 2018, *Review of Financial Studies* 31(4), 1377-1417.

"Debt Correlations in the Wake of the Financial Crisis: What are Appropriate Default Correlation for Structured Products?" with Jordan Nickerson, 2017, *Journal of Financial Economics* 125, 454-474.

"Did Dubious Mortgage Origination Practices Distort House Prices?" with Gonzalo Maturana, 2016, *Review of Financial Studies* 29(7), 1671-1708.

"Who Facilitated Misreporting in Securitized Loans?" with Gonzalo Maturana, 2016, *Review of Financial Studies* 29(2), 384-419. Winner of Michael J. Brennan Best Paper Award for best paper in the Review of Financial Studies. Winner of the Ohio State Alumni Conference Best Paper Award sponsored by BlackRock.

"How Important Are Foreign Ownership Linkages for International Stock Returns?" with Sohnke Bartram, Tae-Hoon Lim, and David Ng, 2015, *Review of Financial Studies* 28(11): 3036-3072.

"Complex Securities and Underwriter Reputation: Do Reputable Underwriters Produce Better Securities?" with Richard Lowery and Alessio Saretto, 2014, *Review of Financial Studies* 27(10), 2872-2925. Winner of the Blackrock Prize at the 26th Australasian Finance and Banking Conference.

"Rating Shopping or Catering? An Examination of the Response to Competitive Pressure for CDO Credit Ratings" with Jordan Nickerson and Dragon (Yongjun) Tang, 2013, *Review of Financial Studies* 26(9), 2270-2310.

"Did Subjectivity Play a Role in CDO Credit Ratings?" with Dragon Tang, August 2012, *Journal of Finance* 67(4), 1293-1328.

"Examining the Dark Side of Financial Markets: Evidence from Short-Term Institutional Trading Prior to Major Events," with Tao Shu and Selim Topaloglu, 2012, *Review of Financial Studies* 25, 2155-2188.

"How Important Is the Financial Media in Global Markets?" with Nicholas H. Hirschey and Patrick J. Kelly, 2011, *Review of Financial Studies* 24(12), 3941-3992.

"Did Credit Rating Agencies use Biased Assumptions?" with Dragon Tang, May 2011, *American Economic Review*, Vol. 101, No. 3: Pages 125-130.

"Who Drove and Burst the Tech Bubble?" with Jeffrey Harris, Tao Shu, and Selim Topaloglu, August 2011, *The Journal of Finance* 66(4), 1251-1290.

"Do Market Efficiency Measures Yield Correct Inferences? A Comparison of Developed and Emerging Markets" with Patrick Kelly and Federico Nardari, 2010, *Review of Financial Studies*, 23(8), 3225-3277.

"How Smart are the Smart Guys? A Unique View from Hedge Fund Stock Holdings," with Jin Xu, 2009, *Review of Financial Studies* 22, 2531-2570.

"Why are IPO Investors Net Buyers through Lead Underwriters?" with Jeffrey Harris and Selim Topaloglu, 2007, *Journal of Financial Economics* 85, 518-551.

"Do Investors Trade More When Stocks Have Performed Well? Evidence from 46 Countries," with Federico Nardari and René M. Stulz, 2007, *Review of Financial Studies* 20, 905-951.

"Measuring the Economic Importance of Exchange Rate Exposure," with Craig Doidge and Rohan Williamson, 2006, *Journal of Empirical Finance* 13, 550-576.

"The Informational Content of Option Volume Prior to Takeovers," with Charles Cao and Zhiwu Chen, 2005, *Journal of Business* 78, 1073-1109.

"Global Momentum Strategies: A Portfolio Perspective," with Susan Ji and Spencer Martin, 2005, *Journal of Portfolio Management* (Winter), 23-39.

"Daily Cross-border Equity Flows: Pushed or Pulled?" with Federico Nardari and René M. Stulz, 2004, *The Review of Economics and Statistics* 86, 642-657.

"The Dynamics of Institutional and Individual Trading," with Jeffrey Harris and Selim Topaloglu, 2003, *Journal of Finance* 58, 2285-2320.

"Momentum Investing and Business Cycle Risk: Evidence from Pole to Pole," with Susan Ji and Spencer Martin, 2003, *Journal of Finance* 58, 2515-2547.

"Does Book-to-Market Equity Proxy for Distress Risk?" with Mike Lemmon, 2002, *Journal of Finance* 57, 2317-2336. Reprinted in The International Library of Critical Writings in Economics; The Psychology of World Equity Markets, edited by Werner de Bondt.

"Are the Fama and French Factors Global or Country-Specific?" 2002, *Review of Financial Studies* 15, 783-803.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis," with René M. Stulz, 2001, *Review of Financial Studies* 14, 215-241.

"Another Look at the Role of the Industrial Structure of Markets for International Diversification Strategies," with G. Andrew Karolyi, 1998, *Journal of Financial Economics* 50, 351-373.

Citations in academic papers according to Google Scholar: 10,322 as of January 2023.

## WORKING PAPERS

## EDUCATION

| | |
|---|---|
| 1993 – 1997 | **Ph.D., Finance**, Ohio State University |
| 1992 – 1993 | **M.S., Finance**, Texas A&M University |
| 1988 – 1992 | **B.A., Economics**, Baylor University |

## NON-ACADEMIC POSITIONS

| | |
|---|---|
| CEO/Owner | Integra FEC, Integra REC, Integra Research Group, Integra MED Analytics, engage in litigation consulting and research connected to fraud discovery and recovery. See IntegraFEC.com |

## UNIVERSITY TEACHING

**Investments,** Undergraduate Program, University of Texas
**Empirical Methods/Asset Pricing/Behavioral Finance Seminar,** Doctoral Programs, University of Texas, Yale School of Management, and Arizona State University
**Global Finance,** MBA Program, University of Texas
**International Finance,** Undergraduate Program, University of Texas
**Applied Finance Research,** Doctoral Program, University of Texas
**International Finance,** Yale School of Management
**Investment Management,** Evening and Day MBA Programs, Arizona State University
**International Financial Management,** Undergraduate Program, Arizona State University
**Investment Management,** Undergraduate Program, The Ohio State University

## ACADEMIC AWARDS AND HONORS

**President and Vice President,** Western Finance Association, 2020-2022.
**Michael J. Brennan Best Paper Award,** best paper in the Review of Financial Studies for "Who Facilitated Misreporting in Securitized Loans?", 2017.
**Chair,** Society of Financial Studies (SFS) Cavalcade, 2013.
**Vice-Chair,** Society of Financial Studies (SFS) Cavalcade, 2012.
**Distinguished Referee Award,** Review of Financial Studies, 2012.
**Award for Research Excellence,** McCombs School of Business, University of Texas at Austin, 2012.
**Research Excellence Grant,** McCombs School of Business, University of Texas at Austin, 2009, 2011, 2013, 2015, 2016, 2017, 2019.
**BSI – Gamma Foundation Research Grant**, 2008.

## PRESENTATIONS

2021-2022 *"Did FinTech Lenders Facilitate PPP Fraud?"*
Hong Kong Baptist University, Lone Star Conference (co-author), the University of Texas at Austin (co-author), Atlanta Fed (co-author), ASU Sonoran Winter Finance Conference (co-author), Financial Research Association Conference (co-author), Lone Star Finance Conference (co-author), Pontifical Catholic University of Chile (co-author), Georgetown University, RCFS Winter Conference (co-author), Texas Finance Festival (co-author), UT Dallas Finance Conference (co-author), SFS Cavalcade (co-author), Western Finance Association Conference (co-author), The Office of the Comptroller of the Currency, the U.S. Government Accountability Office

2019-2020 *"Are CLO Collateral and Tranche Ratings Disconnected?"*
MIT-Sloan (co-author), the University of Texas at Austin, the Federal Reserve

2019-2020 "*Do Municipal Bond Dealers Give their Customers Best Execution or Opportunistic Pricing*?"
Hong Kong University of Science and Technology, Hong Kong Polytechnic University, London Business School (co-author), the University of Texas at Austin (co-author), the Nova School of

Business and Economics (co-author), the University of Melbourne (co-author), Lone Star Finance Conference (co-author), Northern Finance Association (co-author), Adam Smith Juniors Workshop (co-author), American Finance Association (co-author), European Winter Finance Conference (co-author), Midwest Finance association (co-author), Municipal Finance Workshop (co-author)

2020 *"Is COVID Revealing a CMBS Virus?"*
The University of Texas at Austin (co-author), 2021 OSU PhD Conference (co-author)

2016-2020 *"Is the Chinese Anti-Corruption Campaign Effective?"*
Finance Down Under Conference (co-author), Conference of Financial Economics and Accounting (co-author), Financial Management Association Meeting Asia Panel Session (co-author), Paris December Conference (co-author), AFE Meeting (co-author), ABFER Meeting (co-author), the Fifth Symposium on Emerging Financial Markets: China and Beyond (co-author), China International Conference of Finance (co-author), MIT Asian Conference in Accounting (co-author), China Financial Research Conference (co-author), Arizona State University, Tulane University, University of Georgia (co-author), Georgia State University (co-author), University of Hong Kong, and University of Utah

2018-2019 *"What Drove the 2003-2006 House Price Boom and Subsequent Collapse? Disentangling Competing Explanations"*
Emory University (co-author), Louisiana State University (co-author), Pennsylvania State University (co-author), Texas A&M University, the University of Texas (co-author), Lone Star Finance Conference (co-author), Santiago Finance Workshop (co-author), American Economic Association Meeting (co-author), AREUEA National Conference (co-author), UBC Winter Finance Conference (co-author), and the University of Chicago 10th Anniversary of the Financial Crisis Conference

2018-2019 *"Is Bitcoin Really Un-Tethered?"*
The Chinese University of Hong Kong, Cryptocurrencies and Blockchain Conference at the University of Chicago (co-author), FBI CPA Conference, Financial Intelligence and Investigations Conference (co-author), Fintech Conference at the Hong Kong University, Hong Kong University of Science and Technology, Hong Kong Securities and Futures Commission, Korea Advanced Institute of Science and Technology, Korean Financial Supervisory Service, Japan Financial Services Agency, Santa Clara University (co-author), Texas Bitcoin Conference (joint), Tsinghua University, U.S. Commodity Futures Trading Commission, University of Texas-Austin (co-author), University of Zurich, and Wharton Liquidity Conference at the University of Pennsylvania (co-author)

2016-2018 *"Personal Infidelity and Professional Conduct in 4 Settings"* American Finance Association Annual Meeting (co-author), the Catholic University of Chile (co-author), the Lone Star Finance Conference

(co-author), the Wake Forest Corporate Social Responsibility Conference (co-author), the Center for Accounting Research and Education Conference (co-author), the Midwest Finance Association Annual Meeting (co-author), the Securities and Exchange Commission, and the University of Texas at Austin (co-author)

2016-2017 "*Do Labor Markets Discipline? Evidence From RMBS Bankers*" New York University, University of Colorado Boulder, Washington University in St. Louis, the 2017 Florida State University Conference, the 2017 University of Tennessee Finance Conference, and the 2017 Western Finance Association Meeting (co-author, in attendance)

2016-2017 *"Do Personal Ethics Influence Corporate Ethics?"* American Finance Association Annual Meeting (co-author, in attendance), the Securities and Exchange Commission

2015-2017 *"Manipulation in the VIX?"* Commodity Futures Trading Commission, SFS Cavalcade Conference 2017 (by co-author), the Western Finance Association, the University of Bristol, University of Notre Dame, University of Texas-San Antonio, and University of Warwick

2013-2015 *"Forensic Finance in the Financial Crisis"* related versions 2015 *FMA* Doctoral Symposium*,* Fall 2013 FMA Members' & Friends' Breakfast Keynote, 2014 Australasian Finance and Banking Conference Keynote

2014-2015 *"Did Dubious Mortgage Origination Practices Distort House Prices?"* Baylor University, the Darden School at the University of Virginia, Georgia State University, London Business School, London School of Economics, Texas Christian University, University of Michigan, University of New South Wales, University of Texas at Dallas

2014 *"Debt Correlations in the Wake of the Financial Crisis: What are Appropriate Default Correlation for Structured Products?"* Cambridge University.

2013-2014 *"Who Facilitated Misreporting in Securitized Loans?"* Arizona State University, Boston College, Harvard Business School, Ohio State Alumni Conference, University of Massachusetts Amherst

2013 *"Conflicts of Interest, Complexity, and The Financial Crisis"* SFS Cavalcade Keynote.

2012-2013 *"Complex Securities and Underwriter Reputation: Do Reputable Underwriters Produce Better Securities?"* Oxford 2012 Conference on Reputation, Tilburg University, Ohio State University, presented at the Western Finance Association (by co-author but in attendance)

2011-2013 *"Rating Shopping or Catering? An Examination of the Response to Competitive Pressure for CDO Credit Ratings"* Erasmus University Rotterdam, University of Houston, Notre Dame/NASDAQ 2012 Conference on Regulatory Implications, Macquarie Graduate School of Management, U.S. Securities and Exchange Commission (co-presented), Western Finance Association (by co-author but in attendance), NBER (by co-author but in attendance)

| | |
|---|---|
| 2012 | *"Recent Research in Forensic Finance"* Speaker for FMA Special Session 2012, also speaker for the FMA Doctoral Consortium |
| 2011 | *"Do Hedge Funds Make Money for their Clients?"* with Christian Tiu, Macquarie Graduate School of Management Alumni Event |
| 2009-2011 | *"How Important is Foreign Ownership for International Stock Co-Movement?"* University of Texas at Dallas, Dimensional Fund Advisors, 2010 China International Conference, Tsinghua Emerging Markets Conference |
| 2008-2010 | *"Did Subjectivity Play a Role in CDO Credit Ratings?"* BSI Gamma Conference, Tsinghua University, INSEAD, Singapore, 2008 Chulalongkorn Accounting and Finance Symposium, National University of Singapore, University of Texas, Hebrew University, the Hong Kong Monetary Authority, University of Arizona, 16th Mitsui Finance Symposium, University of Michigan, Notre Dame Conference on the Financial Crisis, Shanghai Jiaotong University, 2010 Atlanta Federal Reserve Financial Markets Conference, 2010 American Finance Association, 2010 Utah Winter Finance Conference, Securities and Exchange Commission, University of Hawaii, 2010 China International Conference, 2010 NBER Credit Rating Sessions |
| 2008-2010 | *"How Important is the Financial Press in Emerging Markets?"* Hong Kong University of Science and Technology, Singapore Management University, Peking University, Singapore Management University, Fudan University, Jiao Tong University, Nanyang Technological University, University of Washington, Darden International Conference, 2010 American Finance Association (by co-author, but in attendance), 2010 China International Conference |
| 2008 | Work-in-progress, *"Examining Quant Risk: International Movements and Domestic Implications"* Sanford C. Bernstein Conference, part of a presentation to AllianceBernstein |
| 2007-2008 | *"Examining the Dark Side of Financial Markets: Evidence from Short-Term Institutional Trading Prior to Major Events,"* Darden School of Business, 2008 China International Conference (by co-author, but in attendance), 2008 Singapore International Conference (by co-author, but in attendance and responded to discussant) |
| 2006-2008 | *"Are Emerging Markets More Profitable? Implications for Comparing Weak and Semi-Strong Form Efficiency,"* formerly titled, "Measurement and Determinants of International Stock Market Efficiency" 2008 American Finance Association (by co-author, but in attendance and responded to discussant), Baruch College, Carnegie Mellon, Copenhagen Business School, Darden/NYSE Conference in N.Y. (by co-author, but in attendance and responded to discussant), George Mason University, the Federal Reserve in D.C., Norwegian School of Management, The Ohio State University |
| 2002-2006 | *"Who Drove and Burst the Tech Bubble?"* Western Finance Association, University of Texas, Dartmouth College, Ohio State University, AGSM Summer Research Camp, University of New South Wales. FMA European Conference in Stockholm, The Review of Financial Studies/Indiana University bubble conference, Texas A&M University |

| | |
|---|---|
| 2005-2008 | *"How Smart are the Smart Guys? A Unique View from Hedge Fund Stock Holdings"* 2008 American Finance Association (by co-author, but in attendance and responded to discussant), University of Lisboa in Portugal, University of Texas, Yale School of Management |
| 2004-2005 | *"Why are IPO Investors Net Buyers through Lead Underwriters?"* Conflict of Interest conference sponsored by Ohio State University/Federal Reserve Bank of New York, University of Tilburg, Rutgers University, University of Florida, University of Texas, American Finance Association |
| 2004 | *"Stock market trading and market conditions"* University of Texas Finance and Accounting Symposium, University of Amsterdam |
| 2002 | *"Daily Cross-border Equity Flows: Pushed or Pulled?"* Georgia Tech International Finance Conference |
| 2001-2002 | *"The Dynamics of Institutional and Individual Trading"* Financial Management Association, University of North Carolina, Rice University, Baylor University, Texas A&M University, (under previous title) Ohio State University, University of Michigan |
| 1999-2001 | *"The Informational Content of Option Volume Prior to Takeovers"* American Finance Association, Utah Winter Finance Conference, Western Finance Association |
| 1999-2000 | *"Does Book-to-Market Equity Proxy for Distress or Overreaction?"* University of Maryland, Southern Methodist University, Western Finance Association |
| 1998-1999 | *"International competition and exchange rate shocks: A cross-country industry analysis"* American Finance Association, Arizona Finance Symposium |
| 1997 | *"Do the Fama and French Factors Proxy for Risk? An International Test."* Penn State University, University of Arizona, Arizona State University, McGill University |
| 1996 | *"Another Look at the Role of the Industrial Structure of Markets for International Diversification Strategies"* Financial Management Association, Western Finance Association |

## PROFESSIONAL ACTIVITIES

**Editorial**

Associate Editor, Review of Financial Studies, June 2012-May 2015

**Director**

Board of Directors, Financial Management Association, 2014-2016

**Referee**

The Journal of Finance, The Review of Financial Studies, The Journal of Financial and Quantitative Analysis, The Journal of Financial Economics, Management Science, The Review of Corporate Financial Studies, The Journal of International Money and Finance, The Journal of Empirical Finance, American Economic Review, The Journal of Corporate Finance, The Journal of Economics and Business, Journal of Financial Markets, European Financial Management, Financial Review, 1995-present

**Conference Organizer**

Western Finance Association, 2021

Texas Finance Festival, April 2017, 2018
Cavalcade Chair, May 2013
Cavalcade Vice Chair, May 2012
Co-organizer, HKUST Asset Pricing Conference, December 2008

**Session Chair**

American Finance Association, 2006, 2007, 2012
ASB The Australasian Finance and Banking Conference, 2011
AsianFA-NFA International Conference, 2008
China International Finance Conference, 2010
Western Finance Association, 2005, 2006, 2007
Georgia Tech International Conference, 2005
McGill International Conference, 2007

**Discussant**

American Finance Association, 2008, 2010, 2011, 2013
AREUEA Conference, 2013
ASB The Australasian Finance and Banking Conference PHD session, 2011, 2014
AsianFA-NFA International Conference, 2008 (2 papers)
Atlanta Federal Reserve Conference, April 2006
Georgia Tech International Conference, 2005
Singapore International Conference, 2008
Western Finance Association, 2001, 2002, 2004 (2), 2010

**Program Committee Member**

Darden International Finance Conference, 2008-2012
Western Finance Association, 2003-2015
American Finance Association, 2004-2007, 2011
European Finance Association, 2005
European Financial Management Association, 2006
Financial Management Association, 2004, 2006

**PhD Committee Members**

Alex Priest (chair), on job market
Amin Shams (co-Chair), initial appointment at Ohio State
Gonzalo Maturana (Chair), initial appointment at Emory
Ruoyu Shao, (Co-chair), Economics Student, initial industry appointment
Jordan Nickerson (Co-chair), initial appointment at Boston College
Nicholas Hirschey (Co-chair), initial appointment at London Business School
Chishen Wei, initial appointment at Nanyang Technological University
Michael Yates, initial appointment at Auburn University
Tao Shu, initial appointment at University of Georgia
Jin Xu (Co-chair), initial appointment at Zebra Asset Management
Patrick Kelly (Co-chair), initial appointment at University of South Florida
Susan Ji, (Dissertation Chair), initial appointment at Baruch College
Magali Valero, Economics, PhD expected August 2003
Selim Topaloglu, initial visiting appointment at Purdue, now at Queens University
Naveen Daniel, initial visiting appointment at Georgia State

Chris Gadarowski, initial visiting appointment at the Cornell Hotel School
Jim Linck, University of Georgia

**Doctoral Program**

Speaker and Session for the FMA Doctoral Consortium 2012, 2015
McCombs School of Business, January 2004 – May 2008

**Chaired Committee for New MS Finance Program**

McCombs School of Business, 2011

## II. APPENDIX B – RECENT TESTIMONY AND COURT-FILED EXPERT REPORTS

**Testimony in the last four years and court-filed expert reports**

**Case Name:** Securities and Exchange Commission v. AT&T Inc. et al.
**Case No.:** 1:21-cv-01951-PAE (United States District Court, Southern District of New York)
**Date:** February 2022 (Report), April 2022 (Rebuttal Report), April 2022 (Deposition)

**Case Name:** Strathclyde Pension Fund v. Bank OZK et al.
**Case No.:** 4:18-cv-00793-DPM (United States District Court, Eastern District of Arkansas, Central Division)
**Date:** May 2021 (Report), August 2021 (Deposition), September 2021 (Report)

**Case Name:** United States of America v. Smith et al.
**Case No.:** 5:18-cr-00084-SMH-MLH-2 (United States District Court, Western District of Louisiana, Shreveport Division)
**Date:** October 2019 (Report)

*Note: John Griffin is also an expert in a another matter in which his involvement is under seal. For that matter, he has written a Report, Rebuttal Report, and has been deposed.*

# III. APPENDIX C – DOCUMENTS RELIED UPON


Bitfinex. Account Verification for Jean Paul Ramirez (ID 2252267). SEC-EW-EPROD-000000066.

BitMEX. Account Information for Jean Paul Ramirez Account (ID 952258). SEC-EW-EPROD-000036757.

BitMEX. Account Information for Jean Paul Ramirez Account (ID 1150088). SEC-EW-EPROD-000036766.

BitMEX, Account Information for Jean Paul Ramirez Account (ID 1189154). SEC-EW-EPROD-000036774.

BitMEX, Account Information for Jean Paul Ramirez Account (ID 1216926). SEC-EW-EPROD-000036783.

Bitzolkin Records. Deposit Transactions. SEC-EW-EPROD-000004273.

Bitzolkin Records. Withdrawal Transfers. SEC-EW-EPROD-000004276.

CoinMarketCap. Historical Bitcoin Price Data. Available at: https://coinmarketcap.com/.

CoinMarketCap. Historical Ether Price Data. Available at: https://coinmarketcap.com/.

CoinPayments. EyelineTrading Account. SEC-EW-EPROD-000010298.

CoinPayments. Modern Money Team Account (ID 289244). SEC-EW-EPROD-000000119.

Coinbase. Daniel Putnam Account Information. SEC-EW-EPROD-000010120.

Email from Daniel Putnam to Angel Rodriguez, December 18, 2019. SEC-EW-EPROD-000035300.

Email From Zack Myers to SEC, April 24, 2020. SEC-EW-EPROD-000000001.

Email from Jason Anderson to Harry Singh and Zack Myers, July 30, 2019. SEC-EW-EPROD-000004300.

Email from Jason Anderson to Harry Singh then forwarded by Harry Singh to Zack Myers, August 19, 2019, SEC-EW-EPROD-000004298.

Email from Jason Anderson to Harry Singh then forwarded by Harry Singh to Daniel Putnam. July 30, 2019, SEC-EW-EPROD-000004299.

Email from Jason Anderson to Harry Singh and Zack Myers, July 30, 2019. SEC-EW-EPROD-000004300.

Freewallet. Jean Paul Ramirez Affiliates Account. SEC-EW-EPROD-000053041.

Google BigQuery. Bitcoin Dataset: "bigquery-public-data.crypto_bitcoin." Available at: https://cloud.google.com/bigquery/public-data.

Google BigQuery. Ethereum Dataset: "bigquery-public-data.crypto_ethereum." Available at: https://cloud.google.com/bigquery/public-data.

LocalBitcoins. Jean Paul Ramirez Account. SEC-EW-EPROD-000054868.

LocalBitcoins. Wallets Overview. SEC-EW-EPROD-000054860.

Text messages between Putnam and Rodriguez. SEC-RodriguezA-E-0000332 and SEC-RodriguezA-E-0000432.

U.S. Securities and Exchange Commission. SEC v. Putnam et al., Case: 2:20−cv−00301. Complaint. May 20, 2020.

Xapo. Jean Paul Ramirez Account, SEC-EW-2023-000000301.

Yahoo Finance. S&P 500 Index Values. Available at: https://finance.yahoo.com/quote/%5EGSPC/history?p=%5EGSPC.

# IV. APPENDIX D – BLOCKCHAIN TRACING METHODOLOGY

## METHODOLOGICAL OVERVIEW

1. Due to the public and recorded nature of blockchain transactions, it is possible to trace the flow of funds between blockchain addresses to identify where funds are sent or where funds originate from. In terms of blockchain transactions, Defendants primarily received and sent funds using the Bitcoin and Ethereum blockchains and the methodology for tracing funds on those two blockchains is described in this Appendix. Blockchain tracing was not applied for Litecoin and Bitcoin Cash transactions since these were predominantly direct transfers.[49]

### Bitcoin Blockchain

*Sources*

2. Bitcoin blockchain data are sourced from Google's BigQuery data warehouse.[50] This dataset contains a history of the Bitcoin blockchain and has records of every transaction that has occurred on the Bitcoin blockchain, with associated details such as the transaction amount, the sending and receiving addresses, the date and time, and a uniquely associated transaction identifier known as the transaction hash.

---

[49] It is also more difficult to trace on these blockchains. Also, approximately $100,000 worth of funds left Collection Points on the Litecoin and Bitcoin Cash blockchains and the vast majority of withdrawals from these Collection Points were direct transfers to identified investors as described in Footnote 36. To identify the destination of withdrawals, the Report first identified Litecoin and Bitcoin Cash withdrawal addresses from the crypto platform Collection Points, namely CoinPayments (MMT) and Coinbase (Putnam). Next, these withdrawal addresses were cross-checked in the investor withdrawal lists described in Section 5.1.3 as well as with deposit addresses belonging to other crypto platform Collection Points. Matched withdrawals between the Section 5.1.3 withdrawal lists and the withdrawals data from the crypto platform were categorized as payments to identified investors. There was also a withdrawal made to the Coinbase (R & D Global) Collection Point. For the purposes of this analysis, the remaining funds withdrawn that were not identified were also classified as withdrawals to identified investors. Additional detail regarding these withdrawals can be found in Footnote 36.

[50] More information on Google's BigQuery dataset can be found at: https://cloud.google.com/bigquery/public-data. For the Bitcoin blockchain, this Report used the "bigquery-public-data.crypto_bitcoin" dataset.

3. In addition to data from the actual Bitcoin blockchain, this Report uses data from publicly available sources regarding the identities behind Bitcoin addresses,[51] such as crypto exchanges and platforms like Coinbase and CoinPayments. This information is useful to determine endpoints for tracing, i.e., tracing stops when funds reach a crypto exchange or platform since the custody of funds changes when funds reach such destinations.

*Tracing Methodology*

4. The following steps are taken to trace the destination of funds leaving an identified Collection Point. First, blockchain transactions associated with funds leaving an identified Collection Point are identified either from crypto platforms data (from Coinbase and CoinPayments) or from the Bitcoin blockchain. Next, funds from these identified transactions are traced forward over multiple hops[52] until one of the following conditions are met: i) the funds reach an address identified as belonging to investors, Defendants, or Defendants' associates in documents produced to the SEC, ii) the funds reach an address identified using public sources such as a crypto platform, iii) the funds reach a large unidentified cluster of addresses,[53] iv) the traced amount became negligibly small, i.e., below 0.001 BTC, or v) the funds do not reach an identified address within 30 hops.[54] To analyze the source of funds reaching a Collection Point, the same steps and conditions are used, except that funds are traced backwards instead of forwards.

---

[51] Public sources include social media sites such Twitter and YouTube and publicly available Bitcoin explorers such as https://www.walletexplorer.com/ and https://oxt.me/.

[52] A one hop transaction is when Bitcoin is sent from one address to another via an intermediary address, e.g., Bitcoin sent from Address A to Address B to Address C. A two hop transaction would then be a transaction with two intermediary addresses, e.g., Bitcoin sent from Address A to Address B to Address C to Address D.

[53] A large cluster is defined as a cluster of Bitcoin addresses with over 300 addresses. When funds reached large unidentified clusters it is likely that these are unidentified crypto platforms where the custody of traced funds changed at these platforms.

[54] In this Report, Bitcoin is traced for up to 30 hops because our analysis found that Defendants transferred funds to accounts belonging to themselves over a large number of hops. For example, funds were traced from Eyeline API Collection Points to accounts belonging to Ramirez at BitMEX over 27 hops. For robustness, we limited the number

5. To determine the value of funds traced, the US dollar equivalent value of funds was calculated based on the closing price of Bitcoin, sourced from CoinMarketCap, on the date of the transaction analyzed.

6. This Report employs two techniques specific to tracing funds on the Bitcoin blockchain, clustering and proportional allocation, to trace Bitcoin. These are described in greater detail below.

**Clustering**

7. This report uses established Bitcoin clustering techniques grounded in computer science[55, 56] and utilized in the finance literature[57, 58] to identify large groups of Bitcoin addresses that belong to the same entity. The clustering methodology explicitly relies on a specific property of the Bitcoin blockchain known as the "common-input-ownership heuristic."[59]

8. The "common-input-ownership heuristic" is based on the observation that when multiple addresses are used to send Bitcoin in one transaction, the entity controlling each sending address must know the private keys, or passwords, of all the other addresses sending funds in the

---

of hops traced on the Bitcoin blockchain to 10 hops. With 10 hops tracing, the total raised changes from $13.16 million to $13.17 million and proceeds to Defendants change from $8.57 million to $8.22 million. Under the scenario where Ramirez controls Eyeline API (3Lbgt) the proceeds to Putnam change from $2.43 million to $2.27 million and the proceeds to Ramirez change from $5.97 million to $5.79 million. Under the scenario where Putnam controls Eyeline API (3Lbgt) the proceeds to Putnam change from $3.90 million to $3.72 million and the proceeds to Ramirez change from $4.50 million to $4.34 million. The proceeds to Rodriguez change from $170,000 to $160,000 in either scenario.

[55] Meiklejohn, S., Pomarole, M., Jordan, G., Levchenko, K., McCoy, D., Voelker, G. M., & Savage, S. (2013, October). A fistful of bitcoins: characterizing payments among men with no names. In Proceedings of the 2013 conference on Internet measurement conference (pp. 127-140).

[56] Ron, D., & Shamir, A. (2013). Quantitative analysis of the full bitcoin transaction graph. In Financial Cryptography and Data Security: 17th International Conference, FC 2013, Okinawa, Japan, April 1-5, 2013, Revised Selected Papers 17 (pp. 6-24). Springer Berlin Heidelberg.

[57] Foley, S., Karlsen, J. R., & Putniņš, T. J. (2019). Sex, drugs, and bitcoin: How much illegal activity is financed through cryptocurrencies?. The Review of Financial Studies, 32(5), 1798-1853.

[58] Griffin, J. M., & Shams, A. (2020). Is Bitcoin really untethered?. The Journal of Finance, 75(4), 1913-1964.

[59] Harrigan, M., & Fretter, C. (2016, July). The unreasonable effectiveness of address clustering. In 2016 International IEEE Conferences on Ubiquitous Intelligence & Computing (pp. 368-373). IEEE.

same transaction. This indicates that it is likely that all sending addresses in that transaction are controlled by one entity since private keys grant complete access to an address and are usually known only by the owner.[60] Therefore, if it is observed on the blockchain that multiple addresses are used to send Bitcoin in one transaction, it can be inferred with high probability that all sending addresses in that transaction are controlled by a single individual or entity. Since addresses do not need private key authorization to receive Bitcoin, the same heuristic cannot be used to cluster receiving addresses.

9. Using the "common-input-ownership heuristic," it is possible to aggregate multiple addresses into the same clusters. For example, if addresses A and B were both used to send Bitcoin in one transaction and subsequently addresses B and C were both used to send Bitcoin in a second transaction, it can be inferred that addresses A, B, and C are all owned by the same entity. By applying this heuristic on every single transaction on the Bitcoin blockchain, it is possible to aggregate connected Bitcoin addresses into large clusters, sometimes as large as several hundred thousand addresses belonging to the same entity.

10. Using the clustering technique described above, it is possible to infer that a certain group of addresses is controlled by the same person or entity, but not necessarily the person or the entity's identity. To identify real world identities, this Report relied on documents produced to the SEC, as well as publicly available sources identifying crypto platforms and other publicly identifiable Bitcoin blockchain entities.

11. The combination of clustering and identification techniques makes it possible to identify cryptocurrency exchanges which can have hundreds of thousands of addresses under their

[60] Since a private key is analogous to a bank account password, it is rare for cryptocurrency users to share private keys due to the unregulated and irreversible nature of cryptocurrency transactions. The person with the private key has complete control over the crypto assets held at the associated address.

control. Through clustering, the many addresses belonging to a particular exchange are grouped into one single entity. Then, by identifying one address as belonging to the exchange, it is possible to positively identify all clustered addresses as belonging to the same exchange. As mentioned above, this information is useful to determine endpoints for the tracing analysis, i.e., funds are not traced after funds reach a known crypto exchange or platform since the custody of funds changes when funds reach such destinations.

**Proportional Allocation**

12. When funds are withdrawn from a Collection Point, after multiple hops it is possible that they become comingled with other funds not tied to the Securities Offerings. In such a case, a "proportional allocation" assumption is applied to account for funds originating from different sources. This is a necessary assumption when tracing Bitcoin in a transaction that involves multiple inputs or outputs. As shown below in Figure 6, under proportional allocation, the traced amount of Bitcoin at each destination is based on the share of funds belonging to the source being traced.

**Figure 6. Example of Proportional Allocation**



13. In the above example, for transaction "6fdac…" which is downstream from an Eyeline API Collection Point, 0.28519 BTC originated from address "34z4M…", which comprised 15% of the input funds for that transaction. Thus, subsequent tracing uses the 15% allocation to calculate the traced amount[61] from the Eyeline API Collection Point to the two destination addresses ("3EKg7…" and "1MMx9…") as well as to the transaction fees.

14. Proportional allocation is used because the Bitcoin blockchain allows multiple input addresses and multiple output addresses contemporaneously in the same transaction. Therefore, the Bitcoin that is being traced can be combined with other incoming Bitcoin in one transaction and subsequently sent to multiple different addresses. When this occurs, this Report uses the proportion of the traced amount on the input side and applies that same proportion to all outputs.

[61] The use of the term "traced amount" in this Report refers to the proportional allocation to outputs where the proportion is determined by the amount of Bitcoin inputs that originate from the starting point of the trace. In Figure 6, the traced amount from address "34z4m…" to address "3Ekg7…" is 0.0377 BTC or $153.28 and the traced amount from address "34z4m…" to address "1MMx9…" is 0.2475 BTC or $1,007.50.

**Ethereum Blockchain**

*Sources*

15. Ethereum blockchain data are sourced from Google's BigQuery data warehouse.[62] This dataset contains a history of the Ethereum blockchain and has records of every transaction that has occurred on the Ethereum blockchain, with associated details such as the transaction amount, the sending and receiving parties, the date and time, and a uniquely associated transaction identifier known as the transaction hash.

16. In addition to data from the actual Ethereum blockchain, this Report uses data from publicly available sources regarding the identities behind Ethereum addresses,[63] such as crypto exchanges and platforms like Coinbase and CoinPayments.

*Tracing Methodology*

17. The following steps are taken to trace the destination of funds on the Etherem blockchain leaving an identified Collection Point. First, blockchain transactions associated with funds leaving an identified Collection Point are identified using data from crypto platforms (i.e., Coinbase and CoinPayments).[64] Next, funds from these identified transactions are traced forward over multiple hops until one of the following conditions are met: i) the funds reach an address identified belonging to investors, Defendants or Defendants' associates in documents produced to the SEC, ii) the funds reach an address identified using public sources such as a crypto platform, iii) the funds reach a non-identified address with over 2,000 transactions (labeled as "high-activity

[62] More information on Google's BigQuery dataset can be found at: https://cloud.google.com/bigquery/public-data. For the Ethereum blockchain, this Report used the "bigquery-public-data.crypto_ethereum" dataset.
[63] Public sources include social media sites such as such Twitter and YouTube and publicly available Ethereum explorers like https://etherscan.io/.
[64] Ether is only traced forward from Collection Points that are crypto platform accounts since Collection Points that are blockchain addresses on the Ethereum blockchain have not been identified.

address"),[65] iv) the traced amount became negligibly small, i.e., below 0.0001 ETH, or v) the funds do not reach an identified address within five hops.[66] To analyze the source of funds reaching a Collection Point, the same steps and conditions are used, except that funds are traced backwards instead of forwards.

18. To determine the value of funds traced, the US dollar equivalent value of funds was calculated based on the closing price of Ether, sourced from CoinMarketCap on the date of the transaction analyzed.

19. The Ethereum does not have multiple input and multiple output transactions such as exists on the Bitcoin blockchain. As such, the clustering and proportional allocation techniques used for tracing Bitcoin do not apply for funds on the Ethereum blockchain. Nevertheless, it is possible for an Ethereum address to receive funds from multiple addresses and to send funds to multiple addresses over the course of separate transactions. Unlike Bitcoin, crypto assets on the Ethereum blockchain are pooled at an address and it is not possible to follow each individual unit. To properly trace the flow of such funds, this Report uses the "first-in, first-out" (FIFO) accounting

---

[65] Addresses that have had over 2,000 transactions and were labelled "high-activity" because it is possible that they are crypto platforms that have not been identified, and it is likely that the custody of traced funds changed at these platforms. Note that for Ethereum this Report defines a high activity Ethereum address as one having 2,000 *transactions*, whereas in Bitcoin this Report defines a high activity cluster as one having over 300 *addresses*. These thresholds are chosen to minimize the possibility of tracing through a crypto platform while also seeking to minimize the possibility of falsely labeling a crypto platform.

[66] In this Report, Ether is traced for up to five hops. This is fewer hops than for Bitcoin because the Ethereum blockchain has different properties from the Bitcoin blockchain. Specifically, any Bitcoin transaction must use the full balance of a given unspent transaction amount (technically referred to as a UTXO) residing in a Bitcoin address, which means that any amount sent to an address with an amount less than the full balance of the UTXO must be accompanied by sending an amount with the remaining balance of funds to another address (commonly referred to as a "change address"). For example, if Bitcoin Address A has 1 BTC in a UTXO and wishes to send 0.2 BTC to Address B, it must also send 0.8 BTC to Address C (or back to Address A) in the same transaction. Subsequently, if the owner of Address A, who also controls Address C, wishes to send 0.2 BTC to Address D, she must also send 0.6 BTC to another address in the same transaction. From this example, it can be seen how it is possible for the original owner of Bitcoin in Address A to send funds across multiple hops while maintaining control of funds. In contrast, on the Ethereum blockchain, the concept of UTXO does not exist which means that Ethereum addresses do not need to have change addresses. As such, it is not typical for individuals or entities to send funds over many hops since this would needlessly incur a larger amount of transaction fees. Indeed, for the Ether withdrawn from Collection Points, over 99 percent reached a known destination within 5 hops.

methodology to trace the flow of Ether[67] since the account-based nature of the Ethereum wallets is similar to how actual fiat balances are stored in bank accounts and there exists legal precedents in forensic accounting for using a FIFO approach for tracing funds.[68] Under FIFO, each Ethereum address holds a balance of Ether deposits arranged by time. Every time a payment is made, FIFO assumes that the first Ether to leave the wallet are the "oldest" Ether in stock—thus "first-in, first-out."

20. The application of the FIFO approach to the Ethereum blockchain provides a systematic way to track the flow of Ether to and from Collection Points. The FIFO methodology associates the withdrawal of funds from an address against received funds in chronological order, starting with the earliest deposits. For tracing purposes, two numbers are recorded with each deposit into a given address, i) the total number of Ether deposited into the address and ii) how many of the total Ether deposited can be traced to Ether received from a traced withdrawal from a Collection Point. If there are multiple subsequent addresses receiving funds from the given address, they will be identified as receiving Ether from the Collection Point as long as the sending address has sufficient Ether balance that can be traced back to the Ether withdrawal from the Collection Point.

[67] For a description of using FIFO to trace funds on the blockchain, see Wu, J., Liu, J., Zhao, Y., & Zheng, Z. (2021). Analysis of cryptocurrency transactions from a network perspective: An overview. Journal of Network and Computer Applications, 190, 103139.

[68] See In re Christensen, 149 P.3d 40, 122 Nev. 1309 (2006).

## V. APPENDIX E – REVIEW OF DOCUMENTS PROVIDED BY DEFENDANTS' EXPERT AFTER CLOSE OF DISCOVERY

21. After the close of Discovery, Defendants' Expert provided additional documents which seek to provide an explanation for the deposits and withdrawals into five Collection Points identified in this Report: CoinPayments (MMT), CoinPayments (Eyeline), CoinPayments (R & D Global), Coinbase (Putnam) and Trezor (Putnam). This Appendix provides a review of the documents used as sources to justify Defendants' Expert's classification of transactions and assesses the extent to which the information contained in those documents affect the findings of this Report. The documents reviewed are contained in a folder labeled "Transaction Support (New)" and within this folder are 88 subfolders, each one containing documents or additional subfolders that are used to support Defendant's Expert's calculations.

**Methodology**

22. This Appendix reviews these new documents in the same manner that documents produced in Discovery were reviewed as part of the analysis in this Report. Specifically, each new document provided by Defendants' Expert is reviewed and relevant information is recorded if it contains any of the following: i) blockchain addresses that appear to be controlled by Defendants, ii) mining-related blockchain addresses, iii) investor deposit transactions and investor addresses, and iv) blockchain addresses appearing to belong to associates of Defendants. After extracting this information from this new set of documents, this Appendix then recalculates the values provided in this Report as it relates to the total raised, total collective proceeds and proceeds to individual Defendants. It should be noted that these adjusted values are calculated with the assumption that the information contained in the new set of documents is accurate, not taken out of context, not modified from the original, nor fabricated.

23. If the information in the documents is unclear as to the use or ownership of an account, address or transaction, the information is not utilized. Also, only primary source documents are utilized; documents that appeared to be created by Defendants' Expert are considered as analysis files and not relied upon for the analysis in this Appendix.[69] Finally, information from documents that are notably unreliable, e.g., which have inconsistencies, is not included.[70]

**Findings**

24. The 88 subfolders provided by Defendants' Expert can be categorized into the following groups:

- 42 subfolders contained at least one wallet address but no transactions; 27 of these 42 subfolders identified the owner of the identified wallet;
- 3 subfolders contained at least one transaction hash but no wallet addresses; 2 of these 3 subfolders identified the party associated with the transaction;
- 14 subfolders contained at least one wallet address and at least one transaction hash; 12 of these 14 subfolders identified an associated party;
- 27 subfolders do not contain any wallet addresses or transaction hashes;
- 2 subfolders contained documents that are noticeably unreliable.

25. Tables 5, 6 and 7 show updated values based on the new documents provided by Defendants' Expert. The total raised amount increases from approximately $13.16 million to

[69] For example, file "Wallet Transactions qqps.csv" purports to "contain[] a list of all transfer outputs of the custom cluster identified by the following name: qpp942uqrqjep76fktsczw49vc4l2pwd5cazwvhcyx," and has a list of transactions with dates and counterparties. However, there are no individuals identified in the document and no explanation as to the nature of the transactions listed.

[70] For example in folder "3PPU", Defendants' Expert provided two backup files, DP_104083.eml DP_104083.pdf, which have two different dates and which have the sender and recipient reversed. Thus, these files are treated as noticeably unreliable. This occurrence deviated from the normal pattern seen in other backup files with the same name, but different file extension like .eml and .pdf, where those files had the identical information.

$13.24 million. The total proceeds to Defendants decrease from approximately $8.57 million to approximately $7.97 million.[71] In the scenario where Ramirez controls the Eyeline API (3Lbgt) Collection Point, proceeds to Putnam decrease from approximately $2.43 million to approximately $1.96 million and proceeds to Ramirez decrease from approximately $5.97 million to approximately $5.87 million. In the scenario where Putnam controls the Eyeline API (3Lbgt) Collection Point, proceeds to Putnam decrease from approximately $3.90 million to $3.21 million and proceeds to Ramirez increase from approximately $4.50 million to approximately $4.62 million. Under either scenario, proceeds to Rodriguez decrease from approximately $170,000 to approximately $140,000.

[71] The reason why the total amount raised increases and total proceeds decreases is because additional investor addresses were identified in the Defendants' Expert's documents. Some of these investor addresses received payouts from Collection Points and subsequently made new deposits into the Collection Points. As a result, these new deposits are classified as investor deposits whereas they were previously classified as Recycled Funds, which results in a higher total amount raised. Also, payouts to these investors are now classified as payments to identified investors as opposed to proceeds to Defendants, which results in lower total proceeds.

**Table 5. Updated Total Raised from Investors Based on New Documents Provided.**
This table shows the calculation of total raised from investors for each Collection Point. It incorporates new addresses related to Defendants, mining sources, and investors based on new documents provided by Defendants' Expert. Values shown are in US Dollars.

| Collection Points | Deposits | Recycled | Mining | Funds from Ramirez | Total Raised | Identified Investors | Other Deposits |
|---|---|---|---|---|---|---|---|
| Coinbase (Rodriguez) | 285,572 | 46,772 | 169 | 8,857 | 229,775 | - | 229,775 |
| CoinPayments (MMT) | 3,429,967 | 169,767 | 338,105 | 94,925 | 2,827,169 | - | 2,827,169 |
| CoinPayments (Eyeline) | 265,188 | - | - | - | 265,188 | - | 265,188 |
| CoinPayments (R&D Global) | 2,106 | 1,987 | - | - | 119 | - | 119 |
| Trezor (31r7m) | 513,259 | - | 34 | - | 513,225 | 377,266 | 135,959 |
| Trezor (3NpiR) | 1,512,797 | - | 1,119 | 40,740 | 1,470,938 | 593,695 | 877,243 |
| Trezor (38o8u) | 472,965 | 278,743 | - | - | 194,222 | 108,647 | 85,575 |
| Trezor (Putnam) | 196,820 | 9 | - | - | 196,811 | - | 196,811 |
| Coinbase (Putnam) | 1,760,986 | 698,886 | 9,394 | 724,589 | 328,117 | - | 328,117 |
| Eyeline API (3Lbgt) | 8,065,136 | 5,950,371 | 4,883 | 6,673 | 2,103,209 | 247,234 | 1,855,975 |
| Eyeline API (3FmcU) | 3,739,014 | 1,660,944 | 1,059 | - | 2,077,011 | 1,805,690 | 271,322 |
| Eyeline API (3BCEz) | 159,934 | 6,096 | - | - | 153,838 | 153,676 | 162 |
| Eyeline API (3BsKC) | 3,189,242 | 309,978 | 1,583 | - | 2,877,681 | 2,879,223 | (1,542) |
| **Grand Total** | **23,592,986** | **9,123,553** | **356,346** | **875,784** | **13,237,303** | **6,165,430** | **7,071,872** |

**Table 6. Updated Total Proceeds to Defendants Based on New Documents Provided.**
This table shows the calculation of proceeds to Defendants for each Collection Point. It incorporates new addresses related to Defendants, mining sources, and investors based on new documents provided by Defendants' Expert. Values shown are in US Dollars.

| Collection Points | Total Raised | Mining | Asset Appreciation | Total Accrued | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|
| Coinbase (Rodriguez) | 229,775 | 169 | (74,529) | 155,414 | 41,012 | 114,402 |
| CoinPayments (MMT) | 2,827,169 | 338,105 | 84,742 | 3,250,016 | 1,556,486 | 1,693,530 |
| CoinPayments (Eyeline) | 265,188 | - | 4,905 | 270,093 | 777 | 269,316 |
| CoinPayments (R&D Global) | 119 | - | (653) | (535) | 29 | (564) |
| Trezor (31r7m) | 513,225 | 34 | (1,248) | 512,010 | 505,459 | 6,552 |
| Trezor (3NPiR) | 1,470,938 | 1,119 | (74,550) | 1,397,507 | 1,138,457 | 259,050 |
| Trezor (38o8u) | 194,222 | - | (3,350) | 190,871 | 451,125 | (260,254) |
| Trezor (Putnam) | 196,811 | - | 53,970 | 250,781 | 70,509 | 180,272 |
| Coinbase (Putnam) | 328,117 | 9,394 | (64,214) | 273,297 | 1,033,029 | (759,732) |
| Eyeline API (3Lbgt) | 2,103,209 | 4,883 | (103,501) | 2,004,591 | 151,080 | 1,853,511 |
| Eyeline API (3FmcU) | 2,077,011 | 1,059 | 94,118 | 2,172,188 | 557 | 2,171,631 |
| Eyeline API (3BCEz) | 153,838 | - | 23 | 153,861 | 6 | 153,855 |
| Eyeline API (3BsKC) | 2,877,681 | 1,583 | 244,626 | 3,123,890 | 680,619 | 2,443,271 |
| Other Ramirez Accounts | - | - | - | - | 153,981 | (153,981) |
| **Grand Total** | **13,237,303** | **356,346** | **160,337** | **13,753,986** | **5,783,127** | **7,970,859** |

**Table 7. Updated Total Proceeds to Individual Defendants Based on New Documents Provided.** This table shows the calculation of proceeds to individual Defendants, grouped by Collection Points. It incorporates new addresses related to Defendants, mining sources, and investors based on new documents provided by Defendants' Expert. Values shown are in US Dollars.

**Panel A. Scenario 1, if Ramirez Controls Eyeline API (3Lbgt).**

| Defendant | Collection Point | Total Raised | Net - Other Defendants | Mining Funds | Asset Appreciation | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|---|
| Putnam | CoinPayments (MMT) | 2,827,169 | (565,470) | 338,105 | 84,742 | 1,556,486 | 1,128,060 |
| | CoinPayments (Eyeline) | 265,188 | (183,663) | - | 4,905 | 777 | 85,654 |
| | CoinPayments (R&D Global) | 119 | 1,987 | - | (653) | 29 | 1,423 |
| | Trezor (31r7m) | 513,225 | - | 34 | (1,248) | 505,459 | 6,552 |
| | Trezor (3NPiR) | 1,470,938 | (238,003) | 1,119 | (74,550) | 1,138,457 | 21,047 |
| | Trezor (38o8u) | 194,222 | 278,743 | - | (3,350) | 451,125 | 18,490 |
| | Trezor (Putnam) | 196,811 | (773) | - | 53,970 | 70,509 | 179,500 |
| | Coinbase (Putnam) | 328,117 | 1,270,294 | 9,394 | (64,214) | 1,033,029 | 510,562 |
| | Other (Putnam) | - | 12,145 | - | - | - | 12,145 |
| **Subtotal** | | **5,795,788** | **575,261** | **348,652** | **(399)** | **4,755,871** | **1,963,432** |
| Ramirez | Eyeline API (3Lbgt) | 2,103,209 | (605,253) | 4,883 | (103,501) | 151,080 | 1,248,257 |
| | Eyeline API (3FmcU) | 2,077,011 | (447,902) | 1,059 | 94,118 | 557 | 1,723,729 |
| | Eyeline API (3BCEz) | 153,838 | (10,117) | - | 23 | 6 | 143,737 |
| | Eyeline API (3BsKC) | 2,877,681 | (1,419,743) | 1,583 | 244,626 | 680,619 | 1,023,528 |
| | Other (Ramirez) | - | 1,884,997 | - | - | 153,981 | 1,731,016 |
| **Subtotal** | | **7,211,739** | **(598,018)** | **7,526** | **235,265** | **986,243** | **5,870,269** |
| Rodriguez | Coinbase (Rodriguez) | 229,775 | 22,757 | 169 | (74,529) | 41,012 | 137,159 |
| **Subtotal** | | **229,775** | **22,757** | **169** | **(74,529)** | **41,012** | **137,159** |

**Panel B. Scenario 2: If Putnam Controls Eyeline API (3Lbgt).**

| Defendant | Collection Point | Total Raised | Net - Other Defendants | Mining Funds | Asset Appreciation | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|---|
| Putnam | CoinPayments (MMT) | 2,827,169 | (565,470) | 338,105 | 84,742 | 1,556,486 | 1,128,060 |
| | CoinPayments (Eyeline) | 265,188 | (183,663) | - | 4,905 | 777 | 85,654 |
| | CoinPayments (R&D Global) | 119 | 1,987 | - | (653) | 29 | 1,423 |
| | Trezor (31r7m) | 513,225 | - | 34 | (1,248) | 505,459 | 6,552 |
| | Trezor (3NPiR) | 1,470,938 | (238,003) | 1,119 | (74,550) | 1,138,457 | 21,047 |
| | Trezor (38o8u) | 194,222 | 278,743 | - | (3,350) | 451,125 | 18,490 |
| | Trezor (Putnam) | 196,811 | (773) | - | 53,970 | 70,509 | 179,500 |
| | Coinbase (Putnam) | 328,117 | 1,270,294 | 9,394 | (64,214) | 1,033,029 | 510,562 |
| | Other (Putnam) | - | 12,145 | - | - | - | 12,145 |
| | Eyeline API (3Lbgt) | 2,103,209 | (605,253) | 4,883 | (103,501) | 151,080 | 1,248,257 |
| **Subtotal** | | **7,898,997** | **(29,992)** | **353,535** | **(103,900)** | **4,906,951** | **3,211,689** |
| Ramirez | Eyeline API (3FmcU) | 2,077,011 | (447,902) | 1,059 | 94,118 | 557 | 1,723,729 |
| | Eyeline API (3BCEz) | 153,838 | (10,117) | - | 23 | 6 | 143,737 |
| | Eyeline API (3BsKC) | 2,877,681 | (1,419,743) | 1,583 | 244,626 | 680,619 | 1,023,528 |
| | Other (Ramirez) | - | 1,884,997 | - | - | 153,981 | 1,731,016 |
| **Subtotal** | | **5,108,530** | **7,235** | **2,643** | **338,766** | **835,163** | **4,622,011** |
| Rodriguez | Coinbase (Rodriguez) | 229,775 | 22,757 | 169 | (74,529) | 41,012 | 137,159 |
| **Subtotal** | | **229,775** | **22,757** | **169** | **(74,529)** | **41,012** | **137,159** |