THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>  Plaintiff, <br><br> v. <br><br> DANIEL F. PUTNAM, an individual; JEAN PAUL RAMIREZ RICO, an individual; ANGEL A. RODRIGUEZ, an individual; MMT DISTRIBUTION, LLC, a limited liability company; R&D GLOBAL, LLC, a limited liability company, <br><br>  Defendants <br><br> RICHARD T. PUTNAM, an individual, <br><br>  Relief Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [132] MOTION FOR MONETARY RELIEF AS TO DEFENDANTS PUTNAM, RAMIREZ, MMT DISTRIBUTION, AND R&D GLOBAL** <br><br> Case No. 2:20-cv-00301-DBB-DAO <br><br> District Judge David Barlow |

The Securities and Exchange Commission ("SEC") requests that the court order disgorgement, prejudgment interest, and civil penalties as to Defendants Daniel F. Putnam, Jean Paul Ramirez Rico, MMT Distribution, LLC, and R&D Global, LLC ("Defendants").[1] The Defendants largely opposed the motion. On July 27, 2024, the court heard oral argument. After oral argument, the court permitted supplemental briefing, the last of which was received on August 30, 2024.[2] For the following reasons, the court grants the SEC's motion.

---

[1] Mot. for Monetary Relief as to Defs. Putnam, Ramirez, MMT Distribution, and R&D Global ("SEC's Mot."), ECF No. 132.
[2] *See* ECF Nos. 161–166.

## BACKGROUND

In January 2023, the SEC entered into consent decrees with Mr. Putnam, MMT

Distribution, R&D Global, and Mr. Ramirez Rico.[3] Each consent contained the following

provision:

> Defendant agrees that, upon motion of the Commission, the Court shall determine
> whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil
> penalty pursuant to Section 20(d) of the Securities Act and Section 21(d) of the
> Exchange Act and, if so, the amount(s) of the disgorgement and/or civil
> penalty. . . . Defendant further agrees that in connection with the Commission's
> motion for disgorgement and/or civil penalties, and at any hearing held on such
> motion: (a) Defendant will be precluded from arguing that he did not violate the
> federal securities laws as alleged in the Complaint; (b) Defendant may not
> challenge the validity of this Consent or the Judgment; (c) solely for the purposes
> of such motion, the allegations of the Complaint shall be accepted as and deemed
> true by the Court; and (d) the Court may determine the issues raised in the motion
> on the basis of affidavits, declarations, excerpts of sworn deposition or
> investigative testimony, and documentary evidence, without regard to the
> standards for summary judgment contained in Rule 56(c) of the Federal Rules of
> Civil Procedure."[4]

Therefore, the court recites the background of this case according to the allegations in the

Complaint, which the parties have agreed "shall be accepted as and deemed true by the Court,"

together with the evidence submitted with the parties' briefing.

### The Complaint

From 2017 to 2019, Mr. Putnam operated three multilevel marketing ("MLM")

businesses—MMT, Eyeline Trading, and WealthBoss—that purported to offer investors a

---

[3] *See* Pl.'s Unopposed Mot. for Entry of Bifurcated Judgments as to Defs. Daniel F. Putnam, MMT Distribution,
LLC, and R&D Global, LLC, ECF No. 101; Judgment as to Def. Daniel F. Putnam, ECF No. 102; Judgment as to
Def. MMT Distribution, LLC, ECF No. 103; Judgment as to Def. R&D Global, LLC, ECF No. 104; Pl.'s
Unopposed Mot. for Entry of Bifurcated Judgment as to Def. Jean Paul Ramirez Rico, ECF No. 105; Judgment as to
Def. Jean Paul Ramirez Rico, ECF No. 106.
[4] *E.g.*, Consent of Def. Daniel F. Putnam ¶ 4, ECF No. 102 at 4.

chance to profit from investing in digital assets.[5] First, Mr. Putnam offered the opportunity for investors to purchase cryptocurrency mining machines that would be operated by Mr. Putnam and MMT.[6] In exchange, investors were to receive profits from successful mining of cryptocurrency assets.[7] Investors paid Mr. Putnam with both fiat currency and digital assets either directly, or through R&D Global or MMT Distribution.[8] Eventually, investors stopped receiving regular payment for their investments.[9] Investors also were unable to collect the machines they had helped purchase.[10] Mr. Putnam raised around $3.25 million through this operation.[11]

Next, Mr. Putnam, through his MLMs, began offering "cryptocurrency trading packages."[12] Under this scheme, investors could purchase packages ranging from $20 to $500 per package that varied in duration.[13] Half of the funds would be used to engage in cryptocurrency trading, and the other half "would be paid out as commissions to the MLM structure."[14] Mr. Putnam was to aid in recruiting investors, while Mr. Ramirez Rico was to engage in trading activities.[15] Investors "wired funds or deposited cash into [Mr.] Putnam's personal bank account and bank accounts for MMT Distribution."[16] Eventually, Mr. Putnam "began requiring investors to purchase the trading packages with digital assets."[17] In late 2019,

---

[5] Compl. ¶ 18, ECF No. 1.
[6] Id. ¶¶ 19–23.
[7] Id. ¶ 22.
[8] Id. ¶ 24.
[9] Id. ¶ 28.
[10] Id. ¶¶ 31–33.
[11] Id. at ¶ 26.
[12] Id. ¶¶ 34, 38.
[13] Id. ¶ 41.
[14] Id.
[15] Id. ¶ 37.
[16] Id. ¶ 47.
[17] Id. ¶ 48.

Mr. Putnam's MLMs stopped making payments to investors and investors were prevented from making withdrawals.[18] Mr. Putnam and his MLMs "raised at least $1,548,356.81 in digital assets between July 15, 2017 and March 9, 2020."[19]

Finally, Mr. Putnam offered trading packages for $1,000 apiece to an individual identified as J.A.[20] Mr. Putnam represented to J.A. that he could expect returns of up to 0.33% per day.[21] J.A. invested 169 Bitcoin—valued at over $1 million at the time—with Mr. Putnam and his MLMs.[22] Further, J.A. recruited friends and family, who collectively invested 993.29 Bitcoin—valued at $7.2 million—with Mr. Putnam and his MLMs.[23] Beginning in late 2019, J.A. and his fellow investors were no longer able to access their investments.[24]

Thus, in total, Mr. Putnam and his MLMs raised over $12 million.[25]

**Procedural Background and the Record Evidence**

The SEC filed this case on May 7, 2020, alleging violations of Section 17(a)(1) and (3) of the Securities Act,[26] Section 17(a)(2) of the Securities Act,[27] Section 10(b) of the Exchange Act as implemented by Rule 10b-5(a) and (c),[28] Section 10(b) of the Exchange Act as implemented

---

[18] *Id.* ¶¶ 52–54.
[19] *Id.* ¶ 49.
[20] *Id.* ¶ 58.
[21] *Id.* ¶ 60.
[22] *Id.* ¶ 61.
[23] *Id.* ¶ 62.
[24] *Id.* ¶ 68.
[25] *Id.* ¶ 2.
[26] *Id.* ¶¶ 93–97 (against all Defendants). Securities Act Section 17(a) states: "It shall be unlawful for any person in the offer or sale of securities [in interstate commerce] directly or indirectly—(1) to employ any device, scheme, or artifice to defraud" or to "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).
[27] Compl. ¶¶ 98–101 (against Putnam Defendants). Securities Act Section 17(a)(2) prohibits material misstatements or omissions in the sale of securities in interstate commerce. 15 U.S.C. § 77q(a)(2).
[28] Compl. ¶¶ 102–05 (against all Defendants). Section 10(b) of the Exchange Act, as implemented by Rule 10b-5, prohibits substantially the same activities as Securities Act Section 17(a). *See* 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to

by Rule 10b-5(b),[29] and Section 5 of the Securities Act.[30] As noted above, in January 2023, the court entered judgment against Mr. Putnam, MMT Distribution, R&D Global, and Mr. Ramirez Rico pursuant to their consent, whereby it permanently enjoined those Defendants from violating the securities laws, but reserved the question of disgorgement and civil penalties for another day.[31] On October 20, 2023 the SEC moved for disgorgement and civil penalties.[32] This motion was fully briefed on February 12, 2024.[33]

The only substantive evidence the SEC has provided in support of its motion is an expert report from Dr. John M. Griffin.[34] Similarly, the Putnam Defendants and Mr. Ramirez Rico have each provided reports from their own experts—Mr. James T. Wood[35] and Mr. Jeremy Sheridan,[36] respectively. No party has moved to exclude another's expert.[37] In addition to their expert report, the Putnam Defendants have submitted a number of pieces of documentary evidence and declarations. Mr. Ramirez Rico also submitted additional documentary evidence related to alleged business expenses in his supplemental briefing on disgorgement.[38]

---

defraud, . . . (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.").

[29] Compl. ¶¶ 106–09 (against Mr. Putnam). Rule 10b-5(b) prohibits untrue statements or omissions in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b).

[30] Compl. ¶¶ 110–13 (against Putnam Defendants). Section 5 of the Securities Act prohibits the sale of an unregistered security in interstate commerce. 15 U.S.C. § 77e(a), (c).

[31] *See* Judgment as to Def. Putnam; Judgment as to Def. MMT Distribution; Judgment as to Def. R&D Global; Judgment as to Def. Ramirez Rico.

[32] *See* SEC's Mot.

[33] *See* Def. Jean Paul Ramirez Rico's Resp. to the SEC's Mot. for Monetary Relief as to Defs. Putnam, Ramirez, MMT Distribution and R&D Global and Request for Hearing ("Ramirez Rico Resp."), ECF No. 139; Defs. Daniel F. Putnam's, MMT Distribution, LLC's, and R&D Global, LLC's Resp. to the Securities and Exchange Commission's Mot. for Monetary Relief ("Putnam Defs.' Resp."), ECF No. 140; Reply in Support of Mot. for Monetary Relief ("SEC Reply"), ECF No. 149.

[34] Corrected Expert Report of John M. Griffin ("Griffin Report"), ECF No. 132-2.

[35] Corrected and Updated Expert Witness Rebuttal Report ("Wood Report"), ECF No. 140-12.

[36] Jeremy Sheridan's April 17, 2023 Report ("Sheridan Report"), ECF No. 139-3.

[37] *Cf.* Seventh Am. Scheduling Order, ECF No. 114 (setting a deadline to move to exclude expert testimony).

[38] ECF No. 161.

**The SEC's Evidence**

The SEC relies on Dr. Griffin's expert report for evidence in support of its disgorgement calculation. Dr. Griffin began by identifying the accounts used to collect funds from investors ("Collection Points").[39] He identified 13 accounts, displayed in the table below, that either collected deposits from investors, made payouts to investors, or were cryptocurrency accounts containing the names of the companies at issue.[40]

**Table 1. Collection Points Identified.**
Collection Points are identified based on whether they collected investor deposits, made investor payouts, or are accounts held in the name of a Security Offerings company. The identified Collection Points are listed in this table alongside their criteria for inclusion as Collection Points.

| Collection Point | Type | Collected Investor Deposits | Made Investor Payouts | Securities Offering Company Account |
|---|---|:---:|:---:|:---:|
| CoinPayments (MMT) | Crypto platform account | ✓ | ✓ | ✓ |
| CoinPayments (Eyeline) | Crypto platform account | | | ✓ |
| CoinPayments (R & D) | Crypto platform account | | | ✓ |
| Coinbase (Putnam) | Crypto platform account | | ✓ | |
| Coinbase (Rodriguez) | Crypto platform account | | ✓ | |
| Trezor (Putnam) | Crypto wallet/address | | ✓ | |
| Trezor (31r7m) | Crypto wallet/address | ✓ | ✓ | |
| Trezor (3NPiR) | Crypto wallet/address | ✓ | ✓ | |
| Trezor (38o8u) | Crypto wallet/address | ✓ | ✓ | |
| Eyeline API (3Lbgt) | Blockchain address | ✓ | ✓ | |
| Eyeline API (3FmcU) | Blockchain address | ✓ | ✓ | |
| Eyeline API (3BCEz) | Blockchain address | ✓ | | |
| Eyeline API (3BsKC) | Blockchain address | ✓ | ✓ | |

Dr. Griffin then traced funds being deposited into these Collection Points, and funds being sent from these Collection Points, to calculate the total amount of Defendants' ill-gotten gains and

---

[39] Griffin Report ¶¶ 11, 12.
[40] *Id.* at ¶ 12, Tbl. 1. Table 1 identifies three types of Collection Points: cryptocurrency accounts belonging to Defendants, Trezor wallet blockchain addresses, and addresses on the Bitcoin blockchain. *See id.* ¶ 13.

attribute funds to individual Defendants.[41] Throughout, Dr. Griffin relied on data from the

Bitcoin blockchain and "data from publicly available sources regarding the identities behind

Bitcoin addresses."[42] Dr. Griffin traced funds leaving an identified Collection Point over multiple

"hops"—subsequent transactions—until one of the following five conditions was met:

> i) the funds reach an address identified as belonging to investors, Defendants, or Defendants' associates in documents produced to the SEC, ii) the funds reach an address identified using public sources such as a crypto platform, iii) the funds reach a large unidentified cluster of addresses, iv) the traced amount became negligibly small, i.e., below 0.001 BTC, or v) the funds do not reach an identified address within 30 hops.[43]

Dr. Griffin then used two techniques to trace funds on the Bitcoin blockchain: clustering and

proportional allocation.[44] Because the Bitcoin blockchain only permits addresses to send Bitcoin

in a single transaction if the entity sending the Bitcoin has access to each of the addresses, "it can

be inferred with a high probability that all sending addresses in that transaction are controlled by

a single individual or entity."[45] This inference is known as "clustering."[46] Next, because Bitcoin

permits multiple inputs and outputs addresses for a single transaction, which permits tainted

funds to be comingled with untainted funds, Dr. Griffin used "the proportion of the traced

amount on the input side and applie[d] that same proportion to all outputs."[47] This is known as

"proportional allocation."[48]

---

[41] *See id.* at 6–26, 41–49.

[42] *Id.* at 41–42; *see also id.* at 47–48 (explaining the tracing methodology for Ethereum).

[43] *Id.* at 42.

[44] *Id.* at 43.

[45] *Id.* at 44.

[46] *See id.* at 43–45.

[47] *Id.* at 45–46.

[48] *Id.*

Dr. Griffin identified a total of $23,592,986 that was collected at the Collection Points.[49] Of this, $9,123,553 were funds that were transferred between the Collection Points ("Recycled Funds").[50] An additional $356,346 were deposits stemming from cryptocurrency mining conducted by Mr. Ramirez Rico ("Mining Funds").[51] Finally, $875,784 were funds contributed by Mr. Ramirez Rico.[52] This left $13,237,303.[53]

Of this $13,237,303, Dr. Griffin identified $6,165,430 in deposits made by investors ("Identified Investor Deposits").[54] Dr. Griffin based his conclusion that certain deposits were made by investors on evidence that deposits from those accounts had received investor payouts.[55] Finally, Dr. Griffin identified $7,071,872 in deposits that cannot be matched to any of the other categories ("Other Deposits").[56] Dr. Griffin included the $7.07 million as investor deposits because "over half of the Other Deposits went to the same accounts and addresses that received Identified Investor Deposits" and because nearly all the Collection Points made payouts to investors.[57] In other words, Dr. Griffin treated this $7.07 million as tainted funds because there was no indication that the "Collection Points engaged in another business venture unrelated to the Securities Offerings."[58]

---

[49] *Id.* ¶ 23; *id.* App'x E, Table 5.
[50] *Id.* ¶¶ 18, 23; *id.* App'x E, Table 5.
[51] *Id.* ¶¶ 20, 23; *id.* App'x E, Table 5.
[52] *Id.* ¶ 23; *id.* App'x E, Table 5.
[53] *Id.* ¶¶ 23, 24; *id.* App'x E, Table 5.
[54] *Id.* ¶¶ 22, 24; *id.* App'x E, Table 5.
[55] *Id.* ¶ 30.
[56] *Id.* ¶¶ 22, 24; *id.* App'x E, Table 5.
[57] *Id.* ¶ 25.
[58] *Id.*

**Table 5. Updated Total Raised from Investors Based on New Documents Provided.**
This table shows the calculation of total raised from investors for each Collection Point. It incorporates new addresses related to Defendants, mining sources, and investors based on new documents provided by Defendants' Expert. Values shown are in US Dollars.

| Collection Points | Deposits | Recycled | Mining | Funds from Ramirez | Total Raised | Identified Investors | Other Deposits |
|---|---|---|---|---|---|---|---|
| Coinbase (Rodriguez) | 285,572 | 46,772 | 169 | 8,857 | 229,775 | - | 229,775 |
| CoinPayments (MMT) | 3,429,967 | 169,767 | 338,105 | 94,925 | 2,827,169 | - | 2,827,169 |
| CoinPayments (Eyeline) | 265,188 | - | - | - | 265,188 | - | 265,188 |
| CoinPayments (R&D Global) | 2,106 | 1,987 | - | - | 119 | - | 119 |
| Trezor (31r7m) | 513,259 | - | 34 | - | 513,225 | 377,266 | 135,959 |
| Trezor (3NpiR) | 1,512,797 | - | 1,119 | 40,740 | 1,470,938 | 593,695 | 877,243 |
| Trezor (38o8u) | 472,965 | 278,743 | - | - | 194,222 | 108,647 | 85,575 |
| Trezor (Putnam) | 196,820 | 9 | - | - | 196,811 | - | 196,811 |
| Coinbase (Putnam) | 1,760,986 | 698,886 | 9,394 | 724,589 | 328,117 | - | 328,117 |
| Eyeline API (3Lbgt) | 8,065,136 | 5,950,371 | 4,883 | 6,673 | 2,103,209 | 247,234 | 1,855,975 |
| Eyeline API (3FmcU) | 3,739,014 | 1,660,944 | 1,059 | - | 2,077,011 | 1,805,690 | 271,322 |
| Eyeline API (3BCEz) | 159,934 | 6,096 | - | - | 153,838 | 153,676 | 162 |
| Eyeline API (3BsKC) | 3,189,242 | 309,978 | 1,583 | - | 2,877,681 | 2,879,223 | (1,542) |
| **Grand Total** | **23,592,986** | **9,123,553** | **356,346** | **875,784** | **13,237,303** | **6,165,430** | **7,071,872** |

Dr. Griffin then determined that the total amount of proceeds accrued to Defendants was $7,970,859.[59] This figure was arrived at by adding to the $13,237,303 the $356,346 in Mining

---

[59] *See id.* ¶ 31; *id.* App'x E, Table 6.

Assets and $160,337 in appreciation and subtracting $5,783,127 in payments made to identified investors.[60]

**Table 6. Updated Total Proceeds to Defendants Based on New Documents Provided.**
This table shows the calculation of proceeds to Defendants for each Collection Point. It incorporates new addresses related to Defendants, mining sources, and investors based on new documents provided by Defendants' Expert. Values shown are in US Dollars.

| Collection Points | Total Raised | Mining | Asset Appreciation | Total Accrued | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|
| Coinbase (Rodriguez) | 229,775 | 169 | (74,529) | 155,414 | 41,012 | 114,402 |
| CoinPayments (MMT) | 2,827,169 | 338,105 | 84,742 | 3,250,016 | 1,556,486 | 1,693,530 |
| CoinPayments (Eyeline) | 265,188 | - | 4,905 | 270,093 | 777 | 269,316 |
| CoinPayments (R&D Global) | 119 | - | (653) | (535) | 29 | (564) |
| Trezor (31r7m) | 513,225 | 34 | (1,248) | 512,010 | 505,459 | 6,552 |
| Trezor (3NPiR) | 1,470,938 | 1,119 | (74,550) | 1,397,507 | 1,138,457 | 259,050 |
| Trezor (38o8u) | 194,222 | - | (3,350) | 190,871 | 451,125 | (260,254) |
| Trezor (Putnam) | 196,811 | - | 53,970 | 250,781 | 70,509 | 180,272 |
| Coinbase (Putnam) | 328,117 | 9,394 | (64,214) | 273,297 | 1,033,029 | (759,732) |
| Eyeline API (3Lbgt) | 2,103,209 | 4,883 | (103,501) | 2,004,591 | 151,081 | 1,853,511 |
| Eyeline API (3FmcU) | 2,077,011 | 1,059 | 94,118 | 2,172,188 | 557 | 2,171,631 |
| Eyeline API (3BCEz) | 153,838 | - | 23 | 153,861 | 6 | 153,855 |
| Eyeline API (3BsKC) | 2,877,681 | 1,583 | 244,626 | 3,123,890 | 680,619 | 2,443,271 |
| Other Ramirez Accounts | - | - | - | - | 153,981 | (153,981) |
| **Grand Total** | **13,237,303** | **356,346** | **160,337** | **13,753,986** | **5,783,127** | **7,970,859** |

Finally, of the $7,970,859, Dr. Griffin concluded that $1,963,432 belongs to Mr. Putnam, $4,622,011 belongs to Mr. Ramirez Rico, $1,248,258 that belongs to either or both of them, and the remaining $137,159 belongs to Mr. Rodriguez.[61] These amounts were based upon a determination of which Defendant controlled given Collection Points and other non-Collection Point accounts.[62]

---

[60] *See id.* ¶ 31, *id.* App'x E ¶ 25, Table 6.
[61] *See id.* 22–24; *id.* App'x E, Table 7. The remaining $137,159 was traced to Mr. Rodriguez, who is not party to the present Memorandum Decision. *Id.*
[62] *See id.* ¶¶ 35–37.

**Table 7. Updated Total Proceeds to Individual Defendants Based on New Documents Provided.**
This table shows the calculation of proceeds to individual Defendants, grouped by Collection Points. It incorporates new addresses related to Defendants, mining sources, and investors based on new documents provided by Defendants' Expert. Values shown are in US Dollars.

**Panel A. Scenario 1, if Ramirez Controls Eyeline API (3Lbgt).**

| Defendant | Collection Point | Total Raised | Net - Other Defendants | Mining Funds | Asset Appreciation | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|---|
| Putnam | CoinPayments (MMT) | 2,827,169 | (565,470) | 338,105 | 84,742 | 1,556,486 | 1,128,060 |
| | CoinPayments (Eyeline) | 265,188 | (183,663) | - | 4,905 | 777 | 85,654 |
| | CoinPayments (R&D Global) | 119 | 1,987 | - | (653) | 29 | 1,423 |
| | Trezor (31r7m) | 513,225 | - | 34 | (1,248) | 505,459 | 6,552 |
| | Trezor (3NPiR) | 1,470,938 | (238,003) | 1,119 | (74,550) | 1,138,457 | 21,047 |
| | Trezor (38o8u) | 194,222 | 278,743 | - | (3,350) | 451,125 | 18,490 |
| | Trezor (Putnam) | 196,811 | (773) | - | 53,970 | 70,509 | 179,500 |
| | Coinbase (Putnam) | 328,117 | 1,270,294 | 9,394 | (64,214) | 1,033,029 | 510,562 |
| | Other (Putnam) | - | 12,145 | - | - | - | 12,145 |
| Subtotal | | 5,795,788 | 575,261 | 348,652 | (399) | 4,755,871 | 1,963,432 |
| Ramirez | Eyeline API (3Lbgt) | 2,103,209 | (605,253) | 4,883 | (103,501) | 151,080 | 1,248,257 |
| | Eyeline API (3FmcU) | 2,077,011 | (447,902) | 1,059 | 94,118 | 557 | 1,723,729 |
| | Eyeline API (3BCEz) | 153,838 | (10,117) | - | 23 | 6 | 143,737 |
| | Eyeline API (3BsKC) | 2,877,681 | (1,419,743) | 1,583 | 244,626 | 680,619 | 1,023,528 |
| | Other (Ramirez) | - | 1,884,997 | - | - | 153,981 | 1,731,016 |
| Subtotal | | 7,211,739 | (598,018) | 7,526 | 235,265 | 986,243 | 5,870,269 |
| Rodriguez | Coinbase (Rodriguez) | 229,775 | 22,757 | 169 | (74,529) | 41,012 | 137,159 |
| Subtotal | | 229,775 | 22,757 | 169 | (74,529) | 41,012 | 137,159 |

**Panel B. Scenario 2: If Putnam Controls Eyeline API (3Lbgt).**

| Defendant | Collection Point | Total Raised | Net - Other Defendants | Mining Funds | Asset Appreciation | Payments to Identified Investors | Proceeds to Defendants |
|---|---|---|---|---|---|---|---|
| Putnam | CoinPayments (MMT) | 2,827,169 | (565,470) | 338,105 | 84,742 | 1,556,486 | 1,128,060 |
| | CoinPayments (Eyeline) | 265,188 | (183,663) | - | 4,905 | 777 | 85,654 |
| | CoinPayments (R&D Global) | 119 | 1,987 | - | (653) | 29 | 1,423 |
| | Trezor (31r7m) | 513,225 | - | 34 | (1,248) | 505,459 | 6,552 |
| | Trezor (3NPiR) | 1,470,938 | (238,003) | 1,119 | (74,550) | 1,138,457 | 21,047 |
| | Trezor (38o8u) | 194,222 | 278,743 | - | (3,350) | 451,125 | 18,490 |
| | Trezor (Putnam) | 196,811 | (773) | - | 53,970 | 70,509 | 179,500 |
| | Coinbase (Putnam) | 328,117 | 1,270,294 | 9,394 | (64,214) | 1,033,029 | 510,562 |
| | Other (Putnam) | - | 12,145 | - | - | - | 12,145 |
| | Eyeline API (3Lbgt) | 2,103,209 | (605,253) | 4,883 | (103,501) | 151,080 | 1,248,257 |
| Subtotal | | 7,898,997 | (29,992) | 353,535 | (103,900) | 4,906,951 | 3,211,689 |
| Ramirez | Eyeline API (3FmcU) | 2,077,011 | (447,902) | 1,059 | 94,118 | 557 | 1,723,729 |
| | Eyeline API (3BCEz) | 153,838 | (10,117) | - | 23 | 6 | 143,737 |
| | Eyeline API (3BsKC) | 2,877,681 | (1,419,743) | 1,583 | 244,626 | 680,619 | 1,023,528 |
| | Other (Ramirez) | - | 1,884,997 | - | - | 153,981 | 1,731,016 |
| Subtotal | | 5,108,530 | 7,235 | 2,643 | 338,766 | 835,163 | 4,622,011 |
| Rodriguez | Coinbase (Rodriguez) | 229,775 | 22,757 | 169 | (74,529) | 41,012 | 137,159 |
| Subtotal | | 229,775 | 22,757 | 169 | (74,529) | 41,012 | 137,159 |

## The Putnam Defendants' Evidence

Mr. Wood argues that there are eight errors in Dr. Griffin's report: (1) "The Griffin

Report does not provide a disgorgement calculation, which is conventionally necessary in similar

SEC cases"; (2) "The Griffin Report calculations ignore relevant and reliable data and information that is in evidence in this case"; (3) "The calculation models in the Griffin Report produce unreliable results"; (4) "The Griffin Report's 'Total Accrued to Defendants' $7,967,859 exceeds the calculated loss to investors of $7,454,176"; (5) there is "no financial evidence to indicate that Mr. Putnam retained funds for personal use or gain from the cryptocurrency transactions identified in this analysis"; (6) Mr. Putnam's potential disgorgement is significantly less than identified by the Griffin Report; (7) "Payments to Investors exceeded Receipts from Investors from the combined wallets allocated, or that could be allocated to Mr. Putnam"; and (8) "The Griffin Report does not list investors or calculate investor losses conventionally, typically required in similar cases to disburse disgorgeable amounts back to investors."[63]

Ultimately, Mr. Wood concludes that the total deposits at the Collection Points totaled only $16,340,805.[64] Of this, $1,420,898 was recycled between Collection Points, $1,326,235 was initially provided by Mr. Ramirez Rico, $44,207 was initially provided by Mr. Putnam, and $1,987 was provided by Mr. Rodriguez.[65] This left an amount of $12,405,521, which Mr. Wood concludes was the total amount raised as a result of Defendant's wrongdoing.[66]

---

[63] Wood Report 7.
[64] Wood Report 34, Table 16.
[65] *Id.*
[66] *Id.*

### 5.2.3.Table 16 – Summary of Corrections to "Total Raised"

| Summary of Corrections to the "Total Raised" Calculation | | | |
|---|---|---|---|
| **Category** | **Griffin Report Amount** | **Corrected Amount** | **Difference** |
| **Total Deposits** | $23,592,986 | $16,340,805 | -$7,252,181 |
| Less: | | | |
| **Recycled** | $9,123,553 | $1,420,898 | -$7,702,655 |
| **Mining & Trading** | $356,346 | $1,141,957 | $785,611 |
| **Funds from Ramirez** | $875,784 | $1,326,235 | $450,451 |
| **Funds from Putnam** | | $44,207 | $44,207 |
| **Funds from Rodriguez** | | $1,987 | $1,987 |
| **Total** | **$13,237,302** | **$12,405,521** | **-$831,781** |
| **Combined Investor and Other (Unknown) Deposits** | | | |
| **Identified Investors** | $6,165,533 | $7,720,040 | $1,554,507 |
| **Other Deposits** | $7,071,769 | $4,685,482 | -$2,386,407 |
| **Total** | **$13,237,302** | **$12,405,521** | **-$831,781** |

From there, Mr. Wood suggests that Defendants had $856,196 in costs associated with mining pools, miners, and cryptocurrency exchanges.[67] Likewise, Mr. Wood does not include profits from mining—$205,683 by his calculation—in his net profit for Defendants.[68] Mr. Wood also did not include asset appreciation, as he found it to be outside the scope of a disgorgement calculation.[69] Mr. Wood deducted another $156,291 for business expenses.[70] Finally, Mr. Wood subtracted payments made to identified investors.[71] Thus, according to Mr. Wood, the total proceeds to Defendants is $5,210,878.[72]

---

[67] *Id.* at 35.
[68] *Id.*
[69] *Id.* at 37–38.
[70] *Id.* at 38–39.
[71] *Id.* at 39.
[72] *Id.* at 40.

### 5.3.5. Table 19 – Summary of Corrections to "Proceeds to Defendants"

| Summary of Corrections to the "Proceeds to Defendants"  Calculation | | | |
|---|---|---|---|
| Category | Griffin Report Amount | Verature Corrected Amount | Difference |
| Total Raised | $13,237,303 | $12,405,521 | -$831,781 |
| Adjustments: | | | |
| Mining & Trading | $356,346 | -$856,196 | -$1,212,542 |
| Asset Appreciation | $160,337 | $0 | -$160,337 |
| Business Operating Expenses | $0 | -$156,291 | -$156,291 |
| Payments to Identified Investors | -$5,783,127 | -$6,182,156 | -$399,029 |
| Total Proceeds to Defendants | $7,970,859 | $5,210,878 | -$2,759,980 |

Finally, after addressing the errors he perceived in Dr. Griffin's report,[73] Mr. Wood concludes that of the $5,210,878 in ill-gotten gains, -$642,692 can be allocated to Mr. Putnam, $4,314,434 can be allocated to Mr. Ramirez Rico, $115,824 can be allocated to Mr. Rodriguez, and $1,423,313 can be allocated to either Mr. Putnam or Mr. Ramirez Rico.[74] However, the Putnam Defendants later submitted a supplemental addendum from Mr. Wood suggesting that Mr. Putnam's ill-gotten gains are either -$666,299 or $192, depending on whether the 3Lbgt account is allocated to him.[75]

In addition to Mr. Wood's expert report,[76] the Putnam Defendants submitted limited documentary evidence. These documents include: an email with an attached spreadsheet showing refunds from MMT,[77] a declaration from Mr. Richard Putnam describing other business activities

---

[73] *See* Wood Report 41.
[74] *Id.* 42; *id.* 141, sch. 4a.
[75] James Wood Supplemental Addendum, ECF No. 140-14.
[76] In their supplemental briefing, the Putnam Defendants provided Appendix B, Schedule 7, and Schedule 8 of the Wood Report, each of which are spreadsheets. ECF No. 163. According to the Putnam Defendants, Appendix B includes documents "Received and Relied On" by Mr. Wood, ECF No. 163-1; "Schedule 7 of the Wood Report includes detailed line items with references to supporting documents and categorizations for each transaction," ECF No. 163 at 2; and Schedule 8 "highlight[s] incorrect inclusions and exclusions of addresses and amounts due to Dr. Griffin's lack of clustering," *id.* at 3.
[77] MMT Refunds, ECF No. 140-3.

for R&D,[78] an email from Mr. Kwame Warner to Mr. Putnam containing what appears to be a cryptocurrency address,[79] a series of emails describing activation of a "cloud mining contract,"[80] a document showing a series of cryptocurrency transactions,[81] and a document showing a number of deposits into the MMT CoinPayments account.[82]

### Mr. Ramirez Rico's Evidence

Mr. Sheridan provides six opinions: (1) "The analysis, business model, and supporting documentation demonstrates Mr. Ramirez [Rico]'s access to four identified wallets, but this does not equate to custody or ultimate possession of assets"; (2) "Analysis definitively confirms transactions of cryptocurrency that were not and / or could not be ultimately possessed by Mr. Ramirez [Rico], totaling 1,302 bitcoins, valued at approximately $7,184,578"; (3) 328.3 bitcoins, valued at approximately $1,832,007, can be conclusively attributed to Mr. Putnam; (4) 27.3 bitcoins, valued at approximately $418,875.21, can be conclusively attributed to Mr. Ramirez Rico; (5) "The SEC analysis makes several contested attributions and conclusions regarding Mr. Ramirez [Rico]'s ultimate possession of assets that contradict the amounts being assigned to him by the SEC"; and (6) "The SEC analysis utilized flawed tracing methodology by relying on Proportional Allocation, misattributed assets entering unidentified service clusters, and prematurely concluded ultimate possession of assets."[83]

---

[78] Richard Putnam Decl., ECF No. 140-7.
[79] Kwame Warner Email, ECF No. 140-15.
[80] Bitcoin Activation Emails, ECF No. 140-16.
[81] Cryptocurrency Transactions, ECF No. 140-17.
[82] MMT CoinPayments Deposits, ECF No. 140-18.
[83] Sheridan Report 4.

Mr. Sheridan focuses his analysis on the addresses that Dr. Griffin does attribute, or suggests could be attributed, to Mr. Ramirez Rico.[84] Mr. Sheridan provides an analysis of the transactions originating from the four addresses that belong or potentially belong to Mr. Ramirez Rico and concludes that Mr. Ramirez Rico ultimately received only $1,205,641 of a total $8,390,218.62 sent from those addresses.[85] Mr. Sheridan does not include an analysis for how much those accounts, individually or in the aggregate, was collected from investors. Next, Mr. Sheridan concludes that Mr. Ramirez Rico redistributed $786,765.52 of the $1,205,641, leaving $418,875.[86] Mr. Sheridan further concludes that $2,905,631 was sent from the four addresses to "Unattributable beneficiaries."[87]

In his supplemental briefing, Mr. Ramirez Rico also submitted limited documentary evidence regarding disgorgement and claimed legitimate business expenses.[88] These documents primarily consist of various spreadsheets, invoices, and a few payment receipts.

## DISCUSSION

## I.    Experts

Though none of the Defendants filed a motion to exclude and the deadline for so doing is long past,[89] the court still exercises its "gatekeeping" function[90] to determine whether the SEC's proffered expert meets the standards set forth in Federal Rule of Evidence 702.[91] Federal Rule of Evidence 702 reads:

---

[84] *See id.* 12–27.
[85] *See id.* at 24–25.
[86] *Id.* at 26.
[87] *Id.* at 25.
[88] ECF No. 161.
[89] Seventh Am. Scheduling Order (setting deadline for motions exclude expert testimony).
[90] *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 597 (1993).
[91] *See Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[92]

Rule 702 thus requires a two-step inquiry: First, the court determines whether an expert is qualified to render an opinion; and second, the court determines whether the opinions in question are sufficiently reliable.[93] Because the court rejects the arguments raised by Defendants based on Mr. Wood's and Mr. Sheridan's reports, the court does not conduct a *Daubert* analysis for those reports.

First, the court concludes that Dr. Griffin is qualified to render an opinion on the amount of the Defendants' ill-gotten gains, including the amount of funds collected, the source of funds, and the attribution of funds. Dr. Griffin holds a Ph.D. in finance and has held various academic positions in finance since 1997.[94] His academic research focuses on "forensic finance, with a specific interest in cryptocurrency and digital assets."[95] Finally, he is the CEO of Integra, a litigation consulting firm related to "fraud discovery and recovery."[96] Thus, Dr. Griffin's

---

[92] Fed. R. Evid. 702.
[93] *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022).
[94] Griffin Report 27–37.
[95] *Id.* at 3; *see also id.* at 27–30.
[96] *Id.* at 30.

knowledge, education, and experience on the subject of cryptocurrencies and forensic finance

qualify him to render an opinion in this case.

Second, the court finds that Dr. Griffin's report reflects a reliable application of reliable

methods and data. At bottom, Dr. Griffin's analysis proceeds in three broad steps: first, he

calculated the total amount raised from investors; second, he calculated the total proceeds to all

Defendants; and third, he attributed funds to individual Defendants.[97]

At the first step, Dr. Griffin identified Collection Points based on whether they collected

deposits from investors, made payouts to investors, or were crypto platform accounts containing

the names of the Defendants.[98] Next, Dr. Griffin calculated the total inputs and outputs from the

Collection Points based on blockchain data and the close of day price of a given

cryptocurrency.[99] From there, Dr. Griffin identified Recycled Funds based on whether

subsequent transfers from a Collection Point were later deposited into either the same or a

different Collection Point.[100] He then identified Mining Funds based on whether funds originated

from a mining pool or newly mined coin.[101] These were then subtracted from the total.[102] Finally,

Dr. Griffin identified investor deposits based on whether documentary evidence confirmed a

match between a purported deposit and blockchain data.[103] But even if deposits could not be

confirmed as an Identified Investor Deposit, it was attributed to Defendants' wrongdoing

because the majority of the Other Deposits went into accounts that received Identified Investor

---

[97] *See id.* at 6, 16, 20.
[98] *Id.* at 7.
[99] *Id.* at 10.
[100] *Id.* at 11.
[101] *Id.* at 11–12.
[102] *Id.* at 11.
[103] *Id.* at 13.

Deposits and because almost all the Collection Points made payouts to investors.[104] The court finds that each of these smaller steps reliably applies a reliable method.

At the second broad step, Dr. Griffin added to the Total Raised figure the Mining Funds and any asset appreciation.[105] Asset appreciation was calculated based on the difference in value between the date a token was deposited and the date they reached their final destination.[106] He then subtracted payments to identified investors, who were identified using documentary evidence.[107] The court again finds that it is more likely than not that these steps are a reliable application of reliable methods.

At the third and final step, Dr. Griffin attributed funds to individual Defendants based on a determination of which Defendant controlled a given Collection Point and the final destination of funds transferred between Collection Points.[108] Dr. Griffin used clustering and proportional allocation to trace Bitcoin to the proper owner, as described above.[109] The court finds that these steps reflect a reliable application of reliable methods.

Accordingly, the court finds that Dr. Griffin's expert report is admissible under Rule 702.

## II.   Disgorgement

In any action brought under the Securities Act or the Exchange Act by the SEC, the court may grant disgorgement as an equitable remedy.[110] The Tenth Circuit has held that district courts

---

[104] *Id.* at 14.
[105] *Id.* at 16.
[106] *Id.* at 17.
[107] *Id.* at 17–18.
[108] *Id.* at 20–22.
[109] *Id.* at 43; *see supra* "The SEC's Evidence."
[110] 15 U.S.C. § 78u(d)(5); *id.* § 77t(f); *Liu v. SEC*, 591 U.S. 71, 74 (2020). Notably, in 2021, Congress amended the Exchange Act to expressly authorize disgorgement. *See* 15 U.S.C. § 78u(d)(7), (8); National Defense Authorization Act, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625 (2021). However, since this case was commenced prior to the amendments and since neither party argues otherwise in briefing, the court treats disgorgement as an equitable remedy governed by Sections 78u(d)(5) and 77t(f). *Cf. U.S. SEC v. Camarco*, 2021 WL 5985058, *2 n.3 (10th Cir.

may order equitable disgorgement based on a "reasonable approximation" of the defendant's ill-gotten gains.[111] "Once a reasonable approximation is shown [by the SEC], 'the burden shifts back to the defendant[s] to "demonstrate that the disgorgement figure [is] not a reasonable approximation.""'[112] But because disgorgement is an equitable remedy, the Supreme Court has held that a disgorgement award may not exceed a "wrongdoer's net profits."[113] This requires that courts "deduct legitimate expenses before ordering disgorgement," though such deductions may be denied when the entire business is the result of wrongdoing.[114] In addition, the Court has observed that disgorgement "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains," though it has left open whether the SEC may seek disgorgement even when it would be infeasible or impossible to distribute proceeds to the injured investors.[115] Finally, the Court has disapproved of joint and several liability in most circumstances, though not when applied to "partners engaged in concerted wrongdoing."[116]

Here, the SEC seeks disgorgement, both individually and jointly and severally, from Defendants.[117] Specifically, it seeks $1,963,432 from Mr. Putnam, MMT, and R&D Global jointly and severally; $4,622,011 from Mr. Ramirez Rico individually, and $1,248,258 from Mr. Putnam and Mr. Ramirez Rico jointly and severally.[118]

---

2021) ("[T]he SEC maintains that it seeks equitable disgorgement in this case. Therefore, we limit our analysis to the contours of equitable disgorgement within a proceeding initiated by the SEC, leaving for another day whether the amended version of § 78u permits disgorgement as a statutory-based remedy in law.").

[111] *Camarco*, 2021 WL 5985058, *14; *U.S. SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006).

[112] *SEC v. GenAudio, Inc.*, 32 F.4th 902, 945 n.22 (10th Cir. 2022).

[113] *Liu*, 591 U.S. at 74; *id.* at 85–87.

[114] *Id.* at 91–92.

[115] *Id.* at 89–90.

[116] *Id.* at 90–91.

[117] *See* SEC's Mot. 8–12.

[118] SEC's Mot. 7.

The court addresses: (A) whether joint and several disgorgement is appropriate; (B) whether the SEC has provided a reasonable approximation of Defendants' ill-gotten gains and whether Defendants have rebutted that approximation; (C) whether the SEC's disgorgement calculation must fail because it has not identified victims to reimburse; and (D) whether the SEC has failed to deduct legitimate business expenses.

### A.      Joint and Several Disgorgement

The SEC seeks joint and several disgorgement from both Mr. Putnam, MMT, and R&D because they "engaged in concerted wrongdoing and were partners in the fraud," and from Mr. Putnam and Mr. Ramirez Rico because it cannot determine which of the two owned the 3Lbgt address.[119] With regard to the former, none of the Putnam Defendants expressly challenge the validity or amount of joint and several disgorgement. With regard to the latter, both the Putnam Defendants and Mr. Ramirez Rico take the position that the other owned the 3Lbgt wallet;[120] however, neither argues outright that joint and several disgorgement is inappropriate if ownership of the wallet is indeterminate.

As noted above, in *Liu*, while the Supreme Court held that joint and several disgorgement is generally at odds with traditional equity practice, and therefore, is disallowed under Section 78u(d)(5), it observed that "[t]he common law did . . . permit liability for partners engaged in concerted wrongdoing."[121] There, the Court outlined some facts relevant to the inquiry: the defendants—Liu and Wang—were married, and Liu had formed business entities and had

---

[119] SEC's Mot. 11–12.

[120] Ramirez Rico Resp. 8–9; Putnam Defs.' Resp. 17 n.14.

[121] *Liu*, 591 U.S. at 90; *see also id.* at 91 ("Given the wide spectrum of relationships between participants and beneficiaries of unlawful schemes—from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements—the Court need not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals.").

misappropriated investments, while Wang held herself out as a member of the management team on the entity to which Liu directed misappropriated funds.[122] Further, there was no suggestion that Wang was "a mere passive recipient of profits," that "their finances were not comingled, or that one spouse did not enjoy the fruits of the scheme."[123] It then remanded for the lower court "to determine whether the facts are such that [defendants] can, consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required."[124] Following *Liu*, courts have generally permitted joint and several disgorgement between an entity and its control person,[125] and between individuals when the two were knowingly engaged in the same wrongdoing, assets accrued to both defendants, and there was no evidence of mere passive receipt of funds.[126]

With regard to joint and several liability between Mr. Putnam, MMT, and R&D, the evidence suggests that they engaged in concerted wrongdoing, comingled funds, and that Mr. Putnam exercised a high degree of control over MMT and R&D.[127] Joint and several liability under these circumstances is appropriate and consistent with equitable principles. No Defendant argues otherwise.

With regard to joint and several liability between Mr. Putnam and Mr. Ramirez Rico, the analysis is more complicated. The SEC's primary contention is that joint and several liability is

---

[122] *Id.* at 77–78, 91.
[123] *Id.* at 91.
[124] *Id.*
[125] *See, e.g.*, *U.S. SEC v. Johnson*, 43 F.4th 382, 389–93 (4th Cir. 2022); *SEC v. Westport Capital Markets, LLC*, 547 F.Supp.3d 157, 171–72 (D. Conn. 2021).
[126] *See, e.g.*, *SEC v. Liu*, 2021 WL 2374248, *9 (C.D. Cal. June 7, 2021); *cf. SEC v. Yang*, 2021 WL 1234886, * 7–9 (C.D. Cal. Feb. 16, 2021) (holding joint and several disgorgement was inappropriate where funds did not accrue to one defendant).
[127] *See* Compl. ¶¶ 24, 47, 71–76.

appropriate because the two were engaged in concerted wrongdoing, and because it is reasonable

to infer that Mr. Putnam and Mr. Ramirez Rico shared control over the 3Lbgt address.[128] The

allegations of the Complaint—accepted as true by express agreement of the parties—make clear

that Mr. Putnam and Mr. Ramirez Rico were knowingly engaged in concerted wrongdoing. In

2017, they "agreed to a business arrangement" under which Mr. Putnam and Mr. Rodriguez

"would recruit investors" and send funds to Mr. Ramirez Rico, while Mr. Ramirez Rico would

engage in trading activities.[129] No later than 2019, Mr. Putnam was aware that Mr. Ramirez Rico

was engaging in wrongful activity,[130] but continued to receive funds and transfer them to Mr.

Ramirez Rico until early 2020.[131] Likewise, the allegations of the Complaint make clear that Mr.

Ramirez Rico was at the very least reckless that the business arrangement was wrongful.[132] He

also personally was involved in making payments from principal as if they were profits,[133] which

is fraudulent. The evidence also suggests that the defendants were engaged in more than an arms-

length business relationship. Accordingly, the facts show that both Mr. Putnam and Mr. Ramirez

Rico were knowingly engaged in concerted wrongdoing.

Next, the evidence shows that assets accrued to both Defendants and that neither was a

mere passive recipient of funds. In discussing the 3Lbgt address, Dr. Griffin observed that while

"[s]ome documents produced to the SEC indicate that [Mr.] Ramirez [Rico] controlled" the

address, "at least one document" suggests that Mr. Putnam did.[134] Mr. Sheridan opines that Mr.

---

[128] SEC's Mot. 11–12.
[129] Compl. ¶¶ 37, 49.
[130] *See id.* ¶¶ 89–92.
[131] *Id.* ¶ 49.
[132] *Id.* ¶ 92.
[133] *Id.*
[134] Griffin Report ¶ 13 n.14–15.

Putnam controlled the 3Lbgt address, as there were a number of communications between Mr. Putnam and Mr. Ramirez Rico that suggest that Mr. Putnam was able to send and receive funds at the 3Lbgt address.[135] Mr. Wood, by contrast, declares that his analysis supported that Mr. Ramirez Rico controlled the 3Lbgt wallet,[136] though he does not meaningfully examine ownership of the 3Lbgt wallet in either his expert report or his supplemental addendum.[137] It is clear from the materials that Dr. Griffin and Mr. Sheridan rely upon that Mr. Putnam had access to and could send funds from the 3Lbgt address, and Dr. Griffin points to some evidence that Mr. Ramirez Rico had access to and could send funds from the address.

In sum, the evidence suggests both Mr. Ramirez Rico and Mr. Putnam had access to, and therefore control over, the 3Lbgt account. Given this comingling of funds and that the two were knowingly engaged in concerted wrongdoing, it is consistent with equitable principles to impose joint and several liability on Mr. Ramirez Rico and Mr. Putnam for the proceeds stemming from the 3Lbgt wallet.[138] The parties were engaged in concerted wrongdoing, and it would be just to hold them jointly and severally liable.

### B.    Reasonable Approximation

Defendants collectively make three groups of arguments to suggest that the SEC has not provided the court with a reasonable approximation of their ill-gotten gains: (1) that the SEC has

---

[135] Sheridan Report 12–14; *see also id.* at 19 (summarizing conclusions as to the 3Lbgt wallet).
[136] Wood Decl. ¶¶ 18–20.
[137] *Cf.* Wood Report 47 ("I have not reviewed all transactions or had sufficient time to reasonably identify ownership of transactions in . . . Eyeline API wallets 3Lbgt, 3FmcU, [and] 3B[s]KC."); *see also* Wood Dep. 219:11–220:20, ECF No. 140-13. While Mr. Wood's supplemental addendum suggests that the 3Lbgt address belonged to Mr. Ramirez Rico, *see* Wood Supplemental Addendum, ECF No. 140-14, the court finds it unreliable. For starters, as Dr. Griffin points out, Mr. Wood does not identify which evidence he relied upon to generate the conclusions found in the addendum. *See* Griffin Decl. ¶ 13. And further, the addendum is neither sworn nor signed. *See* Wood Supplemental Addendum.
[138] *See* Griffin Report 54, Table 7.

failed to establish that specific assets are causally connected to the alleged wrongdoing; (2) that the SEC attempts to disgorge funds acquired outside the relevant time period alleged in the Complaint; and (3) that Dr. Griffin's expert report makes a number of errors.

### 1.   Causal Connection

Defendants argue that the SEC has not provided a reasonable approximation of their profits because Dr. Griffin included $7,071,872 in the $13,237,203 total amount raised based only on an assumption without a proven causal connection to their wrongdoing.[139]

The Tenth Circuit has not fully illuminated the precise contours of the reasonable approximation analysis. However, two cases are relevant. In *United States v. RaPower-3, LLC*, the district court calculated a disgorgement award by using defendants' business records to determine the number of products sold and multiplying that number by a conservative estimate of the price paid.[140] The Tenth Circuit approved of this calculation as a reasonable approximation, and emphasized that because ambiguities in defendants' own business records caused the uncertainty, their arguments did not render the district court's calculation erroneous.[141] Indeed, the Tenth Circuit observed that "[a]ny uncertainty is resolved against the 'conscious wrongdoer'" in approximating a defendant's ill-gotten gains.[142]

In *U.S. SEC v. Camarco*, an individual had embezzled over $2 million in client funds and had distributed these funds to her personal accounts, to entities she controlled, and to her husband.[143] On appeal, one of the entities objected to the district court's disgorgement award

---

[139] Ramirez Rico Resp. 10–12, 3–6; Putnam Defs.' Resp. 20–23; *see also id.* at 17–19.
[140] 960 F.3d 1240, 1252–53 (10th Cir. 2020).
[141] *Id.*
[142] *Id.* at 1252 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i (Am. L. Inst. 2011)); *accord, e.g.*, *SEC v. First City Fin. Corp., Ltd.* 890 F.2d 1215, 1232 (D.C. Cir. 1989).
[143] 2021 WL 5985058, *1, 2 (10th Cir. 2021).

against it.[144] The Tenth Circuit rejected a "strict tracing requirement" proposed by defendants—
which would have required the SEC to prove not only the amount of ill-gotten gains, but also
that particular funds or assets purchased with those funds were still in defendants' possession—
and instead reaffirmed the "reasonable approximation" standard.[145] The Tenth Circuit, however,
rejected several bases for a disgorgement award.[146] First, it rejected an approach under which the
disgorgement amount as to one entity was calculated by subtracting from the total amount
embezzled the funds the defendants had reimbursed and the money provided to the other
defendants.[147] The Tenth Circuit observed that "the SEC must prove the amount of ill-gotten
funds [the defendant] received, not merely the amount of money that the SEC cannot attribute to
another recipient."[148] Second, it rejected two bases for the disgorgement award that did not
properly distinguish between assets purchased with tainted and untainted funds.[149] The burden in
proving "the tainted versus untainted nature of assets" was with the SEC in the first instance.[150]
Finally, however, the Tenth Circuit approved of a method of approximating the defendants' ill-
gotten gains whereby SEC's expert relied on schedules that traced tainted funds to particular
transfers.[151]

   Here, Mr. Ramirez Rico argues that the reasonable approximation analysis does not
extend to a decision whether or not to include an entire class of assets.[152] He does not cite

---

[144] *Id.* at *17–20.
[145] *Id.* *13–17.
[146] *Id.* at *17–18.
[147] *Id.* at *17.
[148] *Id.* (citations omitted).
[149] *Id.* at *18.
[150] *Id.*
[151] *Id.*
[152] Ramirez Rico Resp. 10.

apposite caselaw. Whether or not Mr. Ramirez Rico's argument could be true in some case, it is

not true in this one. Dr. Griffin only classified funds as "Identified Investor Deposits" if there

was a match between an account that had made a deposit and that had also received payouts.[153]

Therefore, where an account had not yet received a payout—which is plausible given that

Defendants stopped making payouts in November 2019[154]—the funds collected from that

account would be classified as "Other Deposits." Dr. Griffin's determination that "Other

Deposits" were investor funds was reasonable based on the absence of any other record evidence

to suggest where that approximately $7 million came from. In other words, like in *RaPower-3*,

Dr. Griffin's taint determination was necessitated by Defendants' poor record-keeping.[155]

The Putnam Defendants argue that Dr. Griffin improperly concluded that the funds were

tainted because R&D ran several legitimate MLMs and because Dr. Griffin erroneously assumed

that the Collection Points were used only to receive funds related to their wrongdoing.[156] Indeed,

Mr. Richard Putnam—Daniel Putnam's father and a relief defendant in this case[157]—summarily

declares that R&D Global ran a nutritional supplement company whose customers often paid in

cryptocurrency.[158] But beyond that broad and conclusory declaration, the Putnam Defendants

provide no evidence of where the $7,071,872 came from if not their wrongdoing.[159] The one-

---

[153] Griffin Report ¶ 22.
[154] *See* Compl. ¶¶ 52, 68.
[155] 960 F.3d at 1252.
[156] Putnam Defs.' Resp. 21.
[157] *See* Compl. ¶¶ 4, 16.
[158] Richard Putnam Decl. ¶¶ 3–6, ECF No. 140-7.
[159] The Putnam Defendants suggest that "documents produced to the SEC demonstrate that Mr. Putnam was involved in buying and selling cryptocurrency mining machines, exchanging currencies for cash with third parties, trading cryptocurrencies and running several multi-level marketing businesses using the same Collection Points the SEC claims solely housed Securities Offering funds." Putnam Defs.' Resp. 21. However, the Putnam Defendants cite only to Mr. Wood's Supplemental Addendum. *Id.* Not only is the Supplemental Addendum of limited probative value, but the transactions cited to appear to be the same as those claimed as legitimate business expenses. *See infra*

page declaration from Richard Putnam is unsupported by any business records or other evidence. The court cannot credit this. While it might be true that Defendants ran legitimate businesses whose customers paid in cryptocurrency, the Putnam Defendants do nothing to suggest that the Collection Points identified by Dr. Griffin were used for such business and how much of the $7,071,872 was tied to legitimate business ventures, as opposed to their wrongdoing. Again, as in *RaPower-3*, Defendants are in the best position to provide such evidence and have chosen not to do so.[160]

Finally, the court notes that the Complaint alleges that Defendants raised at least $12 million from their wrongdoing.[161] Dr. Griffin calculated the total amount raised as $13,237,203, after excluding recycled funds, mining funds, and funds initially contributed by Mr. Ramirez Rico.[162] Indeed, Mr. Wood similarly concludes that $12,405,521 was raised by Defendants as a result of their wrongdoing—he does not exclude "Other Deposits" from his analysis.[163] To do so as both sets of Defendants suggest would impermissibly reduce the amount raised below the $12 million alleged in the Complaint and would contravene the Putnam Defendants' own expert's analysis. As noted earlier, the parties have agreed that the Complaint's allegations "shall be accepted as and deemed true by the Court."[164]

Therefore, the court concludes that $13,237,203 reasonably approximates Defendants' ill-gotten gains obtained from investors. The "Other Deposits" amount is reasonably included both

---

Section II.D. Finally, the Wood Supplemental Addendum contains no discussion of other businesses using the same Collection Points.
[160] 960 F.3d at 1252–53.
[161] Compl. ¶ 2.
[162] Griffin Expert Report 53, tbls. 5, 6.
[163] *See* Wood Expert Report 34, 40.
[164] *E.g.* Consent of Def. Daniel F. Putnam ¶ 4, ECF No. 102 at 4.

based on Dr. Griffin's report and the parties' agreement to be bound by the allegations of the Complaint.

### 2. Timeframe of Transactions

The Putnam Defendants suggest that "the SEC includes in its disgorgement analysis transactions [that] precede and post-date the relevant period of July 2017 to November 2019."[165] However, they cite only to Mr. Wood's supplemental addendum, which merely makes a conclusory assertion, and does not provide supporting citations or documentation.[166] The court does not credit this assertion.

### 3. Alleged Errors in Dr. Griffin's Report

Next, Defendants suggest that the SEC has not carried its burden in providing a reasonable approximation of their ill-gotten gains because Dr. Griffin's report contains several errors.[167] They make five types of objections that the court addresses in turn.

First, the Putnam Defendants argue that Dr. Griffin "employs an incomplete calculation methodology."[168] This objection is without merit. The Putnam Defendants argue that Dr. Griffin's methodology is flawed because he only excluded "recycled, mining, and identified investor funds" and therefore his calculation of the amounts Defendants profited were simply "plug numbers, or numbers used to balance an equation when specific values are unknown."[169] This objection has largely been addressed above.[170] Dr. Griffin's calculations do not lose their force simply because they are based on reasonable assumptions necessitated by Defendants' lack

---

[165] Putnam Defs.' Resp. 19.
[166] *See* Wood Supplemental Addendum 3.
[167] Putnam Defs.' Resp. 24–27.
[168] Putnam Defs.' Resp. 24.
[169] Putnam Defs.' Resp. 25.
[170] *See supra* Section II.B.1.

of recordkeeping. Dr. Griffin provided an analysis that takes into account how much money was received at identified Collection Points, how much was recycled between Defendants, and how much was paid to investors.[171] There is nothing inherently unreliable about using math to balance the equation.

Second, the Putnam Defendants argue that Dr. Griffin erroneously concluded that over $1.8 million belonged to Defendants.[172] Mr. Wood suggests that Dr. Griffin included in his final analysis $570,422 in "unspent" funds—funds that remain "at an unknown address less than 30 transactions from the Collection Point"—and $1.3 million of funds that are "left-to-trace"— funds that had "not met a known address before passing through 30 transactions."[173] Dr. Griffin explains his tracing methodology for Bitcoin as follows:

> First, blockchain transactions associated with funds leaving an identified Collection Point are identified either from crypto platforms data (from Coinbase and CoinPayments) or from the Bitcoin blockchain. Next, funds from these identified transactions are traced forward over multiple hops until one of the following conditions are met: i) the funds reach an address identified as belonging to investors, Defendants, or Defendants' associates in documents produced to the SEC, ii) the funds reach an address identified using public sources such as a crypto platform, iii) the funds reach a large unidentified cluster of addresses, iv) the traced amount became negligibly small . . ., or v) the funds do not reach an identified address within 30 hops.[174]

As Dr. Griffin does not use the term "unspent" or "left-to-trace," Defendants appear to be challenging the inclusion of amounts identified by the fifth condition only.

For starters, neither Mr. Wood nor the Putnam Defendants point to evidence supporting the amounts they seek to deduct.[175] But in any event, even assuming Defendants had provided

---

[171] *See* Griffin Report 7–14, 53–54.
[172] Putnam Defs.' Resp. 25.
[173] Wood Report 17, 22.
[174] Griffin Report 42; *see also id.* at 47–48 (explaining the tracing methodology for Ethereum).
[175] Mr. Wood cites to a spreadsheet not before the court. *See* Wood Report 22.

accurate amounts, Dr. Griffin's tracing methodology is supported. Dr. Griffin "found that Defendants transferred funds to accounts belonging to themselves over a large number of hops. For example, funds were traced from Eyeline API Collection Points to accounts belonging to [Mr. Ramirez Rico] at BitMEX over 27 hops."[176] Based on this, if funds had not reached an identified destination within 30 hops, it is not unreasonable to determine that Defendants were transferring funds to themselves. Likewise, if funds were sent to an unknown address and remained there, it is not unreasonable to conclude that said address belonged to Defendants and that Defendants had not identified the address to the SEC. As discussed above, Dr. Griffin treated funds that had been received at the Collection Points as belonging to Defendants unless there was evidence that they transferred them to someone else.[177] This was reasonable. Defendants are in the best position to provide an accurate accounting from their business and financial records, and, for whatever reason, they have chosen not to do so.[178]

Third, Defendants argue that Dr. Griffin incorrectly applied clustering methodologies.[179] Clustering refers to a method under which multiple addresses are assumed to be under the control of the same person or entity because they are used to send Bitcoin in a single transaction.[180] According to Mr. Wood, Dr. Griffin did not consistently apply clustering, which resulted in Dr. Griffin failing to treat certain transactions as Recycled Funds.[181] The SEC replies

---

[176] Griffin Report 42 n.54.

[177] *See* Griffin Report ¶¶ 26–31.

[178] While the Putnam Defendants suggest that Dr. Griffin's methodology improperly excluded any documentation "that does not explicitly contain a cryptocurrency wallet address," Putnam Defs.' Resp. 25, they do not provide any evidence to support deducing all or portions of the $1.8 million challenged here.

[179] Putnam Defs.' Resp. 25–26. No party suggests that clustering is an inappropriate methodology.

[180] *See* Griffin Report ¶¶ 7–10. This assumption is premised on the idea that "when multiple addresses are used to send Bitcoin in one transaction, the entity controlling each sending address must know the private keys, or passwords, of all the other addresses sending funds in the same transaction." *Id.* ¶ 8.

[181] Wood Report 24–26.

that Mr. Wood misunderstands Dr. Griffin's analysis and that Dr. Griffin properly applied clustering.[182]

Again, the court is not persuaded by Defendants' argument. Mr. Wood points to two putative errors in Dr. Griffin's application of clustering. First, he argues that "the two Eyeline API addresses, 3FmcU and 3BCEz, are identified as separate wallets in Griffin's analysis" but that they in fact "belong to the same cryptocurrency wallet."[183] But Dr. Griffin's report identifies both addresses as belonging to Mr. Ramirez Rico, not the Putnam Defendants.[184] Dr. Griffin only considers the wallets separately when tracing funds because this is how the Bitcoin blockchain records balances at the address level.[185] Therefore, there was no error. Second, Mr. Wood argues that Dr. Griffin's application of clustering improperly fails to "recognize a number of addresses owned by Mr. Ramirez [Rico]," which contain transactions totaling $356,263.[186] But Mr. Wood points to no record evidence before the court that could lead it to adopt the same conclusions.[187] Neither he nor the Putnam Defendants have provided evidence to show that the addresses Mr. Wood claims belong to Mr. Ramirez [Rico] sent Bitcoin together in a single transaction, which would be required for a clustering analysis. Therefore, Defendants have not demonstrated that Dr. Griffin erred in applying clustering.

---

[182] SEC Reply 13–16.

[183] Wood Report 24. The Putnam Defendants echo this concern in their supplemental briefing. *See* ECF No. 163 at 3–4.

[184] Griffin Report 54, Table 7.

[185] ECF No. 166 at 5 (citing Griffin Report App'x D, ¶¶ 1, 17).

[186] Wood Report 25.

[187] Mr. Wood cites to Schedule 7, *see* Wood Report 25 n.42, which is a spreadsheet that lists line items with references to other documents but does not itself include any supporting documents.

Finally, Defendants repeatedly argue that Dr. Griffin improperly failed to consider evidence when it did not have a blockchain address, which led to errors in his report.[188] Specifically, the Putnam Defendants, relying on Mr. Wood's analysis, suggest that because Dr. Griffin excluded evidence from his analysis when it did not have a blockchain address, Dr. Griffin failed to examine two records, which would have allowed Dr. Griffin to account for $1.7 million in identified investor funds.[189] The SEC replies that because those funds were classified as Other Deposits, the Total Raised does not ultimately change.[190] The SEC is correct. Further, Dr. Griffin properly restricted his review to transactions on the blockchain, as inclusion of other sources of financial data would be of limited use in this case given that the wrongdoing was a fraudulent cryptocurrency scheme.[191] As such, it was likewise not unreasonable for Dr. Griffin to base his analysis only on evidence that contained a blockchain address.[192] At the very least, the SEC's approximation of Defendants' ill-gotten gains is not an unreasonable one simply because it is premised on an expert report that is restricted to a review of transactions on the blockchain. Defendants could have sought to prove deductions through evidence that Dr. Griffin excluded from his analysis, and they have not persuasively done so.

Fifth, both sets of Defendants argue that Dr. Griffin erroneously tallied funds that were provided to the Putnam Defendants through various other business associates.[193] In his report, Dr. Griffin included within the Other Deposits category deposits coming from "associates of

---

[188] Putnam Defs.' Resp. 25, 26–27.
[189] *Id.* at 26–27; Wood Report 22–23.
[190] SEC Reply 16.
[191] *Cf.* Griffin Decl. ¶ 9.
[192] *Cf.* Griffin Decl. ¶ 8; Griffin Report 50.
[193] Putnam Defs.' Resp. 18, 21; Ramirez Rico Resp. 5.

Defendants for which it cannot be ruled out as indirectly coming from other investors."[194] These were transactions coming from people "that seem to be associated with the defendant in terms of [handling funds]."[195] With respect to ultimately attributing these deposits to the scheme, as discussed above with respect to the Other Deposits category generally, the court finds that this assumption was proper and was necessitated by Defendants' own poor recordkeeping. However, when withdrawals were given to these associates, Dr. Griffin did not include them within the Investor Payouts category,[196] but instead, apparently treated them as Recycled Funds. The SEC argues that this approach was likewise reasonable, given that there is no evidence of what the withdrawals were for.[197] The court agrees. Based on the record here, it was reasonable for SEC to treat deposits as tainted funds absent contrary evidence, just as it was reasonable to treat withdrawals as tainted until they arrived at an identified investor. That the SEC took the same approach with Defendants' associates does not change the analysis. Defendants are in the best position to provide evidence of what the deposits were for—if not the schemes—just as they are in the best position to provide evidence of what the withdrawals were for. And Defendants have made only cursory arguments on this point;[198] they have not provided sufficient evidence to the court demonstrating that Dr. Griffin erred.

In sum, the court finds that the SEC has reasonably approximated Defendants' ill-gotten gains. Defendants have not presented sufficient evidence or argument showing otherwise.

---

[194] Griffin Expert Report ¶ 24 n.34.
[195] Griffin Dep. 94:25–95:7.
[196] *Id.* at 96:15–97:24.
[197] SEC Reply 11–12; Griffin Decl. ¶¶ 17–19, 26.
[198] *Cf.* Putnam Defs.' Resp. 18, 21; Ramirez Rico Resp. 5; *see also* Wood Expert Report 39.

### C. Victim Identities

Mr. Ramirez Rico argues that disgorgement is improper because the SEC has not identified to whom the disgorgement it seeks to collect would be distributed.[199] In other words, SEC does not identify each defrauded investor and the amount each lost.

In *Liu*, the Supreme Court observed that because the securities laws require that equitable relief be "appropriate or necessary for the benefit of investors," disgorgement "must do more than simply benefit the public at large by depriving a wrongdoer of ill-gotten gains."[200] Thus, the SEC must "return a defendant's gains to wronged investors for their benefit."[201]

Mr. Ramirez Rico cites to *SEC v. Govil*[202] to advance his argument that disgorgement is inappropriate here. In *Govil*, the Second Circuit observed that "[t]he Supreme Court's opinion in *Liu* did not explain straightforwardly what a 'victim' was for the purpose of awarding 'equitable relief'" and that the term must be limited to individuals who had suffered pecuniary harm, otherwise those who had not suffered pecuniary harm could receive a windfall.[203] Thus, the Second Circuit held disgorgement was inappropriate when the only injuries at issue were the defendant's lies—no investors suffered pecuniary harm because the defendant had already returned much of his ill-gotten gains.[204]

The SEC suggests that *Govil* is incorrect because *Liu* held that "disgorgement prevents 'unjust enrichment' and restores the violator to the 'status quo' by taking 'money out of the

---

[199] Ramirez Rico Resp. 12–15.
[200] *Liu*, 591 U.S. at 89.
[201] *Id.* at 88.
[202] 86 F.4th 89 (2d Cir. 2023).
[203] *Id.* at 102–03.
[204] *Id.* at 105, 106; *see id.* at 94–97.

wrongdoer's hands.'"[205] That argument is foreclosed by *Liu* itself. As *Liu* stressed, "depriving a wrongdoer of ill-gotten gains" alone is insufficient, as it would "simply benefit the public at large."[206] Rather, *Liu* clearly held that disgorgement must run to the benefit of victims, at least when they can be identified and where it is feasible to do so.[207]

Whatever its merits, *Govil* is factually inapposite. There, the defendant had already agreed to return the misappropriated funds, and thus, there was no pecuniary harm to identified investors.[208] Here, Mr. Ramirez Rico argues the SEC has not proved that the amount identified by Mr. Griffin as "Other Deposits" includes funds from identified investors who were wronged by the conduct alleged in the Complaint.[209] In other words, Mr. Ramirez Rico apparently suggests that because the SEC has not yet identified to whom the funds identified as "Other Deposits" belong, there are no individuals to whom the court can order the funds returned.[210] *Govil* has nothing to say on this front. And nothing in the statute or in *Liu* suggests that before ordering disgorgement, the SEC must prove the identity of, and amount owed to each and every wronged investor. Rather, *Liu* suggests that a constructive trust is an appropriate equitable remedy,[211] which would not require *ex ante* proof of victims' identities.

Therefore, the court concludes that the SEC need not prove the identities of wronged investors before the court orders disgorgement. The SEC, of course, must prove that individuals invested in Defendants' offering. The allegations of the Complaint, accepted as true, suffice to

---

[205] SEC Reply 18 (quoting *Liu*, 591 U.S. at 80).
[206] *Liu*, 591 U.S. at 89.
[207] *Id.* at 89–90.
[208] *Govil*, 86 F.4th at 95–96.
[209] Ramirez Rico Resp. 12–15.
[210] *Id.* at 12.
[211] *Liu*, 591 U.S. at 82.

establish that element here. Nothing further is required at this stage. The court stresses, however, that funds may not merely be deposited in the Treasury. *Liu* disapproved an approach under which the SEC did "not always return the entirety of disgorgement proceeds to investors" and instead deposited "a portion of its collections in a fund in the Treasury," though it left open whether it was consistent with equitable principles for the SEC to deposit disgorgement funds with the Treasury "where it is infeasible to distribute the collected funds to investors."[212]

### D.    Legitimate Business Expenses

Both Mr. Ramirez Rico and the Putnam Defendants argue that the SEC failed to deduct legitimate business expenses from its disgorgement calculation.[213] As noted above, the Supreme Court has held that "courts must deduct legitimate expenses before ordering disgorgement."[214] Expenses are "legitimate" if they are not associated with the defendants' commission of illegal acts.[215] Defendants have the burden in proving the claimed expenses.[216]

Mr. Ramirez Rico argues that $272,844 should be deducted as legitimate business expenses.[217] After initially providing no support for this figure,[218] in his supplemental briefing Mr. Ramirez Rico points to a set of documents that supposedly "contained support for the

---

[212] *Id.* at 87–90.

[213] Ramirez Rico Resp. 15; Putnam Defs.' Resp. 23–24.

[214] *Liu*, 591 U.S. at 91–92. The Supreme Court has recognized an exception under which the court may order disgorgement of a defendant's gross profits when the "'entire profit of a business or undertaking' results from the wrongdoing." *Id.* at 92. However, the SEC does not apparently seek to invoke this exception.

[215] *FTC v. Washington Data Resources, Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013) (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011)); *accord U.S. CFTC v. Tayeh*, 848 Fed.Appx. 827, 829 (11th Cir. 2021).

[216] *RaPower-3, LLC*, 960 F.3d at 1251; *accord Tayeh*, 848 Fed.Appx. at 829–30.

[217] Ramirez Rico Resp. 15; ECF No. 162 at 2–3.

[218] Mr. Ramirez Rico wrote: "[Dr.] Griffin was provided with $272,844 in legitimate business expenses from [Mr.] Ramirez Rico that should be deducted from the disgorgement amount. See section I(1) *supra*." Ramirez Rico Resp. 15. But that section of Mr. Ramirez Rico's brief did not mention that figure or what the legitimate business expenses provided to Dr. Griffin might be. *See id.* at 5. That is not sufficient.

$272,844 in legitimate business expenses from Mr. Ramirez Rico that should be deducted from the disgorgement amount."[219] Notably, none of these documents were cited to or relied upon in either Mr. Ramirez Rico's initial brief or Mr. Sheridan's expert report.[220] Additionally, the belated evidence suffers from a number of defects and fails to establish legitimate business expenses. Each of the documents either fails to show a payment of funds—as opposed to a general invoice received—provides no indication that it is for a legitimate business expense, or fails to show that the payment was made by one of the businesses at issue.[221] In any event, additional testimony would not be sufficient to cure these deficiencies. No deduction for these amounts is supported.

The Putnam Defendants argue that Dr. Griffin improperly included "$757,918 in mining and trading expenses,"[222] "$1,141,957 in mining and trading disbursements,"[223] $856,196 in "sub-categories of mining and trading costs,"[224] and $156,291 in business operating expenses.[225] The SEC argues that there is insufficient evidence tying those amounts to Defendants' business and that reasonable experts could disagree about whether such expenses were in fact business related.[226]

---

[219] ECF No. 162 at 2. Specifically, Mr. Ramirez Rico refers to Bates Ramirezprod-00049 to 00067. *Id.*
[220] *See* ECF No. 139, 139-3.
[221] *See generally* Ramirezprod-00049 to 00067. Mr. Ramirez Rico also seeks an evidentiary hearing. Fact discovery closed in January 2023 and expert discovery closed in June 2023. *See* ECF Nos. 93 and 114. This untimely request is entirely unsupported.
[222] Putnam Defs.' Resp. 24; *see* Wood Report 17–20, 39, Sch. 4a. This figure was not included in the Putnam Defendants' supplemental report. *See* ECF No. 163.
[223] ECF No. 163 at 2; Putnam Defs.' Resp. 19–20; *see* Wood Report Supplemental Addendum.
[224] ECF No. 163 at 2; Putnam Defs.' Resp. 19; *see* Wood Report Supplemental Addendum.
[225] Putnam Defs.' Resp. 19; ECF No. 163 at 2; *see* Wood Report Supplemental Addendum.
[226] SEC Reply 10–11; ECF No. 166 at 2; Griffin Decl. ¶¶ 17-27.

Regarding the $757,918, Mr. Wood contends that while Dr. Griffin includes mining pool returns in his analysis, he neglects to include costs associated with those mining pools.[227] Mr. Wood then points to a series of emails from Bitcoin sent to Mr. Putnam referencing activation of a mining pool.[228] These emails simply read "[w]e received your payment and activated your contract."[229] They do not reference the cryptocurrency address tied to the now-activated mining pool, nor do they mention how much was paid. Mr. Wood asserts that transactional data for the CoinPayments (MMT) Collection Point shows transactions referencing "Cloud Mining"[230] and states that these transactions total $37,217 between August 15, 2017 and September 2, 2017.[231] However, Mr. Wood cites only to a document that does not contain transactional data.[232] And, without providing any evidence to support his claims, Mr. Wood later includes a $731,396 deduction for the mining and trading expenses associated with the CoinPayments (MMT) Collection Point, and a $26,522 deduction for mining and tracing expenses associated with the Coinbase (Putnam) collection point.[233] The Putnam Defendants point to no evidence, other than Mr. Wood's unsupported assertion, that either Collection Point had trading and mining expenses associated with them in the amounts at issue.[234]

Next, as support for deduction of $1,141,957 and $856,196 in mining and trading disbursements and costs, the Putnam Defendants first cite to tables in the Wood Report and its

---

[227] Wood Report 17.
[228] *Id.* at 18; *see also* Bitcoin Activation Emails, ECF No. 140-16.
[229] *E.g.*, Bitcoin Activation Emails.
[230] Wood Report 19.
[231] *Id.*
[232] *See* Putnam Defs.' Exhibit 18, ECF No. 140-17. This is contrasted with Putnam Defs.' Exhibit 19, ECF No. 140-18, which does contain transactional data.
[233] *Id.*, Sch. 4a.
[234] *Cf.* Wood Report, Sch. 4a.

Addendum.[235] Yet neither of these tables contain citations to record evidence that would allow the court to credit them.[236] The Putnam Defendants state that "Mr. Wood reviewed thousands of transactions and thousands of pages of documents to properly categorize these amounts as business expenses" and "including every supporting document within the Wood Report is impractical." [237] Instead, they cite broadly to the Wood Report's Appendix B—a list of documents "Received and Relied On" by Mr. Wood—and Schedule 7, which is a spreadsheet that lists "line items with references to supporting documents and categorizations for each transaction."[238] But nowhere do the Putnam Defendants point the court to specific record evidence to support the amount of these alleged legitimate business expenses.[239]

Further, neither Mr. Wood nor the Putnam Defendants make any effort to describe what these mining and trading expenses were for or why the court should determine that they are legitimate business expenses. Mr. Wood simply asserts that "[t]ransactions such as these would be what are, in my opinion, 'legitimate business expenses' for a disgorgement analysis."[240] Without more, like substantiating documentation to prove the amounts of these payments, their purpose, and their link to legitimate business activities, the court cannot find that Mr. Wood's opinion is reliable. Therefore, Mr. Wood failed to "show his work" and demonstrate a reliable application of reliable methods and data. No deduction for mining and trading expenses is appropriate.

---

[235] ECF No. 163 at 2.
[236] *See* Wood Report 33, 41; Wood Report Supp. Addendum.
[237] ECF No. 163 at 2.
[238] *Id.*
[239] To the extent that Schedule 7 lists a "source" for a business expense, the court has not been provided with the source.
[240] Wood Report 19.

Lastly, Mr. Wood suggests another $156,291 should be classified as legitimate business expenses.[241] Mr. Wood bases this conclusion on the premise that such monies were paid to a number of different people or entities either ultimately for investor payouts or for expenses such as office space or translation.[242] But as Dr. Griffin points out, there is no record of what a number of these transactions were for, and it is improper to simply assume that they were legitimate business expenses.[243] In addition, Dr. Griffin challenges whether something like a housing rental would be a legitimate business expense for the Putnam Defendants.[244]

The court agrees with Dr. Griffin. Mr. Wood does not provide supporting documentation detailing with particularity what the transactions totaling $156,291 were for, nor does he attempt to explain how those transactions were for legitimate business expenses. He simply provides a table:

### 5.3.4. Table 18 – Summary of Payments of Business Operating Expenses

| Business Operating Expenses | |
| --- | --- |
| **Payee** | **Withdrawal (USD)** |
| Dager Contreras (Developer) | ($19,028) |
| Golden Tree Realty (Office Space Rental) | ($4,927) |
| Harry Singh | ($17,734) |
| Kwame Warner | ($63,102) |
| Kwame Warner (MU) | ($9,992) |
| Net Global USA (Translation) | ($999) |
| Vladimir Canro | ($40,509) |
| **Total Disbursements** | **($156,291)** |

---

[241] *Id.* 39, Table 18; *id.* Sch. 4a.
[242] Wood Report 38–39.
[243] Griffin Decl. ¶¶ 18–20, 24–25.
[244] *Id.* ¶ 21.

That is not sufficient. For example, while hiring the services of a developer or translator could plausibly be legitimate business expenses, there is nothing before the court that would make that likely. In contrast, a payment of $4,927 for office space rental is presumptively a legitimate business expense. Yet, the Putnam Defendants cite to no record evidence to show they incurred this expense. Schedule 7 of the Wood Report states that the source of this evidence is "13s6 (folder)."[245] But the court has not been provided with this source evidence to determine whether the document(s) show evidence of this rent payment by a pertinent business. Therefore, the court concludes that the deductions should not be made.

In sum, the court finds that the SEC has provided a reasonable approximation of Defendant's ill-gotten gains, and Defendants have not demonstrated that SEC's estimate is unreasonable, nor have they sufficiently supported any deductions. Accordingly, the court grants disgorgement in the amount of $1,963,432 from Mr. Putnam, MMT, and R&D Global jointly and severally; $4,622,011 from Mr. Ramirez Rico individually, and $1,248,258 from Mr. Putnam and Mr. Ramirez Rico jointly and severally.

## III.  Prejudgment Interest

Following *Liu*, courts have found that an award of prejudgment interest falls within the type of traditional equitable relief contemplated by Section 78u(d)(5).[246] The SEC seeks prejudgment interest of $336,593 for Mr. Putnam, MMT, and R&D jointly and severally; $792,357 for Mr. Ramirez Rico; and $213,990 for Mr. Putnam and Mr. Ramirez Rico jointly and severally.[247] In their consent judgments, Defendants agreed to pay prejudgment interest on any

---

[245] ECF No. 163-2 at 94 of 317.
[246] *See, e.g.*, *SEC v. Ahmed*, 72 F.4th 379, 403–04 (2d Cir. 2023); *see also SEC v. Hallam*, 42 F.4th 316, 341 (5th Cir. 2022) (holding SEC may get interest on legal, as opposed to equitable, disgorgement).
[247] SEC's Mot. 12; *see also* ECF No. 166-1 (detailing method for calculations).

disgorgement award, "calculated from February 6, 2020, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."[248] The rate specified by Section 6621(a)(2) is "the Federal short-term rate determined under [26 U.S.C. § 6621(b)(3)]" plus "3 percentage points."[249] SEC regulations dictate that this rate is to be compounded quarterly.[250]

The court therefore concludes that the SEC's requested prejudgment interest in the amount of $1,342,940 is proper.

## IV.    Civil Penalties

The securities laws provide for three tiers of civil penalties for their violation, which impose greater amounts depending on the scienter of the defendant and the harm to other persons.[251] The purpose of the civil penalty provisions is both to punish violators and deter future violations from the defendants and from others.[252] The SEC seeks third tier penalties for Defendants totaling $1,960,000 against Mr. Putnam, $4,620,000 against Mr. Ramirez Rico, and $1,116,140 against both MMT and R&D Global.[253]

### A.    Third-Tier Penalties

A third-tier penalty requires a violation of the securities laws that (1) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and

---

[248] *E.g.*, Consent of Def. Daniel F. Putnam ¶ 3.
[249] 26 U.S.C. § 6621(a)(2).
[250] 17 C.F.R. § 201.600(b).
[251] 15 U.S.C. § 78u(d)(3); *id.* § 77t(d).
[252] *SEC v. Mine Shaft Brewing LLC*, 2023 WL 6541552, *14 (D. Utah Oct. 6, 2023); *SEC v. Merrill Scott & Assocs., Ltd.*, 2006 WL 3422106, *6 (D. Utah Nov. 28, 2006).
[253] *See* SEC's Mot. 12–15.

(2) that "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[254]

Neither Mr. Ramirez Rico nor the Putnam Defendants argue that a third-tier penalty is improper in this case. The court finds that both elements are satisfied. First, the Complaint alleges two separate investment opportunities that involved fraud, deceit, or misrepresentation.[255] It details a number of misrepresentations on the part of Mr. Putnam related to investor funds not being pooled, the trading packages being SEC compliant, investors' ability to turn trading on and off, and purchase of mining machines,[256] and it suggests that Mr. Putnam and Mr. Ramirez Rico at least recklessly engaged in a Ponzi scheme.[257] Second, the Complaint alleges that investors suffered substantial losses from two schemes.[258] As noted earlier, the parties have agreed that, for purposes of this motion, the Complaint's allegations are true. Therefore, the court concludes that it may impose third-tier penalties up to the statutory maximum. Adjusted for inflation, a third-tier penalty "shall not exceed the greater of" $230,464 for an individual, $1,152,314 for an entity, or the "gross amount of pecuniary gain to such defendant as a result of the violation."[259]

---

[254] 15 U.S.C. § 77t(d)(2)(C); *id.* § 78u(d)(3)(A)(iii).

[255] *See* Compl. ¶¶ 1, 18–70.

[256] *Id.* ¶¶ 3, 77–87.

[257] *Id.* ¶¶ 88–95.

[258] *See* Compl. ¶¶ 2, 25–27, 49, 61–62.

[259] *See* 15 U.S.C. § 77t(d)(2)(C); *id.* § 78u(d)(3)(A)(iii); 17 C.F.R. § 201.1001; *Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission*, U.S. Securities and Exchange Commission (Jan. 15, 2024), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments [https://perma.cc/MN7V-QEYN]. "The adjusted penalty amounts will apply to all penalties imposed after the effective date of the adjustment." 17 C.F.R. § 201.1001(b).

### B.       Amount of Penalty

Having found that third-tier penalties establish the maximum penalties the court may

impose, the court turns next to an evaluation of precisely what penalties it will impose. Courts

consider the following factors in assessing the appropriate penalty:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the
> repeated nature of the violations, (4) defendants' failure to admit to their
> wrongdoing; (5) whether defendants' conduct created substantial losses or the risk
> of substantial losses to other persons; (6) defendants' lack of cooperation and
> honesty with authorities, if any; and (7) whether the penalty that would otherwise
> be appropriate should be reduced due to defendants' demonstrated current and
> future financial condition.[260]

Here, SEC seeks the maximum third-tier penalties for all Defendants. Defendants make no

challenge to the majority of the factors and instead make only two arguments. First, Defendants

argue that they did not act with a culpable mental state that warrants high penalties; and second,

they argue that their signing of consent judgments should be taken into consideration.[261] The

court addresses the arguments raised by Defendants, and then proceeds to a cumulative analysis

of the factors.

### 1.     Scienter

Defendants argue that they did not act with particularly culpable scienter and therefore,

that they should receive a reduced penalty.[262]

The Putnam Defendants argue that the Complaint shows scienter on the part of Mr.

Ramirez Rico, but does not show that they acted with the intent to deceive, manipulate, or

defraud.[263] For starters, to the extent that Putnam Defendants suggest that only a mental state of

---

[260] *GenAudio*, 32 F.4th at 954.
[261] Ramirez Rico Resp. 15–16; Putnam Defs.' Resp. 31–34.
[262] Ramirez Rico Resp. 15–16; Putnam Defs.' Resp. 32–33.
[263] Putnam Defs.' Resp. 32–33.

intent warrants a high penalty,[264] they are incorrect. The case they rely upon discusses the

scienter element for purposes of a Rule 10b-5 claim; it has nothing to say about the scienter

factor the court is tasked with evaluating for purposes of penalties under the securities laws.[265]

And in any event, contrary to Defendants' suggestion, a mental state of recklessness is sufficient

for liability under Rule 10b-5.[266] Thus, the scienter factor is more properly understood as "the

degree of scienter" evidenced by defendants,[267] with more culpable mental states supporting

higher penalties.

And here, the Complaint contains sufficient allegations of Mr. Putnam's scienter for the

court to find that this factor weighs in favor of a heightened penalty. First, the Complaint details

a number of misrepresentations on the part of Mr. Putnam.[268] Mr. Putnam likely knew, or at least

recklessly disregarded the accuracy of his representations that the trading packages were SEC

compliant, that investors could turn trading on and off, and that all investor funds would be used

to purchase mining machines were not true. Next, the Complaint details a series of messages

between Mr. Putnam and Mr. Rodriguez that suggest that at least by sometime between February

and July 2019, Mr. Putnam was aware that Mr. Ramirez Rico was running a Ponzi scheme.[269]

And yet the Complaint alleges that the Putnam Defendants continued to operate the scheme

involving Mr. Ramirez Rico until at least late 2019 or early 2020.[270] In other words, even giving

---

[264] *Id.* at 32 ("It is well recognized that 'the appropriate level of scienter in securities fraud cases is "a mental state embracing intent to deceive, manipulate, or defraud."'" (quoting *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1259 (10th Cir. 2001))).

[265] *Cf. Fleming Cos.*, 264 F.3d at 1257–58.

[266] *Id.*

[267] The line of cases cited by the Tenth Circuit in *GenAudio* make this point clear. *See, e.g.*, *SEC v. Lybrand*, 281 F.Supp.2d 726, 730 (S.D.N.Y. 2003) (citing *SEC v. Coates*, 137 F.Supp.2d 413, 429 (S.D.N.Y. 2001)).

[268] Compl. ¶¶ 77–87.

[269] Compl. ¶¶ 89–92.

[270] *Id.* ¶¶ 18, 32, 49, 78.

the Putnam Defendants the benefit of the doubt on this argument, the allegations of the Complaint establish that they knew of Mr. Ramirez Rico's wrongdoing and continued to partner with him. Indeed, Mr. Putnam appeared to have no qualms with the scheme, stating: "We are going to bring Jean Paul [Ramirez Rico] so much money this year . . . We are either going to retire this year or go to jail."[271] At the very least, this comment suggests that Mr. Putnam was reckless. Additional messages between Mr. Putnam and Mr. Rodriguez suggest that Mr. Putnam was aware that he might have to flee the country and that he knew Mr. Ramirez Rico was making Ponzi-like payments.[272] And in any event, the Complaint alleges a separate scheme by Mr. Putnam and MMT that did not include Mr. Ramirez Rico, from which at least recklessness can be inferred, and also alleges a number of intentional misrepresentations on the part of Mr. Putnam.[273] Once again, the court notes that the parties have agreed that the fact allegations in the Complaint are to be treated as true for purposes of these issues.

Turning to Mr. Ramirez Rico, Mr. Ramirez Rico argues that he did not act with scienter and did not make any misrepresentations to investors.[274] The Complaint contains sufficient allegations for the court to infer that Mr. Ramirez Rico acted with intent. Namely, Mr. Rodriguez messaged Mr. Putnam, and stated "'I talked to [Mr. Ramirez Rico] and he told me he was going to have [the payments] today but he needs to be careful because he is going to be paying from principal' and thus would not 'have anything to trade later.'"[275] In other words, Mr. Ramirez

---

[271] *Id.* ¶ 89.
[272] *Id.* ¶¶ 90–92.
[273] *See id.* ¶¶ 19–33, 77–87, 95, 104, 108.
[274] Ramirez Rico Resp. 15–16.
[275] Compl. ¶ 92 (second alteration in original).

Rico appears to have been aware that he was running a Ponzi-like scheme. It is immaterial that Mr. Ramirez Rico himself did not make misrepresentations to investors.

Therefore, the court finds that Mr. Putnam, the entities he controlled,[276] and Mr. Ramirez Rico each acted with a mental state that warrants a high penalty.

### 2.  Cooperation with the SEC

Defendants argue that because they have cooperated with the SEC by entering consent judgments, their penalties should be reduced.[277] In reply to the Putnam Defendants, the SEC argues that the delay in entering into a consent judgment should be considered, and that nonetheless, any cooperation does not counteract the wrongful conduct.[278]

For starters, Mr. Ramirez Rico devotes a single sentence to suggesting that because he entered into a consent judgment, the penalty should be reduced.[279] And while the Putnam Defendants develop their argument more fully, it is nonetheless unpersuasive. In this case, the only evidence of cooperation is that Defendants entered into consent judgments over 30 months after the SEC filed its Complaint. This does not suggest to the court that Defendants have shown significant "cooperation and honesty with authorities." Even in cases where a defendant's cooperation has been more significant than by simply signing a consent decree, courts have not reduced the penalty.[280]

---

[276] *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (holding, for purposes of Rule 10b-5, that the mental state of an entities officers could be imputed to the entity itself).

[277] Ramirez Rico Resp. 15; Putnam Defs.' Resp. 33–34. Additionally, Putnam Defendants note that "Mr. Putnam cooperated with the SEC from the minute he received a subpoena from the SEC in this matter." *Id.* at 33. As this argument is made without citation or elaboration, the court does not address it.

[278] SEC Reply 22–23.

[279] Ramirez Rico Resp. 15.

[280] *See, e.g.*, *SEC v. Merrill Scott & Assocs., Ltd.*, 2006 WL 3422106, at *4, 6 (D. Utah Nov. 28, 2006).

Thus, to the extent that the signing of a consent judgment shows *some* cooperation with the SEC, the court does not find that this factor carries much weight in its ultimate analysis.

### 3.   Totality of the Factors

The court finds that the totality of the factors weighs in favor of a substantial penalty. First, the violations at issue are egregious. Not only are they clean-cut violations of both the anti-fraud provisions and the registration requirements of the securities laws, but they also involve substantial cumulative damage to investors. Second, even if the Complaint lacked sufficient facts for the court to infer that Defendants acted intentionally, it at a minimum shows extreme recklessness, as discussed above. Third, these were not isolated violations; they occurred over two years and involved thousands of investors. Fourth, while Defendants have entered consent judgments, they have not admitted wrongdoing.[281] Fifth, the violations at issue involve substantial loss and substantial risk of loss by investors, since Defendants "raised at least $12 million from over two thousand investors."[282] Sixth, as discussed above, the court finds that the limited cooperation evidence by the signing of consent judgments does not carry much weight. And seventh, the court has minimal information about Defendants' current or future financial conditions because Defendants have only supplied some declaration-based asset information with varying levels of detail from 2020.[283] Additionally, Defendants have not advanced any arguments as to why a deduction on this basis would be appropriate.

A comparison to other cases is useful. In *GenAudio*, the Tenth Circuit affirmed a penalty representing the full amount of defendant's pecuniary gain when all save the final factor weighed

---

[281] *See, e.g.*, Consent of Def. Daniel F. Putnam ¶ 2 (admitting the allegations of the complaint for only limited purposes).
[282] Compl. ¶ 2.
[283] *Cf.* SEC's Mot. 15; Putnam Defs.' Resp. at 5 (citing ECF Nos. 25–27, 32, 41–43).

in favor of the SEC.[284] There, the defendant repeatedly knowingly misrepresented his business'

relationship with Apple in order to obtain investments.[285] The district court stressed that the

defendant repeatedly lied, was unwilling to admit his fault, and the misrepresentations at issue

had a high likelihood of causing harm to investors.[286] "Courts frequently authorize civil penalties

equal to the amount of disgorgement."[287] However, even where the majority of the factors weigh

in favor of the SEC, courts occasionally decline to impose the full statutory maximum.[288]

Here, the balance of these factors points to a hefty penalty. The only factors that favor a

lower penalty are the second and the sixth. And the court does not find that either carries much

weight when weighed against the first, third, and fifth factors. The court finds that 75% of their

ill-gotten gains is an appropriate penalty for Mr. Putnam and Mr. Ramirez Rico. The appropriate

penalty as to the entity Defendants is considered separately.

### C.    Separate Penalty for Entity Defendants

The Putnam Defendants argue that imposition of the maximum statutory penalty against

R&D and MMT in addition to a penalty against Mr. Putnam "would essentially amount to the

imposition of triple maximum penalties against Mr. Putnam."[289] In *GenAudio*, the Tenth Circuit

---

[284] *GenAudio*, 32 F.4th at 919, 954–55.

[285] *Id.* at 917–19, 954–55.

[286] *Id.* at 954–55.

[287] *SEC v. BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *6 (E.D. Cal. May 4, 2017) (collecting cases); *see SEC v. Mine Shaft Brewing LLC*, 2023 WL 6541552, at *15 (D. Utah Oct. 6, 2023).

[288] *See, e.g.*, *U.S. SEC v. Harkins*, 2022 WL 3597453, at *15–18 (D. Colo. Aug. 23, 2022) (holding that while the first six factors supported a high penalty, a penalty up to the statutory maximum would "no better punish defendants' wrongdoing or deter future violations of the securities laws than would a lesser penalty, especially given the substantial disgorgement that the Court has already ordered. Accordingly, the Court will impose a civil penalty equal to one-half each defendant's disgorgement amount[.]"); *U.S. SEC v. Garcia*, 2023 WL 3976235, at *2–3 (D. Colo. May 10, 2023) (holding that while the majority of factors "support a heightened penalty," that the defendant had returned a "significant amount of money to almost all the investors" warranted reducing the penalty from the statutory maximum to the amount of ill-gotten gains, which was lower); *SEC v. Lybrand*, 281 F.Supp.2d 726, 730–32 (S.D.N.Y. 2003).

[289] Putnam Defs.' Resp. 31.

approved of civil penalties on both a CEO and the entity he controlled equivalent to the amount of their pecuniary gain.[290] As such, it is not *per se* unreasonable for the court to order penalties against Mr. Putnam and the entities he controls. But here, the SEC seeks to impose a penalty on Mr. Putnam equal to his pecuniary gain and the statutory maximum penalty on the entities he controls untethered from pecuniary gain. For purposes of disgorgement, the SEC treats Mr. Putnam and his entities as essentially identical. Under these circumstances, the court does not find imposition of the statutory maximum penalty on MMT and R&D to be equitable. But, as the SEC pointed out at oral argument,[291] these entities did admit to a violation of the securities laws and as such, some penalty is appropriate. Accordingly, the court finds that 25% of the statutory maximum—$288,078 each—is appropriate to punish them for their admitted wrongdoing.

### ORDER

For the forgoing reasons, the court GRANTS the SEC's Motion. The court ORDERS that:

a. Mr. Putnam, MMT, and R&D disgorge $1,963,432 plus prejudgment interest of $336,593 for a total of $2,300,025, jointly and severally;

b. Mr. Ramirez Rico disgorge $4,622,011 plus prejudgment interest of $792,357 for a total of $5,414,368;

c. Mr. Putnam and Mr. Ramirez Rico disgorge $1,248,258 plus $213,990 for a total of $1,462,248, jointly and severally;

d. Mr. Putnam pay a civil penalty of $1,960,000;

---

[290] *GenAudio*, 32 F.4th at 919, 954–56.
[291] Hearing Tr. 38:13–17, ECF No. 159.

e.   Mr. Ramirez Rico pay a civil penalty of $4,620,000;

f.   MMT pay a civil penalty of $288,078; and

g.   R&D pay a civil penalty of $288,078.


Signed September 10, 2024.

BY THE COURT

David Barlow
United States District Judge